UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH QUINTERO, DAVID GUIRGIS, MARY THOMAS, REMA KHACHO, RAYMOND CHAO, and LAUREN KRAMER individually and on behalf of others similarly situated,<br><br>                                    Plaintiffs,<br><br>         - against -<br><br>TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,<br><br>                                    Defendant. | **Case No. 1:25-cv-5541**<br><br>**Judge:  Hon. P. Kevin Castel**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Joseph Quintero, David Guirgis, Mary Thomas, Rema Khacho, Raymond Chao, and Laura Kramer ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendant Trustees of Columbia University in the City of New York ("Columbia University" or "Defendant"), and allege as follows:

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the proposed Class who are diverse from Defendant, including some Plaintiffs, and (4) there are more than 100 proposed Class Members.

2.      This Court has personal jurisdiction over Defendant because Defendant maintains a principal place of business in this District and because Defendant conducts substantial business in this District.

1

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident and citizen of this District.

## PARTIES

4.      Plaintiff Joseph Quintero is a resident and citizen of Queens, New York, where he intends to remain.

5.      Plaintiff David Guirgis is a resident and citizen of Jersey City, New Jersey, where he intends to remain.

6.      Plaintiff Mary Thomas is a resident and citizen of Memphis, Tennessee, where she intends to remain.

7.      Plaintiff Rema Khacho is a resident and citizen of New York, New York, where she intends to remain.

8.      Plaintiff Raymond Chao is a resident and citizen of Brooklyn, New York, where he intends to remain.

9.      Plaintiff Lauren Kramer is a resident and citizen of Decatur, Georgia, where she intends to remain.

10.     Defendant Trustees of Columbia University in the City of New York is a not-for-profit, private educational institution with its principal place of business at 211 Low Library, MC 4324, 535 West 116th Street, New York, NY 10027.

## FACTUAL ALLEGATIONS

**Defendant's Operations**

11.     Defendant is a nationally recognized higher education institution, holding itself out as "one of the world's most important centers of research and at the same time a distinctive and distinguished learning environment for undergraduates and graduate students in many scholarly and professional fields. The University recognizes the importance of its location in New York City

2

and seeks to link its research and teaching to the vast resources of a great metropolis. It seeks to attract a diverse and international faculty, staff, and student body, to support research and teaching on global issues, and to create academic relationships with many countries and regions. It expects all areas of the University to advance knowledge and learning at the highest level and to convey the products of its efforts to the world."[1]

12.     In connection with its operations, Defendant collects and stores from prospective students and employees highly sensitive Personally Identifiable Information ("PII").

13.     Defendant acknowledges the benefits it receives in collecting PII, stating in its "Information Security Charter" that "[s]uch information is an important resource of the University and any person who uses the information collected by the University has a responsibility to maintain and protect this resource."[2]

14.     Upon information and belief, Defendant promises to maintain the confidentiality of Plaintiffs' and Class Members' Private Information to ensure compliance with federal and state laws and regulations, and not to use or disclose Plaintiffs' and Class Members' Private Information for non-essential purposes.

15.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

16.     Defendant recognizes these duties, declaring in its "Information Security Charter" that:

---

[1] https://www.columbia.edu/content/about-columbia (last accessed July 3, 2025)
[2] *Information Security Charter*, COLUMBIA UNIVERSITY,
https://universitypolicies.columbia.edu/content/information-security-charter (last visited July 7, 2025).

a.      "Federal and state laws and regulations, as well as industry standards, also impose obligations on the University to protect the confidentiality, integrity and availability of information relating to faculty, staff, students, research subjects and patients;"

b.      "In addition, terms of certain contracts and University policy require appropriate safeguarding of information;" and

c.      "The mission of the Information Security Program is to protect the confidentiality, integrity and availability of University Data. Confidentiality means that information is only accessible to authorized users. Integrity means safeguarding the accuracy and completeness of University Data and processing methods."[3]

17.      Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs and Class Members would not have entrusted Defendant with their Private Information had they known that Defendant would fail to implement industry standard protections for that sensitive information.

18.      Plaintiffs and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

19.      Additionally, Defendant's policy fir "Handling Personally Identifying Information-PII" states:

a.      "Stolen PII is frequently used to commit identity theft and fraud, and should be guarded carefully. Hackers and malware will search a compromised computer for SSN's they can find;"

---

[3] *Id.*

4

b.      "As a matter of good practice, you should never keep any unprotected PII on your workstation. For Columbia employees and equipment, any PII should be protected with strong encryption or removed;"

c.      "The capture, storage and retention of confidential and sensitive information by CUIT employees is permissible only if it is a University business requirement and complies with Columbia University's Social Security Number Usage Policy, Data Classification Policy and University Requirements for Endpoints Containing Sensitive Data Policy."[4]

20.     Defendant further represents that it "maintains certain policies with regards to the use and security of its computer systems, networks and information resources [which] are meant to protect the University's computer systems, networks, data and other information resources."[5]

21.     While Defendant's website suggest it cares about data security – even publishing "User Guides to Safer Computing"[6] – Columbia University's own actions (or nonactions) demonstrate it failed to heed its own advice.

22.     To wit, on July 2, 2025, Defendant released a statement conceding that an unauthorized party stole data from its network.

23.     Plaintiffs and Class Members are individuals who have provided their PII to Defendant, for one reason or another.

24.     As a sophisticated organization with an acute interest in maintaining the confidentiality of the PII entrusted to it, Defendant is well-aware of the numerous data breaches that have occurred throughout the United States and their responsibility for safeguarding PII in their possession.

---

[4] *Handling Personally Identifying Information – PII*, COLUMBIA UNIVERSITY, https://www.cuit.columbia.edu/handling-pii (last visited July 7, 2025).
[5] https://www.cuit.columbia.edu/columbia-it-policies-strategies (last accessed July 3, 2025)
[6] https://www.cuit.columbia.edu/content/security-and-privacy (last accessed July 3, 2025)

**The Data Breach**

25.     According to an email sent to Plaintiffs Quintero, Guirgis, and Khacho by Columbia University, a data security incident (hereinafter the "Data Breach") occurred around June 24, 2025, leading Columbia University to conduct an investigation. The investigation revealed that "an unauthorized party with the apparent intent to disrupt [Defendant's] systems … stole data from Defendant's network."[7]

26.     While the Notice Email does not even hint at the type of information that may have been compromised, media reports have indicated that substantial PII was compromised in the Data Breach, including Social Security numbers.[8]

27.     The Notice Email did not indicate why Defendant was unable to prevent the Data Breach or which security feature failed.[9]

28.     The Notice Email did not state why Defendant did not notify Plaintiffs, among others, until July 2, 2025 at the earliest, when it had known of the Data Breach at least a week earlier.[10]

29.     Defendant failed to prevent the Data Breach because it did not adhere to commonly accepted security standards and failed to detect that its databases were subject to a security breach.

30.     The Data Breach resulted in widespread outages in Defendant's online platforms.[11]

---

[7] *See* Email sent to Plaintiffs Quintero, Guirgis, and Khacho from Columbia University dated July 2, 2025, attached hereto as Exhibit 1. ("Notice Email")
[8] https://www.columbiaspectator.com/news/2025/07/01/columbia-data-stolen-in-cyberattack-that-caused-dayslong-it-outage-university-says/ (last accessed July 3, 2025)
[9] *See supra* fn. 7.
[10] *Id.*
[11] *Columbia University hit in suspected cyberattack, systems down*, CYBERNEWS, https://cybernews.com/news/columbia-university-suspected-cyberattack-systemwide-outage/ (last visited June 29, 2024).





31.    The outage caused some of Columbia's key services to be offline and inaccessible to both students and professors for an extended period.[12] These included email services, the coursework/assignment platform, and "UNI" authentication service, which students use to log into university accounts.[13]

---

[12] *Id.*
[13] *Id.*

32.    Additionally, as a result of the Incident, Defendant urged professors to make alternative arrangements for class[14] and certain online classes were even canceled on June 24, 2025.[15]



33.    Defendant reported the incident to the FBI and stated that it is investigating alongside law enforcement, including the New York Police Department.[16]

34.    Concerningly, in a statement to Columbia's school newspaper, Defendant confirmed that it was "aware of online posts from a group claiming responsibility for this outage."[17] Though Defendant has since attempted to discredit these claims, experts still believe the outages were the result of a cyberattack.[18]

---

[14]  *Columbia University investigating cyber incident after tech outages*, THE RECORD, https://therecord.media/columbia-university-technology-outages (last visited June 29, 2025).

[15]  @columbiasps, Instagram (June 24, 2025) https://www.instagram.com/p/DLTAoPUMe0e/.

[16]  *Columbia, NYPD investigating hourslong University IT outage*, COLUMBIA SPECTATOR, https://www.columbiaspectator.com/news/2025/06/24/columbia-nypd-investigating-hourslong-university-it-outage/ (last visited June 29, 2025).

[17]  *Id.*

[18]  *Major Outage Brings Columbia University to a Standstill*, NEWSINTERPRETATION, https://newsinterpretation.com/columbia-university-hit-by-widespread-digital-outage/ (last visited June 29, 2025).

35.    Additionally, during the outages, Defendant's officials reported that several screens throughout campus began displaying images "unrelated to University activities," indicating that an unauthorized actor had gained access to these systems and posted the images.[19]

36.    Worryingly, this incident is only part and parcel of Defendant's pattern of negligent data security. In May 2024, The Cyber Express, a cybersecurity news site, reported that a cybercriminal group claimed credit for a cyberattack on Columbia.[20]

37.    Additionally, in 2007, Columbia exposed 2,600 Social Security numbers belonging to its undergraduate students and alumni.[21] As a result of this security breach, Defendant sent letters to affected students and alumni, encouraging them to monitor their credit to guard against identity theft.[22] These previous incidents further evidence Defendant's lack of adequate cybersecurity measures.

38.    Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative class can be ascertained from information in Defendant's custody and control. And upon information and belief, the putative class consists of thousands of members—as it includes its current and former students.

39.    Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data

---

[19] *Potential Cyberattack Scrambles Columbia University Computer Systems*, THE NEW YORK TIMES, https://www.nytimes.com/2025/06/25/nyregion/columbia-university-cyberattack.html (last visited June 29, 2025).

[20] *Hacktivists Claim Cyberattack on Columbia University After Police Crackdown on Protests*, THE CYBER EXPRESS, https://thecyberexpress.com/cyberattack-on-columbia-university/ (last visited June 29, 2025).

[21] *Data Leak Puts 2,600 at Risk*, COLUMBIA SPECTATOR ARCHIVE, http://spectatorarchive.library.columbia.edu/?a=d&d=cs20070418-01.2.5&srpos=1&e= (last visited June 29, 2025).

[22] *Id.*

Breach and stop cybercriminals from accessing the PII. And thus, Defendant caused widespread injury and monetary damages.

40.    On information and belief, Defendant failed to adequately train its employees on reasonable cybersecurity protocols or implement reasonable security measures.

41.    Because of Defendant's Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

42.    And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[23]

43.    Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

**Injuries to Plaintiffs and the Class**

*Plaintiff Joseph Quintero*

44.    In or around 2024, Plaintiff Quintero applied for admission to Columbia University, with the application requiring he provide certain PII, where he was admitted and enrolled beginning Fall 2024.

45.    On July 2, 2025, Plaintiff Quintero received the Notice Email, wherein he was advised about the Data Breach.[24]

46.    Since the Data Breach, Plaintiff Quintero has received an increase in spam calls and spam emails.

---

[23] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.
[24] *Id.*

47.     Plaintiff Quintero is very concerned about the theft of his PII and has and will continue to spend substantial amounts of time and energy monitoring his credit status.

48.     As a direct and proximate result of Defendant's actions and omissions in failing to protect Plaintiff Quintero's PII, Plaintiff Quintero and the Class have been damaged.

49.     Plaintiff Quintero and the Class have been placed at a substantial risk of harm in the form of credit fraud or identity theft and have incurred and will likely incur additional damages, including spending substantial amounts of time monitoring accounts and records, in order to prevent and mitigate credit fraud, identity theft, and financial fraud.

50.     In addition to the irreparable damage that may result from the theft of PII, identity theft victims must spend numerous hours and their own money repairing the impacts caused by this breach. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[25]

51.     In addition to fraudulent charges and damage to their credit, Plaintiff Quintero and the Class will spend substantial time and expense (a) monitoring their accounts to identify fraudulent or suspicious charges; (b) cancelling and reissuing cards; (c) purchasing credit monitoring and identity theft prevention services; (d) attempting to withdraw funds linked to compromised, frozen accounts; (e) removing withdrawal and purchase limits on compromised accounts; (f) communicating with financial institutions to dispute fraudulent charges; (g) resetting automatic billing instructions and changing passwords; (h) freezing and unfreezing credit bureau account information; (i) cancelling and re-setting automatic payments as necessary; and (j) paying late fees and declined payment penalties as a result of failed automatic payments.

---

[25] U.S. Dep't of Justice, *Victims of Identity Theft*, *2014* (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

52.     Plaintiff Quintero and the Class have suffered severe emotional distress as a result of their PII being compromised and will continue to suffer for an indefinite period of time. Since Plaintiff Quintero and the Class may not change their Social Security numbers, their heightened risk of becoming victims of fraud is now permanent. Plaintiff Quintero and the Class will remain aware of both this permanent risk as well as their permanent inability to cure that risk until it manifests itself in the form of fraud.

53.     Additionally, Plaintiff Quintero and the Class have suffered or are at increased risk of suffering from, *inter alia*, the loss of the opportunity to control how their PII is used, the diminution in the value and/or use of their PII entrusted to Defendant, and loss of privacy.

### *Plaintiff David Guirgis*

54.     In or around 2023, Plaintiff Guirgis applied for admission to Columbia University, with the application requiring he provide certain PII, where he was admitted and enrolled beginning Fall 2023.

55.     On July 2, 2025, Plaintiff Guirgis received the Notice Email, wherein he was advised about the Data Breach.[26]

56.     Since the Data Breach, Plaintiff Guirgis has received an increase in spam calls and spam emails.

57.     Plaintiff Guirgis is very concerned about the theft of his PII and has and will continue to spend substantial amounts of time and energy monitoring his credit status.

58.     As a direct and proximate result of Defendant's actions and omissions in failing to protect Plaintiff Guirgis's PII, Plaintiff Guirgis and the Class have been damaged.

---

[26] *See supra* fn. 7.

59.    Plaintiff Guirgis and the Class have been placed at a substantial risk of harm in the form of credit fraud or identity theft and have incurred and will likely incur additional damages, including spending substantial amounts of time monitoring accounts and records, in order to prevent and mitigate credit fraud, identity theft, and financial fraud.

60.    In addition to the irreparable damage that may result from the theft of PII, identity theft victims must spend numerous hours and their own money repairing the impacts caused by this breach. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[27]

61.    In addition to fraudulent charges and damage to their credit, Plaintiff Guirgis and the Class will spend substantial time and expense (a) monitoring their accounts to identify fraudulent or suspicious charges; (b) cancelling and reissuing cards; (c) purchasing credit monitoring and identity theft prevention services; (d) attempting to withdraw funds linked to compromised, frozen accounts; (e) removing withdrawal and purchase limits on compromised accounts; (f) communicating with financial institutions to dispute fraudulent charges; (g) resetting automatic billing instructions and changing passwords; (h) freezing and unfreezing credit bureau account information; (i) cancelling and re-setting automatic payments as necessary; and (j) paying late fees and declined payment penalties as a result of failed automatic payments.

62.    Plaintiff Guirgis and the Class have suffered severe emotional distress as a result of their PII being compromised and will continue to suffer for an indefinite period of time. Since Plaintiff Guirgis and the Class may not change their Social Security numbers, their heightened risk of becoming victims of fraud is now permanent. Plaintiff Guirgis and the Class will remain aware

---

[27] U.S. Dep't of Justice, *Victims of Identity Theft, 2014* (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

of both this permanent risk as well as their permanent inability to cure that risk until it manifests itself in the form of fraud.

63.     Additionally, Plaintiff Guirgis and the Class have suffered or are at increased risk of suffering from, *inter alia*, the loss of the opportunity to control how their PII is used, the diminution in the value and/or use of their PII entrusted to Defendant, and loss of privacy.

### Plaintiff Mary Thomas

64.     Plaintiff Thomas was required to provide and did provide her PII to Defendant as a condition of applying to enroll.

65.     To date, Defendant has done next to nothing to adequately protect Plaintiff Thomas and Class Members, or to compensate them for their injuries sustained in this Data Breach particularly given the fact that Plaintiffs' PII has already been "impacted" in the Data Breach and likely been made available on the dark web to anyone wishing to purchase it.

66.     Defendant has not compensated Plaintiff Thomas and Class Members for the time they will spend monitoring their accounts, placing credit freezes and fraud alerts, changing online passwords and other actions.

67.     Plaintiff Thomas and Class Members have been further damaged by the compromise of their PII in the Data Breach which was "impacted" and is in the hands of cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the PII.

68.     Plaintiff Thomas typically takes measures to protect her PII and is very careful about sharing her PII. Plaintiff Thomas has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

69.     Plaintiff Thomas stores any documents containing her PII in a safe and secure

14

location, and he diligently chooses unique usernames and passwords for her online accounts.

70.    As a result of the Data Breach, Plaintiff Thomas has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. In response to the Data Breach, Plaintiff Thomas has spent significant time monitoring her accounts and credit score, changing her online account passwords and verifying the legitimacy of the Notice and researching the Data Breach. This is time that was lost and unproductive and took away from other activities and duties.

71.    Plaintiff Thomas also suffered actual injury in the form of damages to and diminution in the value of her PII — a form of intangible property that she entrusted to Defendant for the purpose of applying to enroll, which was compromised in and as a result of the Data Breach.

72.    Plaintiff Thomas suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

73.    Plaintiff Thomas suffered emotional distress and increased stress and anxiety as a result of the Data Breach because of the actions she has been forced to undertake, the loss of control over her most intimate information, and the fact that he must remain vigilant for the remainder of her life.

74.    Plaintiff Thomas has suffered imminent and impending injury arising from the increased risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of criminals.

75.    Defendant obtained and continues to maintain Plaintiff Thomas's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Defendant required the PII from Plaintiff Thomas as a condition of applying to enroll. Plaintiff Thomas, however, would not have entrusted her PII to Defendant had she known that it would fail

to maintain adequate data security. Plaintiff Thomas's PII was compromised and disclosed as a result of the Data Breach.

76.     As a result of the Data Breach, Plaintiff Thomas anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Thomas is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### Plaintiff Rema Khacho

77.     Plaintiff Khacho was required to provide and did provide her PII to Defendant as a condition of applying to enroll.

78.     On July 2, 2025, Plaintiff Khacho received the Notice Email, wherein she was advised about the Data Breach.[28]

79.     To date, Defendant has done next to nothing to adequately protect Plaintiff Khacho and Class Members, or to compensate them for their injuries sustained in this Data Breach particularly given the fact that Plaintiff Khacho's PII has already been "impacted" in the Data Breach and likely been made available on the dark web to anyone wishing to purchase it.

80.     Defendant has not compensated Plaintiff Khacho and Class Members for the time they will spend monitoring their accounts, placing credit freezes and fraud alerts, changing online passwords and other actions.

81.     Plaintiff Khacho and Class Members have been further damaged by the compromise of their PII in the Data Breach which was "impacted" and is in the hands of cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the PII.

---

[28] *See supra* fn. 7.

16

82.     Plaintiff Khacho typically takes measures to protect her PII and is very careful about sharing her PII. Plaintiff Khacho has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

83.     Plaintiff Khacho stores any documents containing her PII in a safe and secure location, and he diligently chooses unique usernames and passwords for her online accounts.

84.     As a result of the Data Breach, Plaintiff Khacho has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. In response to the Data Breach, Plaintiff Khacho has spent significant time monitoring her accounts and credit score, changing her online account passwords and verifying the legitimacy of the Notice and researching the Data Breach. This is time that was lost and unproductive and took away from other activities and duties.

85.     Plaintiff Khacho also suffered actual injury in the form of damages to and diminution in the value of her PII — a form of intangible property that she entrusted to Defendant for the purpose of applying to enroll, which was compromised in and as a result of the Data Breach.

86.     Plaintiff Khacho suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

87.     Plaintiff Khacho suffered increased stress and anxiety as a result of the Data Breach because of the actions he has been forced to undertake, the loss of control over her most intimate information, and the fact that he must remain vigilant for the remainder of her life.

88.     Plaintiff Khacho has suffered imminent and impending injury arising from the increased risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of criminals.

89.     Defendant obtained and continues to maintain Plaintiff Khacho's PII and has a

continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Defendant required the PII from Plaintiff Khacho as a condition of applying to enroll. Plaintiff Khacho, however, would not have entrusted her PII to Defendant had she known that it would fail to maintain adequate data security. Plaintiff Khacho's PII was compromised and disclosed as a result of the Data Breach.

90.     As a result of the Data Breach, Plaintiff Khacho anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Khacho is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### Plaintiff Raymond Chao

91.     Plaintiff Chao is a former student of Defendant—having graduated in 2021.

92.     Thus, Defendant obtained and maintained Plaintiff Chao's PII

93.     As a result, Plaintiff Chao was injured by Defendant's Data Breach.

94.     As a condition of receiving educational services, Plaintiff Chao provided Defendant with his PII. Defendant used that PII to facilitate its provision of educational services and to collect payment.

95.     Plaintiff Chao provided his PII to Defendant and trusted the university would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Chao's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

96.     Plaintiff Chao reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII.

97.     On information and belief, Plaintiff Chao's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

98.     Through its Data Breach, Defendant compromised Plaintiff Chao's PII.

99.     Plaintiff Chao has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft, contacting counsel, and researching the Data Breach.

100.    Plaintiff Chao fears for his personal financial security and worries about what information was exposed in the Data Breach.

101.    Because of Defendant's Data Breach, Plaintiff Chao has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Chao's injuries are precisely the type of injuries that the law contemplates and addresses.

102.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

103.    Plaintiff Chao suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

104.    Plaintiff Chao suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Chao's PII right in the hands of criminals.

105.    Because of the Data Breach, Plaintiff Chao anticipates spending considerable amounts of time and money to try and mitigate his injuries.

106.    Today, Plaintiff Chao has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

### *Plaintiff Lauren Kramer*

107.    Plaintiff Kramer was required to provide and did provide her PII to Defendant as a condition of applying to enroll.

108.    To date, Defendant has done next to nothing to adequately protect Plaintiff Kramer and Class Members, or to compensate them for their injuries sustained in this Data Breach particularly given the fact that Plaintiff Kramer's PII has already been "impacted" in the Data Breach and likely been made available on the dark web to anyone wishing to purchase it.

109.    Defendant has not compensated Plaintiff Kramer and Class Members for the time they will spend monitoring their accounts, placing credit freezes and fraud alerts, changing online passwords and other actions.

110.    Plaintiff Kramer and Class Members have been further damaged by the compromise of their PII in the Data Breach which was "impacted" and is in the hands of cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the PII.

111.    Plaintiff Kramer typically takes measures to protect her PII and is very careful about sharing her PII. Plaintiff Kramer has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

112.    Plaintiff Kramer stores any documents containing her PII in a safe and secure location, and he diligently chooses unique usernames and passwords for her online accounts.

113.    As a result of the Data Breach, Plaintiff Kramer has suffered a loss of time and has

spent and continues to spend a considerable amount of time on issues related to this Data Breach. In response to the Data Breach, Plaintiff Kramer has spent significant time monitoring her accounts and credit score, changing her online account passwords and verifying the legitimacy of the Notice and researching the Data Breach. This is time that was lost and unproductive and took away from other activities and duties.

114.    Plaintiff Kramer also suffered actual injury in the form of damages to and diminution in the value of her PII — a form of intangible property that she entrusted to Defendant for the purpose of applying to enroll, which was compromised in and as a result of the Data Breach.

115.    Plaintiff Kramer suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

116.    Plaintiff Kramer suffered emotional distress and increased stress and anxiety as a result of the Data Breach because of the actions he has been forced to undertake, the loss of control over her most intimate information, and the fact that he must remain vigilant for the remainder of her life.

117.    Plaintiff Kramer has suffered imminent and impending injury arising from the increased risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of criminals.

118.    Defendant obtained and continues to maintain Plaintiff Kramer's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Defendant required the PII from Plaintiff Kramer as a condition of applying to enroll. Plaintiff Kramer, however, would not have entrusted her PII to Defendant had she known that it would fail to maintain adequate data security. Plaintiff Kramer's PII was compromised and disclosed as a result of the Data Breach.

119.    As a result of the Data Breach, Plaintiff Kramer anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Kramer is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

**The Value of PII**

120.    It is well known that PII, and financial account information in particular, is an invaluable commodity and a frequent target of hackers.

121.    According to Javelin Strategy & Research, in 2017 alone over 16.7 million individuals were affected by identity theft, causing $16.8 billion to be stolen.[29]

122.    People place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.[30]

123.    People are particularly concerned with protecting the privacy of their financial account information and social security numbers, which are the "secret sauce" that is "as good as your DNA to hackers."[31] There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their social security numbers have been accessed, Plaintiffs and Class Members cannot obtain new numbers unless they become a victim of social security number misuse. Even then, the Social Security Administration has

---

[29] Javelin Strategy & Research, *Identity Fraud Hits All Time High With 16.7 Million U.S. Victims in 2017, According to New Javelin Strategy & Research Study* (Feb. 6, 2018), https://www.javelinstrategy.com/press-release/identity-fraud-hits-all-time-high-167-million-us-victims-2017-according-new-javelin.
[30]    Identity    Theft    Resource    Center,    *Identity    Theft:    The    Aftermath    2017*, https://www.ftc.gov/system/files/documents/public_comments/2017/10/00004-141444.pdf.
[31] Cameron Huddleston, *How to Protect Your Kids From the Anthem Data Breach*, Kiplinger, (Feb. 10, 2015),    https://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html.

warned that "a new number probably won't solve all [] problems … and won't guarantee … a fresh start."[32]

**Industry Standards for Data Security**

124.    In light of the numerous high-profile data breaches targeting companies like Target, Neiman Marcus, eBay, Anthem, Deloitte, Equifax, and Capital One, Defendant is, or reasonably should have been, aware of the importance of safeguarding PII, as well as of the foreseeable consequences of its systems being breached.

125.    Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

     a.    Maintaining a secure firewall configuration;

     b.    Monitoring for suspicious or irregular traffic to servers;

     c.    Monitoring for suspicious credentials used to access servers;

     d.    Monitoring for suspicious or irregular activity by known users;

     e.    Monitoring for suspicious or unknown users;

     f.    Monitoring for suspicious or irregular server requests;

     g.    Monitoring for server requests for PII;

     h.    Monitoring for server requests from VPNs; and

     i.    Monitoring for server requests from Tor exit nodes.

126.    The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[33] and protection of PII[34] which includes basic security standards applicable to all types of businesses.

---

[32]    Social Security Admin., *Identity Theft and Your Social Security Number*, at 6-7, https://www.ssa.gov/pubs/EN-05-10064.pdf.
[33]    Start with Security: A Guide for Business, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[34]    Protecting Personal Information: A Guide for Business, FTC (Oct. 2016),

127.    The FTC recommends that businesses:

a.   Identify all connections to the computers where you store sensitive information.

b.   Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.   Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.   Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.   Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks

f.   Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.   Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h.   Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i.   Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

---

https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting personalinformation.pdf.

128.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[35]

129.    Because Defendant was entrusted with PII, it had, and has, a duty to keep the PII secure.

130.    Students and former students, such as Plaintiffs and the Class, reasonably expect that when they provide PII to organizations such as Defendant, that their PII will be safeguarded.

131.    Nonetheless, Defendant failed to prevent the Data Breach. Had Defendant properly maintained and adequately protected its systems, it could have prevented the Data Breach.

## CLASS ACTION ALLEGATIONS

132.    Plaintiffs, individually and on behalf of all others, bring this class action pursuant to Fed. R. Civ. P. 23.

133.    The proposed Class is defined as follows:

> All persons whose PII was maintained on Defendant's servers and compromised in the Data Breach.

134.    Plaintiffs reserve the right to modify, change, or expand the definition of the proposed Class based upon discovery and further investigation.

---

[35] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement.

135.     *Numerosity*: The proposed Class is so numerous that joinder of all members is impracticable. Although the precise number is not yet known to Plaintiffs, the number can be readily identified through Defendant's records.

136.     *Commonality*: Questions of law or fact common to the Class include, without limitation:

       a.  Whether Defendant owed a duty or duties to Plaintiffs and the Class to exercise due care in collecting, storing, safeguarding, and obtaining their PII;

       b.  Whether Defendant breached that duty or those duties;

       c.  Whether Defendant failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of records to protect against known and anticipated threats to security;

       d.  Whether the security provided by Defendant was satisfactory to protect customer information as compared to industry standards;

       e.  Whether Defendant misrepresented or failed to provide adequate information to customers regarding the type of security practices used;

       f.  Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiffs' and the Class's PII secure and prevent loss or misuse of that PII;

       g.  Whether Defendant acted negligently in connection with the monitoring and protecting of Plaintiffs' and Class's PII;

       h.  Whether Defendant's conduct was intentional, willful, or negligent;

       i.  Whether Defendant violated any and all statutes and/or common law listed herein;

       j.  Whether the Class suffered damages as a result of Defendant's conduct, omissions, or misrepresentations; and

       k.  Whether the Class is entitled to injunctive, declarative, and monetary relief as a result of Defendant's conduct.

137.     *Typicality*: The claims or defenses of Plaintiffs are typical of the claims or defenses of the Class. Class Members were injured and suffered damages in substantially the same manner as Plaintiffs, Class Members have the same claims against Defendant relating to the same course

of conduct, and Class Members are entitled to relief under the same legal theories asserted by Plaintiffs.

138.    *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the proposed Class and have no interests antagonistic to those of the proposed Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions including, but not limited to, data breaches.

139.    *Predominance*: Questions of law or fact common to proposed Class Members predominate over any questions affecting only individual members. Common questions such as whether Defendant owed a duty to Plaintiffs and the Class and whether Defendant breached its duties predominate over individual questions such as measurement of economic damages.

140.    *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of these claims because individual joinder of the claims of the Class is impracticable. Many members of the Class are without the financial resources necessary to pursue this matter. Even if some members of the Class could afford to litigate their claims separately, such a result would be unduly burdensome to the courts in which the individualized cases would proceed. Individual litigation increases the time and expense of resolving a common dispute concerning Defendant's actions toward an entire group of individuals. Class action procedures allow for far fewer management difficulties in matters of this type and provide the unique benefits of unitary adjudication, economies of scale, and comprehensive supervision over the entire controversy by a single judge in a single court.

141.    *Manageability*: Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

142.    The Class may be certified pursuant to Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

143.    The Class may also be certified pursuant to Rule 23(b)(3) because questions of law and fact common to the Class will predominate over questions affecting individual members, and a class action is superior to other methods for fairly and efficiently adjudicating the controversy and causes of action described in this Complaint.

144.    Particular issues under Rule 23(c)(4) are appropriate for certification because such claims present particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/ NEGLIGENCE PER SE
### (on behalf of the Class)

145.    Plaintiffs repeat, re-allege, and incorporate by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

146.    Defendant owed a duty of care to Plaintiffs and Class Members to use reasonable means to secure and safeguard the entrusted PII, to prevent its unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of their systems. These common law duties existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiffs and Class Members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, but Defendant knew that they were more likely than not Plaintiffs and Class Members would be harmed by such exposure of their PII.

147.    Defendant's duties to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of Defendant's duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

148.    Defendant's violations of Section 5 of the FTC Act constitute negligence per se.

149.    Defendant breached the aforementioned duties when it failed to use security practices that would protect the PII provided to it by Plaintiffs and Class Members, thus resulting in unauthorized third-party access to the Plaintiffs' and Class Members' PII.

150.    Defendant further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit its processes, controls, policies, procedures, and protocols to comply with the applicable laws and safeguard and protect Plaintiffs' and Class Members' PII within its possession, custody, and control.

151.    As a direct and proximate cause of failing to use appropriate security practices, Plaintiffs' and Class Members' PII was disseminated and made available to unauthorized third parties.

152.    Defendant admitted that Plaintiffs' and Class Members' PII was wrongfully disclosed as a result of the Data Breach.

153.    The Data Breach caused direct and substantial damages to Plaintiffs and Class Members, as well as the possibility of future and imminent harm through the dissemination of their PII and the greatly enhanced risk of credit fraud or identity theft.

154.    By engaging in the forgoing acts and omissions, Defendant committed the common law tort of negligence. For all the reasons stated above, Defendant's conduct was negligent and departed from reasonable standards of care including by, but not limited to: failing to adequately protect the PII; failing to conduct regular security audits; and failing to provide adequate and appropriate supervision of persons having access to Plaintiffs' and Class Members' PII.

155.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and the Class, their PII would not have been compromised.

156.    Neither Plaintiffs nor the Class contributed to the breach or subsequent misuse of their PII as described in this Complaint. As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and the Class have been put at an increased risk of credit fraud or identity theft, and Defendant has an obligation to mitigate damages by providing adequate credit and identity monitoring services. Defendant is liable to Plaintiffs and the Class for the reasonable costs of future credit and identity monitoring services for a reasonable period of time, substantially in excess of one year. Defendant is also liable to Plaintiffs and the Class to the extent that they have directly sustained damages as a result of identity theft or other unauthorized use of their PII, including the amount of time Plaintiffs and the Class have spent and will continue to spend as a result of Defendant's negligence. Defendant is also liable to Plaintiffs and the Class to the extent their PII has been diminished in value because Plaintiffs and the Class no longer control their PII and to whom it is disseminated.

### COUNT II
### INVASION OF PRIVACY
### (on behalf of the Class)

157.    Plaintiffs repeat, re-allege, and incorporate by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

158.    Plaintiffs and Class Members have objective reasonable expectations of solitude and seclusion in their personal and private information and the confidentiality of the content of personal information and non-public medical information.

159.    Defendant invaded Plaintiffs' and the Class's right to privacy by allowing the unauthorized access to their PII and by negligently maintaining the confidentiality of Plaintiffs' and the Class's PII, as set forth above.

160.    The intrusion was offensive and objectionable to Plaintiffs, the Class, and to a reasonable person of ordinary sensibilities in that Plaintiffs' and the Class's PII was disclosed without prior written authorization from Plaintiffs and the Class.

161.    The intrusion was into a place or thing which was private and is entitled to be private, in that Plaintiffs and the Class provided and disclosed their PII to Defendant privately with the intention that the PII would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable to believe that such information would be kept private and would not be disclosed without their written authorization.

162.    As a direct and proximate result of Defendant's above acts, Plaintiffs' and the Class's PII was viewed, distributed, and used by persons without prior written authorization and Plaintiffs and the Class suffered damages as described herein.

163.    Defendant is guilty of oppression, fraud, or malice by permitting the unauthorized disclosure of Plaintiffs' and the Class's PII with a willful and conscious disregard of their right to privacy.

164.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause Plaintiffs and the Class great and irreparable injury in that the PII maintained by Defendant can be viewed, printed, distributed, and used by unauthorized

persons. Plaintiffs and the Class have no adequate remedy at law for the injuries in that a judgment for the monetary damages will not end the invasion of privacy for Plaintiffs and the Class, and Defendant may freely treat Plaintiffs' and the Class's PII with sub-standard and insufficient protections.

**COUNT III**
**UNJUST ENRICHMENT**
**(on behalf of the Class)**

165.    Plaintiffs repeat, re-allege, and incorporate by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

166.    Plaintiffs and the Class have an interest, both equitable and legal, in their PII that was conferred upon, collected by, and maintained by Defendant and that was ultimately compromised in the data breach.

167.    Defendant, by way of its acts and omissions, knowingly and deliberately enriched itself by saving the costs it reasonably should have expended on security measures to secure Plaintiffs' and the Class's PII.

168.    Defendant also understood and appreciated that the PII pertaining to Plaintiffs and the Class was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that PII.

169.    Instead of providing for a reasonable level of security that would have prevented the breach—as is common practice among companies entrusted with such PII—Defendant instead consciously and opportunistically calculated to increase its own profits at the expense of Plaintiffs and the Class. Nevertheless, Defendant continued to obtain the benefits conferred on it by Plaintiffs and the Class. The benefits conferred upon, received, and enjoyed by Defendant were not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain these benefits.

32

170.     Plaintiffs and the Class, on the other hand, suffered as a direct and proximate result. As a result of Defendant's decision to profit rather than provide requisite security, and the resulting breach disclosing Plaintiffs' and the Class's PII, Plaintiffs and the Class suffered and continue to suffer considerable injuries in the forms of, *inter alia,* attempted identity theft, time and expenses mitigating harms, diminished value of PII, loss of privacy, and increased risk of harm.

171.     Thus, Defendant engaged in opportunistic conduct in spite of its duties to Plaintiffs and the Class, wherein it profited from interference with Plaintiffs' and the Class's legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its conduct.

172.     Accordingly, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court award relief in the form of restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically, the amounts that Defendant should have spent to provide reasonable and adequate data security to protect Plaintiffs' and the Class's PII, and/or compensatory damages.

**COUNT IV**
**VIOLATION OF NEW YORK DECEPTIVE TRADE PRACTICES ACT ("GBL")**
**New York Gen. Bus. Law § 349**
(on behalf of the Class)

173.     Plaintiffs repeat, re-allege, and incorporate by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

174.     Under the New York Gen. Bus. Law § 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

33

175.    Notably, Defendant's deceptive acts and/or practices were directed at consumers. After all, via its policies, Defendant represented to consumers that they would, *inter alia*, use reasonably adequate data security.

176.    And these deceptive acts—including the quotations provided *supra*—were materially misleading insofar as they induced consumers to rely on such statements and disclose their PII.

177.    Section § 349 applies to Defendant because there is a sufficient nexus between Defendant's conduct and New York. After all, Columbia University is incorporated in New York and its corporate headquarters is in New York, New York.

178.    And, upon information and belief, the misleading acts and/or practices alleged herein—including the manifestations in Defendant's data security policies—were written, approved, and/or otherwise authorized by Defendant within the state of New York.

179.    In particular, Defendant violated Section § 349 by, *inter alia*:

a.    failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' PII, which was a direct and proximate cause of the Data Breach;

b.    failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.    failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII, including duties imposed by the

FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq.*, which was a direct and proximate cause of the Data Breach;

d.  omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' PII; and

e.  omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq.*

180.    Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of their PII.

181.    Defendant intended to mislead Plaintiffs and Class Members and induce them to rely on its omissions.

182.    Had Defendant disclosed to Plaintiffs and Class Members that its data systems were not secure—and thus vulnerable to attack—Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant accepted the PII that Plaintiffs and Class Members entrusted to it while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiffs and Class Members acted reasonably in relying on Defendant's omissions, the truth of which they could not have discovered through reasonable investigation.

183.    Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiffs' and Class Members' rights.

184.     As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiffs and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

185.     And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

186.     Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law.

**<u>COUNT V</u>**
**BREACH OF IMPLIED CONTRACT**
(on behalf of the Class)

187.     Plaintiffs repeat, re-allege, and incorporate by reference, all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

188.     Plaintiffs and the Class entrusted their PII to Defendant. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

189.     At the time Defendant acquired the PII of Plaintiffs and the Class, there was a meeting of the minds and a mutual understanding that Defendant would safeguard the PII and not take unjustified risks when storing the PII.

190.    Implicit in the agreements between Plaintiffs and Class Members and Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

191.    Plaintiffs and the Class would not have entrusted their PII to Defendant had they known that Defendant would make the PII internet-accessible, not encrypt sensitive data elements, and not delete the PII that Defendant no longer had a reasonable need to maintain it.

192.    Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

193.    Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their personal information, by failing to provide timely and accurate notice to them that personal information was compromised as a result of the Data Breach.

194.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports;

expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

195.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of themselves and all others similarly situated, pray for a judgment against Defendant as follows:

a.  For an order certifying the proposed Class, appointing Plaintiffs as Representatives of the proposed Class, and appointing the law firms representing Plaintiffs as counsel for the Class;

b.  For compensatory and punitive and treble damages in an amount to be determined at trial;

c.  Payment of costs and expenses of suit herein incurred;

d.  Both pre-and post-judgment interest on any amounts awarded;

e.  Payment of reasonable attorneys' fees and expert fees;

f.  Such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.


Dated:  July 17, 2025


By:    /s/Brett R. Cohen
        Brett R. Cohen
        **LEEDS BROWN LAW, P.C.**
        One Old Country Road, Suite 347
        Carle Place, New York 11514
        Tel: (516) 873-9550
        bcohen@leedsbrownlaw.com

        Jeffrey S. Goldenberg (Admitted Pro Hac Vice)

**GOLDENBERG SCHNEIDER, LPA**
4445 Lake Forest Drive, Suite 490
Cincinnati, OH 45242
Tel: (513) 345-8291
jgoldenberg@gs-legal.com

Charles E. Schaffer (Pro Hac Motion pending)
**LEVIN SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
cschaffer@lfsblaw.com

Raina C. Borrelli
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago IL, 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

Courtney Maccarone (CM-5863)
Jeff Ostrow (Pro Hac Motion to be filed)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 525-4100
maccarone@kolawyers.com
ostrow@kolawyers.com

Vicki J. Maniatis (NY Bar No. 2578896)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 East 50th Street
New York, New York 10022
Tel.: (516) 491-4665
vmaniatis@milberg.com

Mariya Weekes (Pro Hac Motion to be filed)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL  33134
Tel:  (786) 879-8200 / Fax: (786) 879-7520
mweekes@milberg.com

39

Gregory M. Egleston
***Gainey McKenna & Egleston***
260 Madison Avenue, 21[th] Floor
New York, New York 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Website: www.gme-law.com

Paul J. Doolittle (Pro Hac Motion to be filed)
**POULIN | WILLEY | ANASTOPOULO**
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
Email: paul.doolittle@poulinwilley.com
cmad@poulinwilley.com

Leanna A. Loginov (NY Bar No. 5894753)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
Email: lloginov@shamisgentile.com

***Counsel for Plaintiffs and the Proposed Class***