**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *IN RE COLUMBIA UNIVERSITY DATA BREACH LITIGATION* <br><br> This Document Relates To: *All Cases* | **Lead Case No. 1:25-cv-05541-PKC** <br><br> Honorable P. Kevin Castel <br><br> **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> *Jury Trial Demanded* |

Plaintiffs Khamari Babb, Raymond Chao, Steven Daley, Randall Erwin, David Guirgis, Alex Hall, Shakeem Holmes, Rema Khacho, Lauren Kramer, Luke Linich, Nadav Margalit, John McQueen, Liam Murray, Gabriela Nadeau, Joseph Quintero, Carrick Reider, Andrew Rudick, and Mary Thomas (collectively, "Plaintiffs"), bring this First Amended Consolidated Class Action Complaint ("Complaint") against Defendant Trustees of Columbia University in the City of New York ("Columbia" or "Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and allege, upon personal knowledge as to Plaintiffs' own actions and upon information and belief and their counsel's investigation as to all other matters, as follows:

## NATURE OF THE ACTION

1. With this action, Plaintiffs seek to hold Columbia responsible for the harms it caused Plaintiffs and millions of similarly situated persons in the preventable data breach of Columbia's inadequately secured computer network in or around May 2025.

2. Columbia is a nationally recognized higher education institution, holding itself out as "one of the world's most important centers of research and at the same time a distinctive and

distinguished learning environment for undergraduates and graduate students in many scholarly and professional fields."[1]

3.      In connection with its operations, Columbia collects and stores highly sensitive personally identifiable information ("PII") and protected health information ("PHI")[2] (together, "Private Information") from applicants, students, and employees.

4.      Plaintiffs and Class Members (as defined below) are current and former Columbia applicants, students, and employees, whose Private Information was stolen from Columbia's inadequately secured computer network.

5.      This class action seeks to redress Columbia's unlawful, willful, and wanton failure to protect and secure the Private Information it collected from Plaintiffs and Class Members. As a result of Defendant's woefully inadequate data security measures—including its failure to utilize basic encryption for sensitive data—the Private Information of hundreds of thousands, if not millions, of individuals was exposed and stolen in an avoidable breach of Columbia's network (the "Data Breach" or "Breach").

6.      Columbia acknowledges that the Private Information it collects from applicants, students, and employees—including Plaintiffs and Class Members—"is an important resource of the University and any person who uses the information collected by the University has a responsibility to maintain and protect this resource."[3]

---

[1] *About Columbia University*, COLUMBIA, https://www.columbia.edu/content/about-columbia-university (last visited April 10, 2026).
[2] PII refers to identifiers that can be used to  distinguish or trace an individual's identity. PHI is any health information that can identify an individual.
[3] *University Policies – Information Security Charter*, COLUMBIA, https://universitypolicies.columbia.edu/content/information-security-charter (last visited April 10, 2026).

7.      By collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Columbia assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

8.      Plaintiffs and Class Members relied on Columbia to keep their Private Information confidential and secure from unauthorized access, and to make only authorized disclosures of their information.

9.      The Data Breach was first suspected on or around June 24, 2025, when Columbia experienced a technical outage that disrupted its IT systems.[4] Based on a subsequent investigation, Columbia confirmed that an unauthorized third-party gained access to its inadequately secured network *over a month* earlier, on or about May 16, 2025.[5]

10.     Columbia's initial investigation determined that the "unauthorized third party gained access to Columbia's network through a publicly-exposed system[,]" and "[l]everaging [that] access, the unauthorized third party was then able to access and remove personal information from Columbia's student admissions, financial aid, and certain employee databases."[6]

---

[4] *See Notice of Data Breach*, MAINE ATTY GEN, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5cd48662-983a-4c9d-8b5b-e5e097cbbcd5.html (last visited April 9, 2026) ("the Data Breach Notice").

[5] *Id.*; *see also* Sharon Otterman, *Columbia Cyberattack Appears Politically Motivated, University Says*, N.Y. TIMES (July 1, 2025), https://www.nytimes.com/2025/07/01/nyregion/columbia-university-hacker.html ("The person [who perpetrated the Data Breach] told Bloomberg News that they had acquired the data after having access to Columbia's servers for more than two months.").

[6] *Data Breach Notice*, IOWA ATTY GEN (Aug. 8, 2025), https://www.iowaattorneygeneral.gov/media/cms/882025_Columbia_University_8F543BE49BE96.pdf.

11.    "A cyber-forensics firm hired by [Columbia] reported that the hack appeared to be highly sophisticated and targeted in its theft of documents[.]"[7]

12.    Columbia's investigation confirmed that the unauthorized third-party "took certain files from [its] system[,]"[8] including "personal information that [prospective students] provided in connection with [their] application[s] to Columbia," as well as Private Information "collected during [their] studies if [they] enrolled."[9]

13.    According to Columbia, the Private Information stolen in the Data Breach includes, *inter alia*: names, addresses, Social Security numbers, driver's license numbers, financial account information (including, but not limited to, credit and debit card information, as well as bank account and routing numbers), medical information, health insurance information, dates of birth, contact details, demographic information, gender, ethnicity, citizenship status, academic history, financial aid-related information, test scores, academic grades, admission decision, expected

---

[7] Sharon Otterman, *Columbia Cyberattack Appears Politically Motivated, University Says*, N.Y. TIMES (July 1, 2025), https://www.nytimes.com/2025/07/01/nyregion/columbia-university-hacker.html ("The official added that Columbia had not yet determined the scope of the data theft and that it would take weeks to months to do so.").

[8] *See Notice of Data Breach*, MAINE ATTY GEN, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5cd48662-983a-4c9d-8b5b-e5e097cbbcd5.html (last visited April 10, 2026).

[9] *Id.* ("This included [their] contact details, demographic information, academic history, financial aid-related information, and any insurance-related information and health information that [they] shared with [Columbia]."); *see also Updating Story: Hacker Says He Stole Millions of Columbia University Admissions Records*, DataBreach.com (July 2, 2025), https://databreach.com/news/15-updating-story-hacker-says-he-stole-millions-of-columbia-university-admissions-records (explaining that the level of access claimed by the hacker could have exposed: full legal names, dates and places of birth, Social Security numbers and taxpayer IDs, passport, visa and driver's-license numbers, permanent and campus mailing addresses, personal and Columbia email accounts, mobile and home telephone numbers, demographic flags such as race, ethnicity and citizenship, complete academic transcripts and disciplinary notes, financial-aid worksheets, scholarship and loan details, and bank account and routing numbers used for tuition or payroll).

graduation date, financial aid status, financial aid award, tuition information, and an undefined category of "Other" information.[10]

14.    The hacker that perpetrated the Data Breach claims to have acquired approximately 460 gigabytes of data after having "full, unrestricted access" to Columbia's servers for more than two months.[11]

15.    The scope of the undetected intrusion into Columbia's systems, which caused a five-day interruption to Columbia's email, learning platforms, and payroll systems, was confirmed when the hacker disclosed portions of the stolen dataset to multiple media outlets.[12]

16.    The stolen data substantiated the hacker's claims that "Columbia's student-information system, multiple Active Directory domains and every VMware server in data centers

---

[10] *See, e.g.*, *Data Security Breach Reports*, TEX. ATTY GEN.,
https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage    (last    visited
April 10, 2026); *Notice of Data Breach*, MAINE ATTY GEN,
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-
a1252b4f8318/5cd48662-983a-4c9d-8b5b-e5e097cbbcd5.html (last visited April 10, 2026);
*Data Breach Notice*, IOWA ATTY GEN (Aug. 8, 2025),
https://www.iowaattorneygeneral.gov/media/cms/882025_Columbia_University_8F543BE49BE
96.pdf; Cameron Fozi, *Hacked Columbia University Data Includes Bank Numbers, GPAs*,
BLOOMBERG (Aug. 5, 2025), https://www.bloomberg.com/news/articles/2025-08-05/hacked-
columbia-university-data-includes-banking-numbers-gpas.
[11] Sharon Otterman, *Columbia Cyberattack Appears Politically Motivated, University Says*, N.Y.
TIMES (July 1, 2025), https://www.nytimes.com/2025/07/01/nyregion/columbia-university-
hacker.html; *see also Updating Story: Hacker Says He Stole Millions of Columbia University
Admissions Records*, DataBreach.com (July 2, 2025), https://databreach.com/news/15-updating-
story-hacker-says-he-stole-millions-of-columbia-university-admissions-records.
[12] *See, e.g.*, Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*,
BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-
university-applicants-personal-data-stolen-by-hacker; Elizabeth Lopatto, *This 'violently racist'
hacker claims to be the source of The New York Times' Mamdani scoop*, THE VERGE (July 21,
2025), https://www.theverge.com/cyber-security/710480/columbia-hacker-nazi-nyt-affirmative-
action; *Updating Story: Hacker Says He Stole Millions of Columbia University Admissions
Records*, DataBreach.com (July 2, 2025), https://databreach.com/news/15-updating-story-hacker-
says-he-stole-millions-of-columbia-university-admissions-records; *Updating Our Community on
2025 Cyber Incident*, COLUMBIA UNIVERSITY OFFICE OF PUBLIC AFFAIRS (Jan. 6, 2026),
https://communications.news.columbia.edu/news/updating-our-community-2025-cyber-incident.

in Manhattan and Syracuse, [New York]" were compromised in the Data Breach, demonstrating a "level of access [that] would allow an intruder to copy—or quietly alter—almost any record the university keeps."[13]

17.    The hacker claims to have exfiltrated millions of files, including admission applications dating to the late 1990s, as well as payroll files for faculty and staff, and spreadsheets with financial aid information.[14]

18.    In public regulatory filings, Columbia initially claimed that the files stolen from its network in the Data Breach contained Private Information belonging to 868,969 individuals.[15] Multiple news outlets as well as the cybercriminal who perpetrated the Data Breach, however, reported that the Data Breach exposed the Private Information of approximately 2.5 million individuals—including 1.8 million individuals' Social Security numbers and admission applications dating to the late 1990s.[16] In an update posted to its website on January 6, 2026,

---

[13] *Updating Story: Hacker Says He Stole Millions of Columbia University Admissions Records*, DataBreach.com (July 2, 2025), https://databreach.com/news/15-updating-story-hacker-says-he-stole-millions-of-columbia-university-admissions-records.

[14] *Id.*; *see also Data Breach Notice*, IOWA ATTY GEN (Aug. 8, 2025), https://www.iowaattorneygeneral.gov/media/cms/882025_Columbia_University_8F543BE49BE 96.pdf (indicating that Columbia had to "reset passwords" for "known compromised accounts" following the Data Breach).

[15] *Notice of Data Breach*, MAINE ATTY GEN, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5cd48662-983a-4c9d-8b5b-e5e097cbbcd5.html (last visited April 10, 2026).

[16] *See, e.g.*, Sharon Otterman, *Columbia Cyberattack Appears Politically Motivated, University Says*, N.Y. TIMES (July 1, 2025), https://www.nytimes.com/2025/07/01/nyregion/columbia-university-hacker.html; Sara Weissman, *Hack at Columbia Hits 870K People*, INSIDE HIGHER ED. (Aug. 12, 2025), https://www.insidehighered.com/news/tech-innovation/administrative-tech/2025/08/12/hack-columbia-university-hits-870k-people; David Eberly, *Millions of Columbia University Records Exposed in Political Cyberattack*, THE NATIONAL CIO REVIEW (Aug. 6, 2025), https://nationalcioreview.com/articles-insights/extra-bytes/millions-of-columbia-university-records-exposed-in-political-cyberattack/ ("New developments have emerged following Columbia University's 2025 data breach, with officials now acknowledging the intrusion's scale and severity. The breach exposed the financial and academic data of over two million individuals, including students, alumni, and applicants."); *see also Updating Story: Hacker Says He Stole Millions of Columbia University Admissions Records*, DataBreach.com (July 2, 2025),

Columbia reported that it has continued to identify "additional individuals affected by [the Data Breach]" through its ongoing investigation.[17]

19. According to a Columbia official, the Data Breach "appears to be the work of a 'hacktivist' . . . who also stole student data with the apparent goal of furthering a political agenda[.]"[18] The "hacker uses an online handle that is a racial slur" and has "taken credit for five hacks of universities."[19] The hacker "appears to have been specifically targeting universities, often for admissions data" and "information about whether universities persisted in affirmative action admissions after the Supreme Court effectively banned the practice in 2023."[20]

20. Plaintiffs and Class Members—current and former Columbia students, employees, and applicants for admission—entrusted their Private Information to Columbia with the reasonable and mutual understanding that Columbia would take appropriate measures to protect their highly-sensitive information from unauthorized disclosure or access.

https://databreach.com/news/15-updating-story-hacker-says-he-stole-millions-of-columbia-university-admissions-records.

[17] *Updating Our Community on 2025 Cyber Incident*, COLUMBIA UNIVERSITY OFFICE OF PUBLIC AFFAIRS (Jan. 6, 2026), https://communications.news.columbia.edu/news/updating-our-community-2025-cyber-incident ("Notifications to these individuals will begin on December 30, 2025, and continue on a rolling basis."); *see also 2025 Cyber Incident FAQ*, Columbia University Information Technology, https://www.cuit.columbia.edu/content/2025-cyber-incident-faq ("Our process of notifying [affected individuals] remains ongoing and the next grouping will begin on December 30, 2025.").

[18] Sharon Otterman, *Columbia Cyberattack Appears Politically Motivated, University Says*, N.Y. TIMES (July 1, 2025), https://www.nytimes.com/2025/07/01/nyregion/columbia-university-hacker.html.

[19] Elizabeth Lopatto, *This 'violently racist' hacker claims to be the source of The New York Times' Mamdani scoop*, THE VERGE (July 21, 2025), https://www.theverge.com/cyber-security/710480/columbia-hacker-nazi-nyt-affirmative-action.

[20] *Id.* ("Insofar as open racism can be said to be a political motivation, the hacker is indeed politically motivated."); *see also* Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

21.     By taking possession and control of Plaintiffs' and Class Members' Private Information, Columbia assumed a duty to securely store and protect it.

22.     Columbia breached this duty and betrayed the trust of Plaintiffs and Class Members by failing to properly safeguard and protect their Private Information, thus enabling cybercriminals to access, view, exfiltrate, copy, misuse, and release it.

23.     Columbia's misconduct included, *inter alia*, failing to: implement adequate and reasonable data security measures to protect Plaintiffs' and Class Members' Private Information; timely detect the Data Breach; take adequate steps to prevent and stop the Data Breach; disclose the material fact that it did not have adequate data security practices in place to safeguard the Private Information it collected and stored; and provide timely and adequate notice of the Data Breach. These failures caused substantial harm and injuries to Plaintiffs and Class Members across the United States.

24.     Due to Columbia's negligence, Plaintiffs' and Class Members' Private Information is now in the hands of cybercriminals, who can use their information to commit multiple forms of fraud and identity theft, wreaking havoc on the financial and personal lives of hundreds of thousands of individuals.

25.     Due to the politically motivated nature of the Data Breach, Plaintiffs fear their information will be used to target them for harassment or violence based on their political ideology, race, ethnicity, sexual orientation, affiliation, or for other reasons. This fear is not merely speculative.

26.     The cybercriminal who committed the Breach has already disseminated the stolen information to multiple news outlets and political ideologues,[21] and has made public statements expressing violent racist ideologies.[22]

27.     Industry experts warn that "[r]egardless of the criminal's motive," the stolen data could be used for "malicious purposes including theft, identity fraud and stalking."[23] Hacktivist and politically motivated breaches frequently result in public data dumps intended to embarrass or pressure the victim organization. Once those datasets are released online, they are copied, mirrored, and analyzed by third parties beyond the control of the attacker. For example, Sony Pictures Entertainment experienced a breach in November 2014, by a nation-state attacker related to Sony's planned release of the controversial film *The Interview*. Although the attack was politically motivated, the perpetrators stole sensitive information such as Social Security numbers and bank account information that was posted on the internet.[24]

28.     Indeed, upon information and belief, the hacker in this Data Breach has already posted the Private Information stolen from Columbia's inadequately secured systems to the Dark

---

[21] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

[22] Elizabeth Lopatto, *This 'violently racist' hacker claims to be the source of The New York Times' Mamdani scoop*, THE VERGE (July 21, 2025), https://www.theverge.com/cyber-security/710480/columbia-hacker-nazi-nyt-affirmative-action.

[23] *See, e.g.*, Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker; Cameron Fozi, *Hacked Columbia University Data Includes Bank Numbers, GPAs*, BLOOMBERG (August 5, 2025), https://www.bloomberg.com/news/articles/2025-08-05/hacked-columbia-university-data-includes-banking-numbers-gpas.

[24] Steinberg, Sean, *et al.*, *The Hacking of Sony Pictures: A Columbia University Case Study*, SCHOOL OF INTERNATIONAL AND PUBLIC AFFAIRS CASE CONSORTIUM @ COLUMBIA (2021), https://www.sipa.columbia.edu/sites/default/files/2022-11/Sony%20-%20Written%20Case.pdf.

Web, where it can be exploited for nefarious purposes by a broad range of bad actors.[25] For the rest of their lives, Plaintiffs and Class Members will therefore face a risk of fraud and identity theft at the hands of cybercriminals and other bad actors who seek to misuse their Private Information. Plaintiffs and Class Members have already and will continue to spend time responding to the Breach and are at an immediate, imminent, and heightened risk of all manner of fraud and identity theft as a direct and proximate result of the Data Breach. Plaintiffs and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, deprivation of the value of their Private Information, loss of privacy, and additional damages as described below.

29.     Columbia's harmful conduct has injured Plaintiffs and Class Members in multiple ways, including: (i) invasion of privacy and theft of Private Information; (ii) the lost or diminished value of their Private Information; (iii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iv) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; (v) lost benefit of their bargain; (vi) emotional distress associated with the loss of control over their highly sensitive Private Information; and (vii) substantial and ongoing risk that their Private Information will be misused, including through identity theft, fraud, and harassment.

30.     Plaintiffs bring this action individually and on behalf of the Class, seeking remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs,

---

[25] Elizabeth Lopatto, *This 'violently racist' hacker claims to be the source of The New York Times' Mamdani scoop*, THE VERGE (July 21, 2025), https://www.theverge.com/cyber-security/710480/columbia-hacker-nazi-nyt-affirmative-action.

disgorgement, injunctive and declaratory relief, reasonable attorney fees and costs, and all other remedies this Court deems proper.

## PARTIES

### *Plaintiffs*

31.     Plaintiff Khamari Babb ("Plaintiff Babb") is a citizen of Maryland who applied for admission to Columbia in 2024. He is domiciled in Maryland where he intends to remain.

32.     Plaintiff Raymond Chao ("Plaintiff Chao") is a citizen of New York and former Columbia student. He is domiciled in New York where he intends to remain.

33.     Plaintiff Steven Daley ("Plaintiff Daley") is a citizen of Texas who applied for admission to Columbia in 2016. He is domiciled in Texas where he intends to remain.

34.     Plaintiff Randall Erwin ("Plaintiff Erwin") is a citizen of New York and a current student at Columbia, having matriculated in 2025. He is domiciled in New York where he intends to remain.

35.     Plaintiff David Guirgis ("Plaintiff Guirgis") is a citizen of New Jersey and a former Columbia student and employee who graduated in 2025. He is domiciled in New Jersey where he intends to remain.

36.     Plaintiff Alex Hall ("Plaintiff Hall") is a citizen of Maine who applied for admission to Columbia in or around 2020. He is domiciled in Maine where he intends to remain.

37.     Plaintiff Shakeem Holmes ("Plaintiff Holmes") is a citizen of New York and a former Columbia student who graduated in 2020. He is domiciled in New York where he intends to remain.

38.     Plaintiff Rema Khacho ("Plaintiff Khacho") is a citizen of New York and a former Columbia student who graduated in 2025. She is domiciled in New York where she intends to remain.

39.     Plaintiff Lauren Kramer ("Plaintiff Kramer") is a citizen of Georgia who applied for admission to Columbia in 2018 and 2023. She is domiciled in Georgia where she intends to remain.

40.     Plaintiff Luke Linich ("Plaintiff Linich") is a citizen of New York and a former Columbia student who graduated in 2025. He is domiciled in New York where he intends to remain.

41.     Plaintiff Nadav Margalit ("Plaintiff Margalit") is a citizen of Massachusetts and a current student at Columbia. He is domiciled in Massachusetts where he intends to remain.

42.     Plaintiff John McQueen ("Plaintiff McQueen") is a citizen of Massachusetts who applied for admission to Columbia in 2024. He is domiciled in Massachusetts where he intends to remain.

43.     Plaintiff Liam Murray ("Plaintiff Murray") is a citizen of Connecticut and a currently student at Columbia. He is domiciled in Connecticut where he intends to remain.

44.     Plaintiff Gabriela Nadeau ("Plaintiff Nadeau") is a citizen of Florida who applied for admission to Columbia in 2019. She is domiciled in Florida where she intends to remain.

45.     Plaintiff Joseph Quintero ("Plaintiff Quintero") is a citizen of New York and a former student who graduated from Columbia in 2025. He is domiciled in New York where he intends to remain.

46. Plaintiff Carrick Reider ("Plaintiff Reider") is a citizen of Pennsylvania who applied for admission to Columbia in 2015 and 2019. He is domiciled in Pennsylvania where he intends to remain.

47. Plaintiff Andrew Rudick ("Plaintiff Rudick") is a citizen of California who applied for admission to Columbia in 2005 or 2006. He is domiciled in California where he intends to remain.

48. Plaintiff Mary Thomas ("Plaintiff Thomas") is a citizen of Tennessee who applied for admission to Columbia in 2021. She is domiciled in Tennessee where she intends to remain.

*Defendant*

49. Defendant Trustees of Columbia University in the City of New York is a not-for-profit, private educational institution with its principal place of business at 211 Low Library, MC 4324, 535 West 116th Street, New York, NY 10027.

## JURISDICTION AND VENUE

50. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members is over 100, and at least one Class Member— including Plaintiffs Khamari Babb, Steven Daley, David Guirgis, Alex Hall, Lauren Kramer, Nadav Margalit, John McQueen, Liam Murray, Gabriela Nadeau, Carrick Reider, Andrew Rudick, and Mary Thomas—is a citizen of a state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

51. This Court has personal jurisdiction over Defendant because Defendant conducts business in this District, Columbia maintains a principal place of business in this District, Defendant has sufficient minimum contacts with this State, and a substantial part of the events or

omissions giving rise to the claims alleged in this action occurred in this District. *See* 28 U.S.C. § 1391(b)(2).

52.     Venue is proper as to Defendant in this District under 28 U.S.C. § 1391(a)(1) because Defendant maintains a principal place of business in this District and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2). Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged in this action also occurred in this District.

## **FACTUAL ALLEGATIONS**

### A. *Columbia University*

53.     Columbia is a private research university in New York City. According to Columbia, "it expects all areas of the University to advance knowledge and learning at the highest level and to convey the products of its efforts to the world."[26]

54.     As of June 30, 2025, Columbia's endowment totaled $15.9 billion.[27]

55.     Columbia is one of the most selective universities in the United States, with total applications to its undergraduate program alone numbering in the tens of thousands each year.[28]

56.     Columbia requires prospective students to provide detailed Private Information to the university during the application process.[29] Upon information and belief, the Private

---

[26] *About Columbia University*, COLUMBIA, https://www.columbia.edu/content/about-columbia-university (last visited April 10, 2026).

[27] *IMC CEO Statement on FY25 Endowment Returns*, COLUMBIA (Oct. 23, 2025), https://www.finance.columbia.edu/content/imc-ceo-statement-fy25-endowment-returns.

[28] *Columbia University Admissions*, IVY COACH (2025), https://www.ivycoach.com/university/columbia-university/ (last visited April 10, 2026) ("For the Class of 2029, Columbia received 59,616 applications and admitted 2,557, for an acceptance rate of 4.29%.").

[29] *See University Policies*, COLUMBIA, https://undergrad.admissions.columbia.edu/policies (last visited April 10, 2026) ("[T]he applicant will be required to attest to the accuracy and authenticity of all information and documents submitted to Columbia . . . Failure to submit complete, accurate, and authentic application documents consistent with these instructions may result in denial or

Information Columbia requires applicants to provide as a condition of being considered for enrollment includes, *inter alia*: full legal names, addresses, dates of birth, Social Security numbers, driver's license numbers, demographic information (including gender, ethnicity, and citizenship status), academic information (including academic history, test scores, and academic grades), and autobiographical information, including "[l]ists and descriptions of [the prospective] student's achievements, activities, employment and summer activities."[30]

57.    Columbia's "financial aid application process collects information about [prospective students'] family[] income, assets, family composition and other circumstances."[31]

58.    Columbia applicants—including Plaintiffs and Class Members—are also required to pay "[a]n $85 nonrefundable application fee . . . using an electronic check or Visa, MasterCard, Discover or American Express credit card."[32] Plaintiffs and Class Members had a reasonable expectation and understanding that the nonrefundable fees they paid to Columbia would be used to cover the administrative costs of processing their applications for admission, including the cost of adequate data security to protect the highly sensitive and confidential Private Information contained in their applications.

59.    Columbia employees and students who are accepted for enrollment and subsequently matriculate, are required to provide additional Private Information to Columbia as a condition of employment and/or enrollment.[33] For matriculated students, the cost of attendance at

revocation of admission, cancellation of academic credit, suspension, expulsion, or eventual revocation of degree.").

[30] *How to Apply*, COLUMBIA, https://undergrad.admissions.columbia.edu/apply/firstyear (last visited April 10, 2026).

[31] *Id.*

[32] *Id.* ("Payment (or fee waiver) is due at the time that you submit your application.").

[33] *See Columbia College Web Site(s)/Service(s) Terms of Use, Agreement Between You and The Trustees of Columbia University in the City of New York ("Columbia University") on behalf of Columbia College*, COLUMBIA, https://www.college.columbia.edu/terms/ (last visited April 10, 2026) ("Should you be required to open an account with Columbia College, you must complete

Columbia includes tuition and fees, including a "Student Life Fee, which is used to cover many of the services offered to students[.]"[34] The Student Life Fee "combines the Student Activity Fee, Career Education Fee, Printing Fee, Recreational Facilities Fee, ***Information Technology Fee***, Lerner Fee, and Cross-Cutting Multi-School Activities Fee."[35] Columbia's website provides "a breakdown of how [the Student Life Fee] is distributed across the various services provided to . . . student[s]," and specifically explains that the Information Technology Fee "helps fund the student support services offered by Columbia University Information Technology (CUIT) including email and network support, Student Services Online (SSOL), student computer labs, CourseWorks, classroom technology, and the Service Desk."[36] Columbia students, including Plaintiffs and Class Members, therefore had a reasonable expectation and understanding that the Information Technology Fee they paid to Columbia each semester as a condition of enrollment would be used, in part, to cover the cost of adequate data security to protect their highly sensitive and confidential Private Information. In the course of collecting Private Information from applicants, students, and employees, including Plaintiffs and Class Members, Columbia represented that it would implement and maintain adequate data security practices to protect and secure the highly-sensitive

---

the registration process by providing us with current, complete and accurate information as prompted by the applicable registration form.").

[34] *See Cost of Attendance*, COLUMBIA, https://www.gs.columbia.edu/content/cost-attendance#!/%23cu_accordion_item-1364 (last visited April 9, 2026).

[35] *Id.* (emphasis added).

[36] *Id.* (for the 2025–2026 school year, the Student Life Fee for full time undergraduate fees was $854, per semester, of which $299 is allocated to the "Information Technology Fee"); *see also Columbia University Information Technology – Our Mission*, https://www.cuit.columbia.edu/, COLUMBIA (last visited April 9, 2026) ("CUIT is committed to delivering high-quality, stable, and secure technology solutions and services to the Columbia community while providing the IT Leadership required to guide the University on its path toward the future.").

data stored on its systems, including in statements contained in its publicly-posted privacy policies and other disclosures in compliance with statutory privacy requirements.[37]

60.    Columbia specifically promises to "secure information transmission, storage, and retrieval[,]" and assures applicants, students, and employees that it has "put in place appropriate physical, electronic, and managerial procedures to safeguard and help prevent unauthorized access, maintain data security, and correctly use the information [it] collect[s] online."[38]

61.    Columbia publicly acknowledges its duties to protect Private Information in its "Information Security Charter":

     i.    "Federal and state laws and regulations, as well as industry standards . . . impose obligations on the University to protect the confidentiality, integrity and availability of information relating to faculty, staff, students, research subjects and patients";

     ii.    "In addition, terms of certain contracts and University policy require appropriate safeguarding of information";

     iii.    "The mission of the Information Security Program is to protect the confidentiality, integrity and availability of University Data. Confidentiality means that information is only accessible to authorized users. Integrity means

---

[37] *See, e.g.*, *The Privacy Policy of Columbia College of Columbia University in the City of New York*, COLUMBIA, https://www.college.columbia.edu/privacy (last visited April 10, 2026); *University Policies – Acceptable Usage of Information Resources Policy*, COLUMBIA, https://universitypolicies.columbia.edu/content/acceptable-usage-information-resources-policy (last visited April 10, 2026); *University Policies – Information Security Risk Management Policy*, COLUMBIA, https://universitypolicies.columbia.edu/content/information-security-risk-management-policy (last visited April 10, 2026); *University Policies – Information Security Charter*, COLUMBIA, https://universitypolicies.columbia.edu/content/information-security-charter (last visited April 10, 2026).

[38] *The Privacy Policy of Columbia College of Columbia University in the City of New York*, COLUMBIA, https://www.college.columbia.edu/privacy (last visited April 10, 2026).

safeguarding the accuracy and completeness of University Data and processing methods."[39]

62.    Additionally, Columbia's policy for "Handling Personally Identifying Information" recognizes that "[s]tolen PII is frequently used to commit identity theft and fraud, and should be guarded carefully. Hackers and malware will search a compromised computer for SSNs they can find."[40]

63.    Columbia further represents that it "maintains certain policies with regards to the use and security of its computer systems, networks and information resources [which] are meant to protect the University's computer systems, networks, data and other information resources."[41]

64.    Despite these assurances, Columbia's actions (and/or inactions) demonstrate it failed to keep its data security promises.

65.    Plaintiffs and Class Members relied on Columbia's data security promises and reasonably expected that this sophisticated entity would keep their sensitive Private Information confidential and securely maintained, use their information for necessary purposes only, and make only authorized disclosures of their information.

66.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted their Private Information to Columbia had they known it would fail to implement reasonable and industry-standard data protections to secure their sensitive information from unauthorized access and disclosure.

---

[39] *University Policies – Information Security Charter*, COLUMBIA, https://universitypolicies.columbia.edu/content/information-security-charter (last visited April 10, 2026).

[40] *University Policies – Handling Personally Identifying Information*, COLUMBIA, https://www.cuit.columbia.edu/handling-pii (last visited April 10, 2026).

[41] *Columbia University IT Policies and Strategies*, COLUMBIA UNIV. INFORMATION TECH., https://www.cuit.columbia.edu/columbia-it-policies-strategies (last visited April 10, 2026).

67.     Columbia had a duty to protect Plaintiffs' and Class Members' Private Information from involuntary disclosure to third parties.

**B.  *The Data Breach***

68.     On June 24, 2025, Columbia "experienced a systemwide outage that prevented Columbia affiliates from logging into their University emails or other online platforms."[42]

69.     The outage was caused by an unauthorized third party, who seized control of Columbia's computer systems and broadcasted "a smiling image of President Trump on some computer screens at the university, including on public monitors in the student center."[43]

---

[42] Spencer Davis, *Columbia data stolen in cyberattack that caused dayslong IT outage, University says*, COLUMBIA SPECTATOR (July 1, 2025), https://www.columbiaspectator.com/news/2025/07/01/columbia-data-stolen-in-cyberattack-that-caused-dayslong-it-outage-university-says/; *see also University Statement on IT Outage on June 24, 2025*, COLUMBIA (July 1, 2025), https://communications.news.columbia.edu/news/university-statement-it-outage-june-24-2025.

[43] Sharon Otterman, *Columbia Cyberattack Appears Politically Motivated, University Says*, N.Y. TIMES (July 1, 2025), https://www.nytimes.com/2025/07/01/nyregion/columbia-university-hacker.html.

70.    Screenshots of the images that appeared on corrupted computer screens and public monitors in the university's student center during the widespread shutdown of Columbia's network are provided below.[44]





71.    The "widespread system outage" that began on June 24, 2025, impacted Columbia's websites and internal systems, causing key services—including email services, the authentication service students use to login to university accounts, and Columbia's coursework

---

[44] *Id.*; *see also CUIT just got hacked*, REDDIT (June 24, 2025), https://www.reddit.com/r/columbia/comments/1ljfqj0/cuit_just_got_hacked/.

and assignment platform—to be offline and inaccessible to both students and professors for an extended period.[45]

72.     On July 1, 2025, Columbia reported that an initial investigation had confirmed "that the outage was caused by an unauthorized party" who "also unlawfully stole data" from Columbia's network.[46] Columbia explained that it was still "investigating the scope of the apparent theft[,]" but promised to "share [its] findings with the University community as well as anyone whose personal information was compromised."[47]

73.     According to a Columbia official, "[t]he cyberattack that caused [the] widespread shutdown" of the university's computer systems "appear[ed] to be the work of a 'hacktivist' . . . who also stole student data with the apparent goal of furthering a political agenda[.]"[48] And "[a] cyber-forensics firm hired by the university reported that the hack appeared to be highly sophisticated and targeted in its theft of documents[.]"[49]

---

[45] *See, e.g.*, Sharon Otterman, *Columbia Cyberattack Appears Politically Motivated, University Says*, N.Y. TIMES (July 1, 2025), https://www.nytimes.com/2025/07/01/nyregion/columbia-university-hacker.html; Stefanie Schappert, *Columbia University hit in suspected cyberattack, systems down*, CYBERNEWS (June 25, 2025), https://cybernews.com/news/columbia-university-suspected-cyberattack-systemwide-outage/.

[46] *University Statement on IT Outage on June 24, 2025*, COLUMBIA (July 1, 2025), https://communications.news.columbia.edu/news/university-statement-it-outage-june-24-2025.

[47] *Id.*

[48] Sharon Otterman, *Columbia Cyberattack Appears Politically Motivated, University Says*, N.Y. TIMES (July 1, 2025), https://www.nytimes.com/2025/07/01/nyregion/columbia-university-hacker.html.

[49] *Id.* ("The official added that Columbia had not yet determined the scope of the data theft and that it could take weeks to months to do so.").

74.     In an article published on July 1, 2025, *Bloomberg News* reported that the hacker who perpetrated the Data Breach had shared a "1.6-gigabyte volume of data" stolen from Columbia's network.[50]

75.     The hacker "told *Bloomberg News* they acquired the data ***after more than two months of building up access within Columbia's servers.*** Ultimately, they said they attained the most privileged access to the university's data."[51]

76.     *Bloomberg* reviewed the data provided by the hacker and confirmed that the stolen files "represent[ed] 2.5 million [student] applications" and contained "[p]ersonal information about Columbia University students and applicants . . . dating back decades[.]"[52] *Bloomberg* "confirmed the accuracy of the data for eight Columbia students and alumni who applied to Columbia between 2019 and 2024."[53]

77.     According to the hacker, "[t]he records provided to Bloomberg . . . [were] part of approximately ***460 gigabytes of extracted data detailing financial aid packages, employee pay and at least 1.8 million Social Security numbers belonging to employees, applicants, students and their family members***."[54]

78.     The hacker told *Bloomberg* that "***they sought to acquire information about university applications that would suggest a continuation of affirmative action policies in***

---

[50] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

[51] *Id*. (emphasis added).

[52] *Id.*

[53] *Id.* (*Bloomberg* "cross-checked the data with eight current and former students who submitted 12 applications to Columbia between 2019 and 2024. The eight Columbia students and alumni told Bloomberg the data matched their university-issued ID code, gender, citizenship status, admissions decision, the academic programs to which they applied and their decisions on whether to matriculate.").

[54] *Id*. (emphasis added).

*Columbia's admissions*, following a 2023 Supreme Court decision that effectively barred the practice."[55]

79.     On August 5, 2025, *Bloomberg News* published a follow up article, reporting additional details about the Data Breach and noting that Columbia still had not begun notifying individuals whose Private Information was stolen in the Breach.[56]

80.     *Bloomberg* reported that its review of data stolen in the Data Breach—including the 1.6 gigabyte volume of data provided to *Bloomberg* directly by the hacker and "*[a] separate 53.6-gigabyte cache of data*" exfiltrated by the hacker from Columbia's network[57]—confirmed that "[t]he financial information and academic performance of Columbia University students and alumni were stolen" in the Data Breach.[58] The stolen Private Information reviewed by *Bloomberg* included "bank account and routing numbers, student loan and scholarship disbursements, standardized test scores, grade-point averages, class schedules, home addresses and other contact information."[59] The "separate 53.6-gigabyte cache of data reviewed by *Bloomberg* was made available by Jordan Lasker, who runs a blog that has promoted views about race and IQ that have been criticized as offensive and scientifically flawed. Lasker said he obtained the 53.6-gigabyte

---

[55] *Id*. (emphasis added).

[56] Cameron Fozi, *Hacked Columbia University Data Includes Bank Numbers, GPAs*, BLOOMBERG (Aug. 5, 2025), https://www.bloomberg.com/news/articles/2025-08-05/hacked-columbia-university-data-includes-banking-numbers-gpas ("In response to questions from Bloomberg, a Columbia spokesperson said the investigation into the cyberattack—including the specifics of the information exposed—was ongoing. . . . Columbia would begin notifications this week to individuals believed to be affected by the attack, the spokesperson said, adding that the school encouraged 'all members of the university community' to remain vigilant against scams and regularly monitor accounts for suspicious activity.").

[57] *Id.* (emphasis added).

[58] *Id.*

[59] Cameron Fozi, *Hacked Columbia University Data Includes Bank Numbers, GPAs*, BLOOMBERG (Aug. 5, 2025), https://www.bloomberg.com/news/articles/2025-08-05/hacked-columbia-university-data-includes-banking-numbers-gpas. ("Nine current and former students who began attending Columbia undergraduate and graduate programs as early as the 1990s confirmed the accuracy of their data in the files.").

cache of data from the alleged hacker. The hacker, who communicated with *Bloomberg* via *X*, confirmed that they provided the data to Lasker."[60]

81. *Bloomberg* stressed that it was "not clear who else might have access to the stolen data." And "[e]ven if it's not immediately exploited, the hacked data could ultimately be used for malicious purposes including theft, identity fraud and stalking, according to security experts."[61]

82. A data security expert interviewed by *Bloomberg* explained that, "[r]egardless of the criminal's motive, anytime an individual is involved in a data breach, there is cause for concern[,]" and further warned individuals affected by the Data Breach that "[i]t's important to freeze your credit and be on the lookout for tailored phishing lures across all contact methods."[62]

83. The highly sensitive data stolen in the Data Breach—including Social Security numbers and financial aid records—can fuel large-scale identity theft for years. And the personal contact and academic details stolen in the Data Breach can be exploited for targeted scams, phishing campaigns, and even blackmail. The risk faced by Plaintiffs and Class Members—compounded by Columbia's slow incident response—is not short term, it is potentially lifelong.

84. Accordingly, following the Data Breach, "cybersecurity experts urge[d] students, alumni and staff to place fraud alerts on their credit files, change passwords linked to Columbia accounts and remain wary of phishing emails that appear to come from university offices. Identity-theft specialists also recommend[ed] freezing credit outright to block new loan applications in a stolen name."[63]

---

[60] *Id.*

[61] Cameron Fozi, *Hacked Columbia University Data Includes Bank Numbers, GPAs*, Bloomberg (Aug. 5, 2025), https://www.bloomberg.com/news/articles/2025-08-05/hacked-columbia-university-data-includes-banking-numbers-gpas.

[62] *Id.* (quoting Rachel Tobac, chief executive officer of SocialProof Security).

[63] *Updating Story: Hacker Says He Stole Millions of Columbia University Admissions Records*, DataBreach.com (July 2, 2025), https://databreach.com/news/15-updating-story-hacker-says-he-stole-millions-of-columbia-university-admissions-records.

85.    Consistent with the warnings of data security experts, Columbia urged "all members of the University community to remain vigilant and [to] continue [ ] monitor[ing] [their] accounts for suspicious activity[,]" and further warned "that following a cybersecurity incident such as this, scammers may reach out offering fraudulent services."[64]

86.    Columbia published an "update" on the Data Breach on its website on August 5, 2025, explaining that "[t]hough [its] investigation [was] still underway, [it had] learned more about the nature of the incident and the data involved."[65]

87.    Columbia confirmed that the hacker "obtained information about students and applicants related to admissions, enrollment, and financial aid processes, as well as certain personal information associated with some Columbia employees."[66] Columbia further confirmed that the Private Information compromised and stolen in the Data Breach "includes Social Security numbers, contact details, demographic information, academic history, financial aid-related information, insurance-related information, and certain health information."[67]

88.    On August 7, 2025—approximately three months after the hacker first gained access to Columbia's systems and nearly six weeks after Columbia first became aware of the unauthorized intrusion—Columbia began notifying individuals whose Private Information was stolen in the Data Breach "on a rolling basis . . . via U.S. Postal Service mail."[68]

---

[64] *Id.*
[65] *Updating Our Community on the Cyber Incident*, COLUMBIA (Aug. 5, 2025), https://communications.news.columbia.edu/news/updating-our-community-cyber-incident.
[66] *Id.*
[67] *Id.*
[68] *Id.*

89.     In an update posted to its website on January 6, 2026, Columbia advised that its ongoing investigation had "identified additional individuals affected by [the Data Breach]," and that "[n]otifications to [those] individuals . . . [would] continue on a rolling basis."[69]

90.     The cybercriminal who compromised Columbia's computer network and exfiltrated Plaintiffs' and Class Members' Private Information has already misused the stolen data by disclosing it to third parties.[70]

91.     In addition to *Bloomberg News*, the data stolen in the Data Breach has been disseminated to other news outlets, including *The New York Times*,[71] *DataBreach.com*,[72] and political idealogue and blogger Jordan Lasker.[73]

92.     "In an exclusive communication [with] the breach-tracking site DataBreach.com, the hacker said he had obtained 'full, unrestricted access' to Columbia's core infrastructure[,]" and to demonstrate the scope of the Breach, the hacker provided portions of the stolen data set directly to the news outlet.[74]

---

[69] *Updating Our Community on 2025 Cyber Incident*, COLUMBIA UNIVERSITY OFFICE OF PUBLIC AFFAIRS (Jan. 6, 2026), https://communications.news.columbia.edu/news/updating-our-community-2025-cyber-incident.

[70] Sharon Otterman, *Columbia Cyberattack Appears Politically Motivated, University Says*, N.Y. TIMES (July 1, 2025), https://www.nytimes.com/2025/07/01/nyregion/columbia-university-hacker.

[71] Sharon Otterman, *Columbia Cyberattack Appears Politically Motivated, University Says*, N.Y. TIMES (July 1, 2025), https://www.nytimes.com/2025/07/01/nyregion/columbia-university-hacker.html.

[72] *Updating Story: Hacker Says He Stole Millions of Columbia University Admissions Records*, DATABREACH.COM (July 2, 2025), https://databreach.com/news/15-updating-story-hacker-says-he-stole-millions-of-columbia-university-admissions-records.

[73] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

[74] *Updating Story: Hacker Says He Stole Millions of Columbia University Admissions Records*, DATABREACH.COM (July 2, 2025), https://databreach.com/news/15-updating-story-hacker-says-he-stole-millions-of-columbia-university-admissions-records.

93.     On July 3, 2025, *The New York Times* published an article revealing that Private Information belonging to then-candidate for Mayor of New York City, Zohran Mamdani, was included in data stolen from Columbia in the Data Breach and "shared with The New York Times."[75]

94.     The July 3, 2025 article explained that "the information about [Mr. Mamdani] was included in a database of millions of student applications to Columbia going back decades[,]"[76] and confirmed that "[t]he data included information on applicants' citizenship status, national origin, standardized test scores, race and whether they were ultimately admitted to the school, among other factors."[77]

95.     *The New York Times* "tested the data by successfully cross-referencing a dozen Columbia alumni, from classes 1989 to 2014, based on their middle names and birthdays, and Mr. Mamdani did not dispute the veracity of the information about his application."[78]

96.     The data stolen in the Data Breach "was shared with [*The New York Times*] by an intermediary who goes by the name Crémieux on Substack and X"—also known as Jordan Lasker, "an academic who opposes affirmative action and writes often about I.Q. and race."[79]

---

[75] Benjamin Ryan et al., *Mamdani Identified as Asian and African American on College Application*, N.Y. TIMES (July 3, 2025), https://www.nytimes.com/2025/07/03/nyregion/mamdani-columbia-black-application.html.

[76] *Id.*

[77] *Id.* ("Right-wing Republicans, including President Trump, have seized on Mr. Mamdani's Muslim faith and immigrant history to smear and attack him and in some cases call for his deportation.").

[78] *Id.*

[79] *Id.* ("He provided the data under condition of anonymity, although his identity has been made public elsewhere."); *see also* Ali Breland, *A Race-Science Blogger Goes Mainstream*, THE ATLANTIC (July 9, 2025), https://www.theatlantic.com/technology/archive/2025/07/cremieux-race-science-new-york-times/683474/ (explaining that "Jordan Lasker" is "known online as Crémieux").

97.     Subsequent media reports noted that "the Columbia hack and Mamdani leak represent significant escalation. The Columbia hack happened as the school was under political pressure; the Mamdani leak occurred as Trump made him an administration adversary. . . . It has certainly occurred to some of the [hacker's] followers that a hack can be used to humiliate political enemies."[80]

98.     The hacker who perpetrated the Data Breach operates an account on X (formerly Twitter) that uses a racial slur in its username ("N----").[81] Reporters have described the account owner as "violently racist" and a "neo-Nazi[.]"[82]

99.     The hacker has also taken credit for previously disclosed data breaches at other educational institutions—including New York University, the University of Minnesota, Miami University of Ohio, and the University of Mississippi.[83]

---

[80] Elizabeth Lopatto, *This 'violently racist' hacker claims to be the source of The New York Times' Mamdani scoop*, THE VERGE (July 21, 2025), https://www.theverge.com/cyber-security/710480/columbia-hacker-nazi-nyt-affirmative-action.

[81] *What happened in the Columbia University Breach?*, DATA BREACH (June 29, 2025), https://databreach.com/breach/columbia-university-2025.

[82] Elizabeth Lopatto, *This 'violently racist' hacker claims to be the source of The New York Times' Mamdani scoop*, THE VERGE (July 21, 2025), https://www.theverge.com/cyber-security/710480/columbia-hacker-nazi-nyt-affirmative-action ("Scrolling through the [hacker's] accounts was taking a bath in cruelty, contempt, and hate."); *see also* Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker ("The alleged hacker declined to provide their name [to *Bloomberg*], saying they didn't want to go to prison."); Cameron Fozi, *Hacked Columbia University Data Includes Bank Numbers, GPAs*, BLOOMBERG (Aug. 5, 2025), https://www.bloomberg.com/news/articles/2025-08-05/hacked-columbia-university-data-includes-banking-numbers-gpas ("The [hacker's] X account, which includes a racist handle and racist remarks, declined to identify themselves saying they feared self-incrimination.").

[83] *Id*.; *see also* Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

100.    Social media posts on the hacker's X account include "images such as swastikas . . . and a picture of a unicorn sitting on a swastika."[84] In addition, the hacker posted "miss u hitler" and "minorities have no place in our world" and "I am violently racist toward black people[.]"[85] And on November 5, 2024, the hacker replied, "You will be executed" to a post by then-presidential candidate Kamala Harris.[86]

101.    Disturbing images from the hacker's X account are included below.



---

[84] Elizabeth Lopatto, *This 'violently racist' hacker claims to be the source of The New York Times' Mamdani scoop*, THE VERGE (July 21, 2025), https://www.theverge.com/cyber-security/710480/columbia-hacker-nazi-nyt-affirmative-action.
[85] *Id.*
[86] *Id.*



102.    In the aftermath of the Data Breach, news articles have stressed that it remains unclear "who else might have access to the stolen data."[87] And "[e]ven if it's not immediately exploited, the hacked data could ultimately be used for malicious purposes including theft, identity fraud and stalking[.]"[88]

---

[87] Cameron Fozi, *Hacked Columbia University Data Includes Bank Numbers, GPAs*, BLOOMBERG (Aug. 5, 2025), https://www.bloomberg.com/news/articles/2025-08-05/hacked-columbia-university-data-includes-banking-numbers-gpas.
[88] *Id.*

103.    Hacktivist and politically motivated breaches frequently result in public data dumps intended to embarrass or pressure the victim organization. Once those datasets are released online, they are copied, mirrored, and analyzed by third parties beyond the control of the attacker. Criminal actors often harvest personal identifiers from publicly leaked datasets even if the original attacker did not intend financial exploitation. Because of this pattern, the exposure of Social Security numbers or similar identifiers creates a foreseeable risk of identity misuse regardless of the attacker's motivation. Even when the initial attacker claims ideological objectives, once the data is released publicly it can be harvested and reused by other actors.

104.    For example, Sony Pictures Entertainment experienced a politically-motivated breach in November 2014, carried out by a group calling itself the "Guardians of Peace" or "GOP."[89] Columbia published a report—*The Hacking of Sony Pictures: A Columbia University Case Study*—explaining that the "highly publicized cyberattack" was "related to [Sony's] planned release of the controversial film *The Interview*, which intelligence reports later attributed to a nation-state attacker."[90] "The comedy film starred James Franco and [Seth] Rogen as a talk show host/producer duo recruited to assassinate North Korea's real-life leader, Kim Jong-Un, under the pretense of a TV interview."[91] "In June 2014, days after the film's first trailer was released, the North Korean government released a statement threatening 'a merciless counter-measure' for the film, which it deemed not only offensive, but 'the most blatant act of terrorism and war.'"[92]

105.    As described in Columbia's report:

> On the morning of November 24, 2014, . . . [a]bout a month before *The Interview*'s planned Christmas release, Sony Pictures'

---

[89]    Steinberg, Sean, *et al.*, *The Hacking of Sony Pictures: A Columbia University Case Study*, SCHOOL OF INTERNATIONAL AND PUBLIC AFFAIRS CASE CONSORTIUM @ COLUMBIA (2021), https://www.sipa.columbia.edu/sites/default/files/2022-11/Sony%20-%20Written%20Case.pdf.
[90]    *Id*. at 1.
[91]    *Id*. at 4.
[92]    *Id.*

> employees received a chilling morning welcome as they logged onto their corporate network: sounds of gunfire erupted from their computer speakers as a macabre red skeleton hovered over Photoshopped images of [CEO Michael] Lynton's and [studio chief Amy] Pascal's severed heads on their monitors.[93]

106.    In the weeks that followed the Sony hack, it was discovered that "[t]he perpetrators stole nearly 100 terabytes of data from Sony's system," including "sensitive personal information of at least 15,000 current and former Sony employees." *Corona v. Sony Pictures Entertainment, Inc.*, 2015 WL 3916744, at \*1 (C.D. Cal. June 15, 2015). The stolen information included Social Security numbers, employment files, salary and bank account information, health insurance and other medical information, names, home and email addresses, visa and passport numbers, and retirement plan data, and was "used to threaten the individual victims and their families, and was posted on the internet." *Id*. at \*1, \*4. It was also "posted on file-sharing websites for identity thieves to download" and "used to send emails threatening physical harm to employees and their families." *Id*. at \*3.[94]

107.    As demonstrated by the Sony breach, and consistent with the warnings of security experts following this Data Breach, "[r]egardless of the criminal's motive, anytime an individual is involved in a data breach, there is cause for concern[.]"[95]

108.    Data security experts have warned against "categorizing [data security] threats by motive[,]" explaining that "[c]ybersecurity leadership is no longer facing separate and siloed threats of hacktivism and cybercriminals, they are increasingly facing an environment where

---

[93] *Id*. at 5.

[94] On this basis, the *Corona* court found "that Plaintiffs have Article III standing to assert this action." 2015 WL 3916744, at \*3.

[95] Cameron Fozi, *Hacked Columbia University Data Includes Bank Numbers, GPAs*, Bloomberg (Aug. 5, 2025), https://www.bloomberg.com/news/articles/2025-08-05/hacked-columbia-university-data-includes-banking-numbers-gpas.

they're intertwined."[96] Bad actors "might lock files one day" and "leak sensitive documents the next[.]"[97]

109.    Other examples of politically motivated breaches that resulted in public data dumps include the 2011 Stratfor Breach,[98] the 2015 Ashley Madison Breach,[99] the 2020 D.C. Police Department Leak,[100] and the 2021 University of Minnesota Breach,[101] to name just a few.

---

[96] Troy Cruzen, *Hacktivism and Cybercrime: The Merging Threat Keeping CISOs Up at Night*, RSAC (May 13, 2025) https://www.rsaconference.com/library/blog/hacktivism-and-cybercrime-the-merging-threat-keeping-cisos-up-at-night ("This convergence creates a threat landscape that is more unpredictable, more ideologically charged, and often more dangerous. [ . . . ] And ideological motives are being used as cover for financially motivated attacks, or vice versa. This is now the era of blended threats.").

[97] *Id.*; *see also* JP Castellanos, *Hacktivism is a Growing Threat to Higher Education*, Campus Technology (Aug. 27, 2025), https://campustechnology.com/articles/2025/08/27/hacktivism-is-a-growing-threat-to-higher-education.aspx? (describing the risks faced by victims of politically motivated attacks on institutions of higher education).

[98] Robert Booth, *US security firm Stratfor attacked by 'Robin Hood' hackers*, THE GUARDIAN (Dec. 27, 2011), https://www.theguardian.com/technology/2011/dec/27/security-stratfor-hackers-credit-cards.

[99] *Ashley Madison Experiences Fallout from Hacking Scandal*, CENTER FOR ETHICAL ORGANIZATIONAL CULTURES, AUBURN UNIVERSITY (2015), https://harbert.auburn.edu/binaries/documents/center-for-ethical-organizational-cultures/cases/ashley-madison.pdf.

[100] *'BlueLeaks' exposes sensitive files from hundreds of police departments*, SOPHOS (June 23, 2020), https://www.sophos.com/en-us/blog/blueleaks-exposes-sensitive-files-from-hundreds-of-police-departments.

[101] Liz Navratil, *Data Breach Taps 30 Years of Sensitive Info at University of Minnesota*, GOVERNMENT TECHNOLOGY (Sept. 22, 2023), https://www.govtech.com/education/higher-ed/data-breach-taps-30-years-of-sensitive-info-at-university-of-minnesota; *see also, e.g.*, Scott Zelko, *A Recap of Recent Cybersecurity Incidents at Universities*, SCHELLMAN (last updated Feb. 6, 2026), https://www.schellman.com/blog/cybersecurity/cybersecurity-incidents-at-universities-2023 (The University of Minnesota "only realized in July 2023 that the 2021 breach had occurred . . . [and] the school didn't realize what had happened until they learned the hacker was posting the stolen sensitive data online (in 2023)."); Ashish Khaitan, *Over 7 Million SSNs Potentially Exposed in University of Minnesota Data Breach*, THE CYBER EXPRESS (July 21, 2023), https://thecyberexpress.com/university-of-minnesota-data-breach/ ("A dark web user with the username 'n----' has claimed responsibility for the University of Minnesota data breach on a dark web forum. [ . . . ] The hacker claimed to have exploited Computer N---- Exploitation (CNE) to access the university's data warehouse, containing records digitized since 1989. This database system stored valuable and sensitive information about students, faculty, and staff. The attacker's intentions have been driven by providing Signals Intelligence to their connections on the Fediverse

110. Plaintiffs have already suffered actual misuse of their Private Information after it was stolen in this Data Breach, including fraudulent charges to financial accounts, unrecognized and suspicious credit inquiries, social engineering attacks, posting of their information to the Dark Web, and a notable increase in spam messages using their Private Information.

111. Thus, while the original hacker's motivation may have been political, Plaintiffs' and Class Members' information has ended up in the hands of criminals seeking to profit financially from Plaintiffs' misfortune.

C. **Columbia's Discovery of the Data Breach, Subsequent Investigation, and Notice to Class Members**

112. On or around August 7, 2025, Columbia began notifying individuals, including Plaintiffs and Class Members, whose Private Information was accessed and stolen in the Data Breach.

113. In the Data Breach Notice sent to Plaintiffs and Class Members, Columbia acknowledged that the Data Breach was not even suspected until June 24, 2025, when the university experienced the IT outage described above.[102] According to Columbia's representations to the Maine Attorney General's Office, however, while the IT outage prompted an investigation of Columbia's network, Columbia did not discover the actual Data Breach until July 8, 2025.[103]

114. Columbia's subsequent investigation confirmed that numerous files were ***removed*** from its system on May 16, 2025, nearly two months before Columbia became aware of the Breach.[104]

---

[a collection of social networking services that can communicate with each other using a common protocol].").

[102] *See Notice of Data Breach*, MAINE ATTY GEN, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5cd48662-983a-4c9d-8b5b-e5e097cbbcd5.html (last visited April 10, 2026).

[103] *Id.*

[104] *Id.*

115.    Despite the broad evidence of misuse—as publicly reported by *Bloomberg* and *The New York Times*—Columbia has substantially **misrepresented** the severity of the Data Breach, stating that "there is no evidence of identity theft or fraud"[105] and that "Columbia has also not identified any evidence at this time that this data has been offered for sale or otherwise posted publicly."[106]

116.    Omitted from Columbia's Data Breach Notice was any explanation of: (i) why it took Columbia approximately **two months** after the massive data exfiltration to even detect that its system had been infiltrated; (ii) whether further unauthorized access from the same cybercriminals was successfully prevented; (iii) the details of the root cause of the Data Breach; (iv) the vulnerabilities exploited in the Data Breach; (v) the remedial measures undertaken to ensure such a breach does not occur again; and (vi) the politically motivated nature of the Breach and the dangers that could flow from the same. To date, these omitted details have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

117.    Columbia's failure to notify Plaintiffs and Class Members of the nefarious motivations of the hacker is particularly galling as news reporting suggests that the hacker accessed Columbia's systems to acquire information about its affirmative action policies.[107] This motivation suggests that the cybercriminal perpetrating the Breach has animus towards individuals of minority ethnicities or other protected statuses.

---

[105] *Updating Our Community on 2025 Cyber Incident*, COLUMBIA (Jan. 6, 2026), https://communications.news.columbia.edu/news/updating-our-community-2025-cyber-incident.
[106] *Data Breach Notice*, IOWA ATTY GEN (Aug. 8, 2025), https://www.iowaattorneygeneral.gov/media/cms/882025_Columbia_University_8F543BE49BE 96.pdf.
[107] Elizabeth Lopatto, *This 'violently racist' hacker claims to be the source of The New York Times' Mamdani scoop*, THE VERGE (July 21, 2025), https://www.theverge.com/cyber-security/710480/columbia-hacker-nazi-nyt-affirmative-action.

118.    Columbia's Data Breach Notice provided a list of steps that Plaintiffs and Class Members should take to mitigate the risks resulting from the Data Breach. Columbia urged Plaintiffs and Class Members to "remain vigilant and review [their] account statements and free credit reports regularly to ensure there is no unauthorized or unexplained activity."[108] The Data Breach Notice also encouraged Plaintiffs and Class Members to freeze their credit.[109] Based on the list of actions Columbia counseled Plaintiffs and Class Members to take, Columbia acknowledged that Plaintiffs and Class Members now face an actual and imminent risk of fraud, identity theft, and/or other harms.

119.    In the Data Breach Notice, Columbia made an offer of two years of identity monitoring services. This is wholly inadequate to compensate Plaintiffs and Class Members as it fails to account for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information.

120.    Furthermore, Columbia's Data Breach Notice and suggested mitigation steps entirely fail to acknowledge the potential emotional, reputational, and other harms that could result from Plaintiffs' and Class Members' data being in the hands of hacktivists who have animus towards individuals of minority ethnicities and seek to "expose" Columbia's affirmative action policies.[110] Columbia does not provide any guidance on affirmative steps it has taken or that

---

[108] *Notice of Data Breach*, MAINE ATTY GEN,
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-
a1252b4f8318/5cd48662-983a-4c9d-8b5b-e5e097cbbcd5.html (last visited April 10, 2026).
[109] *Id.*
[110] P Castellanos, *Hacktivism is a Growing Threat to Higher Education*, Campus Technology (Aug. 27, 2025), https://campustechnology.com/articles/2025/08/27/hacktivism-is-a-growing-threat-to-higher-education.aspx? (describing the risks faced by victims of politically motivated cyberattacks on institutions of higher education, including "**Cyber-Physical Threats:** Perhaps the most

Plaintiffs or Class Members could take in anticipation of their Private Information being leaked by such actors.

121.    That Columbia is encouraging Plaintiffs and Class Members to enroll in credit monitoring and identity theft protection services and is warning Plaintiffs to be on guard for data misuse is an acknowledgment that cybercriminals obtained Plaintiffs' and Class Members' Private Information and thereby subjects them to a substantial and imminent threat of fraud and identity theft.

### D. *Columbia's Previous Data Breaches and Persisting Cybersecurity Failures*

122.    Worryingly, this Data Breach is only part and parcel of Defendant's pattern of negligent data security. In May 2024, *The Cyber Express*, a cybersecurity news site, reported that a cybercriminal group claimed credit for an unrelated, politically motivated cyberattack on Columbia.[111]

123.    Additionally, in 2007, Columbia inadvertently exposed 2,600 Social Security numbers belonging to its undergraduate students and alumni.[112] As a result of that security breach, Columbia sent letters to affected students and alumni, encouraging them to monitor their credit to guard against identity theft.[113]

---

dangerous evolution in hacktivism is the convergence of cyberattacks with real-world threats. This includes doxxing, or publishing personal information about faculty, administrators, students, or donors online; and swatting, or using stolen or publicized information to direct law enforcement to a victim's location under false pretenses. In these cases, the initial cyber actors and the individuals who act on the exposed information are often unrelated. Physical actors may be opportunists, extremists, or people in crisis, but the outcome can be harassment, threats, or even violence.").

[111] Samiksha Jain, *Hacktivists Claim Cyberattack on Columbia University After Police Crackdown on Protests*, THE CYBER EXPRESS (May 2, 2024), https://thecyberexpress.com/cyberattack-on-columbia-university/.

[112] Jacob Schneider, *Data Leak Puts 2,600 at Risk*, COLUMBIA DAILY SPECTATOR (Apr. 18, 2007), http://spectatorarchive.library.columbia.edu/?a=d&d=cs20070418-01.2.5&srpos=1&e=.

[113] *Id.*

124.    In addition, the Columbia University affiliated Irving Medical Center experienced a data breach involving the protected health information of 29,629 patients between September 11, 2023, and March 7, 2024.[114]

125.    These previous successful cyberattacks targeting Columbia further evidence Columbia's notice of risk and inexcusable lack of adequate cybersecurity measures.[115] Based on these prior attacks, Columbia knew that its systems were a target for hackers but chose not to implement adequate and necessary cyber security to protect Plaintiffs' and Class Members' Private Information.

126.    Continuing its history of intentionally disregarding reasonable and necessary data security practices, Columbia's network still was not protected by sufficient multi-layer data security technologies nor effective firewalls in 2025, as evidenced by the Data Breach's occurrence, despite recent incidents involving theft of data from Columbia.

127.    Similarly, based on the two-month-long delayed discovery of the intrusion, it is evident that Columbia's network, including portions that stored Plaintiffs' and Class Members' Private Information, did not have effective endpoint detection.

128.    Further, the fact that usable Private Information was accessed and obtained in the Data Breach demonstrates that the Private Information contained in the infiltrated network was not encrypted. Had the information been properly encrypted, the data thieves would have accessed only indecipherable data.

---

[114] Dora Gao, *CUIMC pays $600K in data breach lawsuit settlement*, COLUMBIA DAILY SPECTATOR (Sept. 24, 2025), https://www.columbiaspectator.com/news/2025/09/24/cuimc-pays-600k-in-data-breach-lawsuit-settlement/.

[115] P Castellanos, *Hacktivism is a Growing Threat to Higher Education*, Campus Technology (Aug. 27, 2025), https://campustechnology.com/articles/2025/08/27/hacktivism-is-a-growing-threat-to-higher-education.aspx? ("Universities are uniquely appealing targets for hacktivists: open networks create broad attack surfaces, diverse stakeholders fuel ideological disputes, and high visibility guarantees media attention.").

129.    News reports following the Data Breach have noted that "Columbia's breach highlights how digital vulnerabilities and institutional inaction can escalate into nationwide concerns."[116]

130.    The "politically motivated actor" who perpetrated the Data Breach "leveraged security gaps in Columbia's aging login infrastructure."[117] Specifically, the hacker "exploited unpatched vulnerabilities and remained undetected for a significant period. Real-time online discussions suggest that attackers exfiltrated hundreds of gigabytes of sensitive data."[118]

131.    "Technical evaluations show that the [Data Breach] was enabled by vulnerabilities in Columbia's outdated single sign-on (SSO) platform software that was not updated to meet modern security standards. Attackers exploited this vulnerability and moved laterally across the system to access high-value datasets."[119]

132.    Moreover, Columbia's "[b]reach response time was considerable, raising concerns about Columbia's monitoring and incident response capabilities."[120] And "[a]nalysts now suggest that a more robust threat detection system could have flagged unusual access patterns much earlier, possibly minimizing the extent of the breach."[121]

133.    As a result of Columbia's failure to implement reasonable industry-standard data security measures, Plaintiffs' and Class Members' Private Information was accessed and stolen in the Data Breach. Plaintiffs' and Class Members' Private Information was then disseminated to

---

[116] David Eberly, *Millions of Columbia University Records Exposed in Political Cyberattack*, THE NATIONAL CIO REVIEW (Aug. 6, 2025), https://nationalcioreview.com/articles-insights/extra-bytes/millions-of-columbia-university-records-exposed-in-political-cyberattack/.
[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *Id.*

multiple news outlets and, upon information and belief, posted and made available for sale on the Dark Web.

134.    Columbia had obligations created by contract, state and federal law, common law, and industry standards to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

135.    Columbia failed to take the necessary precautions required to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

136.    Columbia also failed to provide timely notice of the Data Breach to Plaintiffs and Class Members.

137.    Defendant's actions represent a flagrant disregard of Plaintiffs' and Class Members' rights, both as to privacy and property.

**E.  *Plaintiffs' Experiences and Injuries***

*Plaintiff Khamari Babb*

138.    Plaintiff Babb is a former applicant of Columbia (i.e., he applied to attend Columbia as a student but did not matriculate). Thus, Plaintiff Babb last provided his Private Information to Columbia on or around November 18, 2024.

139.    Pursuant to this relationship, Columbia required that Plaintiff Babb disclose a wide variety of Private Information.

140.    In doing so, Plaintiff Babb trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Babb would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and

exfiltration. Columbia obtained and continues to maintain Plaintiff Babb's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

141.    Plaintiff Babb does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

142.    Plaintiff Babb received a Data Breach Notice from Columbia in or around August 2025, advising him that his Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff Babb was injured by the Data Breach.

143.    In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Babb's Private Information including at least the following: name; contact details; date of birth; Social Security number; demographic information; academic history; financial-aid related information; insurance-related information; and health-related information.

144.    On information and belief, the Data Breach exposed a broader range of Plaintiff Babb's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff Babb, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[122]

145.    Plaintiff Babb is very careful about the privacy and security of his Private Information—and Plaintiff Babb protects his Private Information by, *inter alia*, keeping sensitive documents in a safe deposit box or locked safe and changing online passwords frequently.

146.    Additionally, Plaintiff Babb checks his credit report every two to four weeks through Experian or annualcreditreport.com.

---

[122] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

147.     Plaintiff Babb suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[123]

148.     On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Babb and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Babb, Zohran Mamdani, and all other Class Members).[124]

149.     Plaintiff Babb has spent—and will continue to spend—significant time and effort attempting to mitigate the harms of the Data Breach by, among other things, monitoring his accounts to protect himself from identity theft and other harms. Indeed, as a result of the Data Breach, Plaintiff Babb has lost several hours attempting to mitigate the fallout of the Data Breach, including researching the Data Breach, changing account access credentials, logins, and passwords, addressing and disputing fraudulent transactions, purchasing credit monitoring services, and reviewing credit monitoring reports. This is valuable time that Plaintiff Babb would have spent on other activities, including but not limited to work and/or recreation. Plaintiff Babb's remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Babb to take those steps in its Data Breach Notice.

150.     As a result of the Data Breach, Plaintiff Babb suffered actual misuse of his Private Information in the form of fraudulent charges on his debit card accounts. These fraudulent charges, beginning in January 2026, required Plaintiff Babb to replace his debit card. Further, Plaintiff Babb received notifications from TransUnion, on December 16, 2025, and March 16, 2026, that his Private Information has been found on the Dark Web. Plaintiff Babb attributes the fraudulent

---

[123] *Id.*
[124] *Id.*

transactions and data misuse to the Data Breach given the time proximity, the unusual nature of the activity, the fact that he is very careful with his Private Information, the fact that financial account information was provided to Columbia and was stolen in the Data Breach, and the fact that cybercriminals frequently post Private Information to the Dark Web following a data breach.

151.    Due to the Data Breach and the actual misuse of his stolen data following the Data Breach, Plaintiff Babb has spent money on credit monitoring services to attempt to safeguard his Private Information. Specifically, Plaintiff Babb is paying $19.95 a month for credit monitoring through Equifax on an ongoing basis.

152.    Plaintiff Babb's Private Information is a form of intangible property that Columbia was required to adequately protect from unauthorized disclosure. Plaintiff Babb suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen and disseminated by a politically motivated "neo-Nazi" hacker.

153.    As a former Columbia applicant, Plaintiff Babb was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Babb suffered actual injury and lost the "benefit of his bargain." He provided his Private Information to Columbia, and paid an application fee, with the reasonable and mutual expectation that Columbia would implement and maintain reasonable data security practices—but Columbia cut corners and did not provide the bargained for data security. Had Columbia been transparent about its deficient data security, Plaintiff Babb would not have entrusted Columbia with his Private Information.

154.    Because of the Data Breach, Plaintiff Babb suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

155.    Because of the Data Breach, Plaintiff Babb suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize his stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

156.    Columbia deprived Plaintiff Babb of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

157.    Plaintiff Babb has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

158.    As a direct and traceable result of the Data Breach, Plaintiff Babb suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession and is subject to further unauthorized disclosures so long as Columbia fails to undertake appropriate and adequate measures to protect the Private Information it collects and stores; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Babb; (h) actual fraud and data misuse; and (i) other economic and non-economic harm (as detailed herein).

*Plaintiff Raymond Chao*

159.    Plaintiff Chao is a former student of Columbia—having last attended Columbia in or around 2021. Thus, Plaintiff Chao last provided his Private Information to Columbia in 2021.

160.    During the time he was a student at Columbia, Plaintiff Chao paid money to Columbia for tuition, fees, and data security (which, upon information and belief, is funded from a portion of the tuition and fees that Columbia charges its students).

161.    Pursuant to this relationship, Columbia required that Plaintiff Chao disclose a variety of Private Information, including, on information and belief, his name, contact details, Social Security number, demographic information, academic history, financial-aid related information, financial account information including credit and debit card information, insurance-related information, and health-related information.

162.    In doing so, Plaintiff Chao trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Chao would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Upon information and belief, Columbia continues to maintain Plaintiff Chao's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

163.    Plaintiff Chao reasonably understood that a portion of the funds he paid to Columbia would be used to pay for adequate cybersecurity and protection of his Private Information.

45

164.    Plaintiff Chao does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

165.    On information and belief, Plaintiff Chao is a Class Member, and his Private Information was exposed and stolen in the Data Breach. Plaintiff provided his Private Information to Columbia before the Data Breach occurred. Moreover, Bloomberg confirmed that the stolen data included "at least 1.8 million Social Security numbers" and "2.5 million applications[.]"[125] Thus, the size of the Class appears to be far larger than the 868,969 number that Columbia reported to the Maine Attorney General in August 2025.[126]

166.    On information and belief, the Data Breach exposed a broader range of Plaintiff Chao's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff Chao, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[127]

167.    Plaintiff Chao is very careful about the privacy and security of his Private Information—and Plaintiff Chao protects his Private Information by, *inter alia*, shredding sensitive financial documents; using strong passwords or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

168.    Additionally, Plaintiff Chao checks his credit report every month through his bank account.

---

[125] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.
[126] *Data Breach Notifications*, MAINE ATTY GEN (Aug. 7, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5cd48662-983a-4c9d-8b5b-e5e097cbbcd5.html.
[127] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

169.    Plaintiff Chao suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[128]

170.    On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Chao and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Chao, Zohran Mamdani, and all other Class Members).[129]

171.    Plaintiff Chao has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms.

172.    As a result of the Data Breach, Plaintiff Chao has lost approximately three (3) hours attempting to mitigate the fallout of the Data Breach by inquiring about the Data Breach, monitoring his accounts for suspicious activity, and contacting his bank regarding the fraudulent charge (discussed *infra*). This is valuable time that Plaintiff Chao would have spent on other activities, including but not limited to work and/or recreation.

173.    In the months following the Data Breach, Plaintiff Chao suffered actual misuse of his Private Information in the form of a fraudulent charge on his financial account card. Plaintiff Chao attributes the fraudulent charge to the Data Breach given the time proximity, the unusual nature of the activity, the fact that he is very careful with his Private Information, the fact that financial account information was provided to Columbia and was among the sensitive information stolen in the Data Breach.

174.    In the aftermath of the Data Breach, Plaintiff Chao suffered from a sharp increase in suspicious and targeted phishing attempts and scam calls and emails. On information and belief,

---

[128] *Id.*
[129] *Id.*

these suspicious phishing attempts and scam calls and emails are a continuation of the "very targeted" actions by the "neo-Nazi" hacker to "further[] their political agenda" by targeting, exposing, or otherwise harming individuals associated with Columbia (including Plaintiff Chao, Zohran Mamdani, and all other Class Members).[130]

175.    Plaintiff Chao has suffered from fear and anxiety because his Private Information was stolen by politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia as well as on account of knowing that his highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against him for the rest of his life. Furthermore, these emotional injuries have resulted in physical manifestations, including sleep disruption.

176.    Plaintiff Chao's Private Information is a form of intangible personal property that Columbia was required to adequately protect from unauthorized disclosure. Plaintiff Chao suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

177.    As a former student, Plaintiff Chao was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Chao suffered actual injury and lost the "benefit of the bargain." He provided his Private Information to Columbia with the reasonable and mutual expectation that Columbia would implement and maintain reasonable data security practices and paid Columbia for educational services and reasonable data security—but Columbia cut corners and declined to provide the bargained for data

---

[130] *Id.*

security. If Columbia had been transparent about its deficient data security, Plaintiff Chao (1) would not have entrusted his Private Information to Columbia, (2) would have declined to matriculate at Columbia and attended a different educational institution instead, or (3) would have matriculated at Columbia only if Columbia reduced its prices to account for the deficient data security.

178.    Because of the Data Breach, Plaintiff Chao suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

179.    Because of the Data Breach, Plaintiff Chao suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

180.    Columbia deprived Plaintiff Chao of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

181.    Plaintiff Chao has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

182.    As a direct and traceable result of the Data Breach, Plaintiff Chao suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private

49

Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Chao; (h) actual fraud involving his financial account; and (i) other economic and non-economic harm (as detailed herein).

### *Plaintiff Steven Daley*

183.    Plaintiff Daley is a former applicant of Columbia (i.e., he applied to attend Columbia as a student but did not matriculate). Thus, Plaintiff Daley last provided his Private Information to Columbia on or around May 2016.

184.    Pursuant to this relationship, Columbia required that Plaintiff Daley disclose at least the following types of Private Information: name, contact details, Social Security number, demographic information, academic history, and financial aid-related information.

185.    In doing so, Plaintiff Daley trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Daley would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Daley's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

186.    Plaintiff Daley received a Data Breach Notice from Columbia advising him that his Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

187.    In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Daley's Private Information including at least the following: name, contact details, date of birth, Social Security number, demographic information, academic history, and financial aid-related information.

188.    On information and belief, the Data Breach exposed a broader range of Plaintiff Daley's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia obtained a wide array of Private Information from Plaintiff Daley, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[131]

189.    Plaintiff Daley is very careful about the privacy and security of his Private Information—and Plaintiff Daley protects his Private Information by, *inter alia*, keeping sensitive documents in a safe deposit box or locked safe; shredding sensitive financial documents; using strong passwords or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

190.    Additionally, Plaintiff Daley checks his credit report every month through his bank account and credit bureau accounts.

191.    Plaintiff Daley suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[132]

---

[131] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.
[132] *Id*.

51

192.    On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Daley and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Daley, Zohran Mamdani, and all other Class Members).[133]

193.    Plaintiff Daley has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms. Plaintiff Daley's remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Daley to take those steps in its Data Breach Notice.

194.    In particular, as a result of the Data Breach, Plaintiff Daley has lost approximately ten (10) hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach, reviewing his various accounts for suspicious activity, and reviewing credit monitoring and dark web reports for unusual activity. This is valuable time that Plaintiff Daley would have spent on other activities, including but not limited to work and/or recreation.

195.    Shortly after the Data Breach, Plaintiff Daley suffered actual misuse of his Private Information when the hacker published his Private Information on the Dark Web. Since the Data Breach, Plaintiff Daley has received numerous alerts through his Financial Shield Dark Web monitoring service advising him that his Private Information has been located on the Dark Web, including notifications received on October 19, 2025, October 27, 2025, December 12, 2025, and January 27, 2026. Plaintiff Daley attributes these Dark Web postings to the Data Breach given the time proximity, the fact that he is very careful with his Private Information, and given that cybercriminals frequently post Private Information to the Dark Web following a data breach.

---

[133] *Id.*

196.    In the aftermath of the Data Breach, Plaintiff Daley also suffered from a sharp increase in suspicious and targeted phishing attempts and scam emails, and text messages since or around July 2025. On information and belief, these suspicious phishing attempts and scam messages are a continuation of the "very targeted" actions by the "neo-Nazi" hacker to "further[] their political agenda" by targeting, exposing, or otherwise harming individuals associated with Columbia (including Plaintiff Daley, Zohran Mamdani, and all other Class Members).[134]

197.    Plaintiff Daley has suffered from fear and anxiety because his Private Information was stolen by politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia as well as on account of knowing that his highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against him for the rest of his life. Furthermore, these emotional injuries have resulted in physical manifestations including sleep disruption.

198.    Plaintiff Daley's Private Information is a form of intangible personal property that Columbia was required to adequately protect from unauthorized disclosure. Plaintiff Daley suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

199.    As a former applicant, Plaintiff Daley was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Daley suffered actual injury and lost the "benefit of the bargain." He entrusted Columbia with his Private Information and paid Columbia an application fee with the reasonable and mutual expectation that

---

[134] *Id*.

Columbia would implement and maintain reasonable data security practices—but Columbia cut corners and did not provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Daley would not have provided his Private Information to Columbia.

200. Because of the Data Breach, Plaintiff Daley suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

201. Because of the Data Breach, Plaintiff Daley suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

202. Columbia deprived Plaintiff Daley of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

203. Plaintiff Daley has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

204. As a direct and traceable result of the Data Breach, Plaintiff Daley suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the Dark Web, remains unencrypted and available

for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Daley; (h) the actual misuse of his data, which has been posted to the Dark Web; and (i) other economic and non-economic harm (as detailed herein).

### *Plaintiff Randall Erwin*

205.    Plaintiff Erwin is a current student of Columbia, having matriculated in 2025. Thus, Plaintiff Erwin last provided his Private Information to Columbia on or around 2025.

206.    As a student at Columbia, Plaintiff Erwin paid money to Columbia for tuition, fees, and data security (which, upon information and belief, is funded from a portion of the tuition and fees that Columbia charges its students).

207.    Pursuant to this student relationship, Columbia required that Plaintiff Erwin disclose at least the following types of Private Information: name; contact details; Social Security number; demographic information; academic history; financial-aid related information; financial account information, including credit and debit card information; insurance-related information; and health-related information.

208.    In doing so, Plaintiff Erwin trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Erwin would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Erwin's Private Information

and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

209. Plaintiff Erwin reasonably understood that a portion of the funds paid to Columbia would be used to pay for adequate cybersecurity and protection of his Private Information.

210. Plaintiff Erwin does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

211. Plaintiff Erwin received a Data Breach Notice from Columbia dated August 7, 2025, advising Plaintiff Erwin that his Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

212. In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Erwin's Private Information including at least the following: name; contact details; date of birth; Social Security number; demographic information; academic history; financial-aid related information; insurance-related information; and health-related information.

213. On information and belief, the Data Breach exposed a broader range of Plaintiff Erwin's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia obtained a wide array of Private Information from Plaintiff Erwin, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[135]

214. Plaintiff Erwin is very careful about the privacy and security of his Private Information—and Plaintiff Erwin protects his Private Information by, *inter alia*, keeping sensitive documents in a safe deposit box or locked safe; shredding sensitive financial documents; using

---

[135] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

strong passwords, or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

215.    Additionally, Plaintiff Erwin checks his credit report two times per week through his bank accounts or credit monitoring service.

216.    Plaintiff Erwin suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[136]

217.    On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Erwin and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Erwin, Zohran Mamdani, and all other Class Members).[137]

218.    Plaintiff Erwin has experienced actual fraud in the wake of the Data Breach. Specifically, in March 2026, Plaintiff Erwin experienced a fraudulent charge in the amount of approximately $96 on his debit card. Plaintiff Erwin attributes this fraudulent activity to the Data Breach based on the proximity in time, the unusual nature of the fraud, the fact that he is very careful with his Private Information, and the fact that he recalls providing Columbia with this bank account information, including when he used the compromised debit card to pay for Columbia's application fee.

219.    Plaintiff Erwin has spent—and will continue to spend—significant time and effort monitoring his accounts, disputing the fraudulent transaction on his debit card, and taking other steps in an effort to protect himself from identity theft and other harms. Plaintiff Erwin's

---

[136] *Id*.
[137] *Id*.

remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Erwin to take those steps in its Data Breach Notice.

220.    As a result of the Data Breach, Plaintiff Erwin has lost approximately five (5) hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach, monitoring his account for suspicious activity, addressing fraud, and dealing with scam phone calls. This is valuable time that Plaintiff Erwin would have spent on other activities, including but not limited to work and/or recreation.

221.    In the aftermath of the Data Breach, Plaintiff Erwin suffered from a sharp increase in suspicious and targeted scam calls. On information and belief, these suspicious scam calls are a continuation of the "very targeted" actions by the "neo-Nazi" hacker to "further[] their political agenda" by targeting, exposing, or otherwise harming individuals associated with Columbia (including Plaintiff Erwin, Zohran Mamdani, and all other Class Members).[138]

222.    Plaintiff Erwin has suffered from fear and anxiety because his Private Information was stolen by a politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia as well as on account of knowing that his highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against him for the rest of his life. Furthermore, these emotional injuries have resulted in physical manifestations including sleep disruption.

223.    Plaintiff Erwin's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Erwin suffered actual injury in the form of damages

---

[138] *Id.*

to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

224.    As a current student, was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Erwin suffered actual injury and lost the "benefit of the bargain." He entrusted Columbia with his Private Information with the reasonable and mutual expectation that Columbia would implement and maintain adequate data security practices and paid Columbia for educational services and reasonable data security—but Columbia cut corners and declined to provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Erwin (1) would not have provided his Private Information to Columbia, (2) would have declined to matriculate at Columbia and attended a different educational institution instead, or (3) would have matriculated at Columbia only if Columbia reduced its prices to account for the deficient data security.

225.    Because of the Data Breach, Plaintiff Erwin suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

226.    Because of the Data Breach, Plaintiff Erwin suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

227.    Columbia deprived Plaintiff Erwin of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

228.    Plaintiff Erwin has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

229.    As a direct and traceable result of the Data Breach, Plaintiff Erwin suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Erwin; (h) actual fraud on his financial account; and (i) other economic and non-economic harm (as detailed herein).

### *Plaintiff David Guirgis*

230.    Plaintiff Guirgis is a former student and employee of Columbia—having last attended Columbia in or around May 2025. Thus, Plaintiff Guirgis last provided his Private Information to Columbia on or around May 2025.

231.    During the time he was a student at Columbia, Plaintiff Guirgis paid money to Columbia for tuition, fees, and data security (which, upon information and belief, is funded from a portion of the tuition and fees that Columbia charges its students).

232. Pursuant to this student and employee relationship, Columbia required that Plaintiff Guirgis disclose at least the following types of Private Information: name; contact details; Social Security number; demographic information; academic history; financial-aid related information; financial account information, including credit and debit card information; insurance-related information; and health-related information.

233. In doing so, Plaintiff Guirgis trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Guirgis would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Guirgis's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

234. Plaintiff Guirgis reasonably understood that a portion of the funds paid to Columbia and/or derived from his employment with Columbia would be used to pay for adequate cybersecurity and protection of his Private Information.

235. Plaintiff Guirgis received a Data Breach Notice from Columbia on July 2, 2025, advising Plaintiff Guirgis that his Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

236. The Data Breach Notice did not specify what Private Information was exposed. On information and belief, the Data Breach exposed Plaintiff Guirgis's Private Information including at least the following: name; contact details; date of birth; Social Security number; demographic

information; academic history; financial-aid related information; insurance-related information; and health-related information.

237.    On information and belief, the Data Breach exposed a broader range of Plaintiff Guirgis's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff Guirgis, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[139]

238.    Plaintiff Guirgis is very careful about the privacy and security of his Private Information—and Plaintiff Guirgis protects his Private Information by, *inter alia*, keeping sensitive documents in a safe; shredding sensitive financial documents; using strong passwords, or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

239.    Additionally, Plaintiff Guirgis checks his credit report every few months through Credit Karma and Experian.

240.    Plaintiff Guirgis suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[140]

241.    On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Guirgis and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals

---

[139] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.
[140] *Id*.

associated with Columbia (including Plaintiff Guirgis, Zohran Mamdani, and all other Class Members).[141]

242.    Plaintiff Guirgis has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms. Plaintiff Guirgis' remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Guirgis to take those steps in its Data Breach Notice.

243.    As a result of the Data Breach, Plaintiff Guirgis has lost approximately half-a-day attempting to mitigate the fallout of the Data Breach by researching the Data Breach, monitoring his accounts for suspicious activity, and changing account access credentials, logins, and passwords for at-risk, sensitive, and financial accounts. Now, Plaintiff spends several minutes each day checking his bank account for signs of suspicious activity.

244.    This is valuable time that Plaintiff Guirgis would have spent on other activities, including but not limited to work and/or recreation.

245.    In the fallout of the Data Breach, Plaintiff Guirgis suffered from the misuse of his Private Information as evidenced by unusual activity to his credit resulting in an unexpected 26-point decline in his credit score on August 7, 2025.

246.    In the aftermath of the Data Breach, Plaintiff Guirgis suffered from a sharp increase in suspicious and targeted phishing attempts, fake receipts, and other scam emails to his personal, professional, and Columbia-specific email accounts. Some of these phishing attempts involved individuals impersonating PayPal and Geek Squad. Notably, these targeted phishing attempts, fake receipts, and other scam emails that evade his spam filter and flood his main inbox. On information and belief, these suspicious phishing attempts and scam messages are a continuation of the "very

---

[141] *Id.*

targeted" actions by the "neo-Nazi" hacker to "further[] their political agenda" by targeting, exposing, or otherwise harming individuals associated with Columbia (including Plaintiff Guirgis, Zohran Mamdani, and all other Class Members).[142]

247.    Plaintiff Guirgis has suffered from fear and anxiety because his Private Information was stolen by politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia as well as on account of knowing that his highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against him for the rest of his life.

248.    Plaintiff Guirgis' Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Guirgis suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

249.    As a former student, Plaintiff Guirgis was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Guirgis suffered actual injury and lost the "benefit of the bargain." Plaintiff Guirgis provided his Private Information to Columbia with the reasonable and mutual expectation that Columbia would implement and maintain adequate data security practices and paid Columbia for educational services and reasonable data security—but Columbia cut corners and declined to provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Guirgis (1) would not have entrusted Columbia with his Private Information, (2) would

---

[142] *Id.*

have declined to matriculate at Columbia and attended a different educational institution instead, or (3) would have matriculated at Columbia only if Columbia reduced its prices to account for the deficient data security.

250.    As a former employee, Plaintiff Guirgis suffered actual injury and lost the "benefit of the bargain" when Plaintiff Guirgis provided his Private Information and labor to Columbia in exchange for both payment and reasonable data security for his Private Information. After all, if Columbia was transparent about its deficient data security, then Plaintiff Guirgis would have either (1) not worked for Columbia at all, or (2) would have required a salary premium (i.e., a "compensating wage differential") to account for the non-standard risk incurred.[143]

251.    Because of the Data Breach, Plaintiff Guirgis suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

252.    Because of the Data Breach, Plaintiff Guirgis suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

253.    Columbia deprived Plaintiff Guirgis of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

254.    Plaintiff Guirgis has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

---

[143] Economics has long recognized that "[w]orkers choose a job and receive in return a bundle consisting of income and a probability of [] injury" and that "jobs with disagreeable characteristics command higher wages[.]" Jeff E. Biddle & Gary A. Zarkin, *Worker Preference and Market Compensation for Job Risk*, 70(4) REV. ECON. & STAT. 660, 660–61 (1988); Robert S. Smith, *Compensating Wage Differentials and Public Policy: A Review*, 32 INDUS. & LAB. REL. REV. 339 (1979); Greg J. Duncan & Bertil Holmlund, *Was Adam Smith Right After All? Another Test of the Theory of Compensating Wage Differentials*, 1 J. LABOR ECON. 336, 336–37 (1983).

255.    As a direct and traceable result of the Data Breach, Plaintiff Guirgis suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Guirgis; (h) actual data misuse; and (i) other economic and non-economic harm (as detailed herein).

### *Plaintiff Alex Hall*

256.    Plaintiff Hall is a former applicant of Columbia (i.e., he applied to attend Columbia as a student but did not matriculate). Thus, Plaintiff Hall last provided his Private Information to Columbia on or around 2020.

257.    Pursuant to this relationship, Columbia required that Plaintiff Hall disclose at least the following types of Private Information: name, date of birth, Social Security number, financial aid information, contact information, and familial information.

258.    In doing so, Plaintiff Hall trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Hall would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Hall's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

259.    Plaintiff Hall received a Data Breach Notice from Columbia on or around August 8, 2025, advising Plaintiff Hall that his Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

260.    In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Hall's Private Information including at least the following: name; Social Security number; date of birth, contact details, demographic information, academic history, financial aid-related information, insurance-related information, and health information.

261.    On information and belief, the Data Breach exposed a broader range of Plaintiff Hall's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff Hall, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[144]

262.    Plaintiff Hall is very careful about the privacy and security of his Private Information—and Plaintiff Hall protects his Private Information by, *inter alia*, keeping sensitive

---

[144] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

documents in a safe deposit box or locked safe; shredding sensitive financial documents; using strong passwords, or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

263.   Additionally, Plaintiff Hall checks his credit report every quarter.

264.   Plaintiff Hall suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[145]

265.   On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Hall and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Hall, Zohran Mamdani, and all other Class Members).[146]

266.   Plaintiff Hall has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms. Plaintiff Hall's remediation efforts are reasonable and foreseeable considering that Columbia itself directed Plaintiff Hall to take those steps in its Data Breach Notice.

267.   As a result of the Data Breach, Plaintiff Hall has lost approximately ten (10) hours per week attempting to mitigate the fallout of the Data Breach by researching the Data Breach, contacting credit bureaus to place a credit freeze, monitoring his accounts for suspicious activity, investigating fraudulent activity, contacting his bank regarding fraudulent activity, changing access credentials to at-risk, sensitive financial accounts, and physically traveling to the Social Security Administration office to change his Social Security number. This is valuable time that

---

[145] *Id.*
[146] *Id.*

Plaintiff Hall would have spent on other activities, including but not limited to work and/or recreation.

268. As a result of the Data Breach, Plaintiff Hall suffered from the misuse of his Private Information when cybercriminals used his Private Information to commit identity theft and placed fraudulent charges on his financial account with Capital One. Specifically, in August 2025, Plaintiff Hall's financial account reflected a fraudulent transaction for Roku services that he did not authorize. Plaintiff Hall attributes this fraudulent transaction to the Data Breach given the proximity in time, the unusual nature of the activity, the fact that he is very careful with his Private Information, and the fact that his financial information (including account information) was provided to Columbia.

269. Plaintiff Hall has incurred significant out of pocket costs as a result of the Data Breach. Approximately one week after he received the Data Breach Notice, Plaintiff Hall paid approximately $25 for one month of monitoring services from Equifax to guard against the fallout of the Data Breach. Plaintiff Hall had tried to sign up for the credit monitoring services offered by Columbia; however, the sign-up process did not work—and Plaintiff Hall was forced to spend his own money to purchases services from Equifax to review his credit report and monitor for any signs of identity theft or fraud caused by the Data Breach. He has specifically maintained this subscription because of the Data Breach and to mitigate his damages caused by the Data Breach.

270. In the aftermath of the Data Breach, Plaintiff Hall suffered from a sharp increase in suspicious and targeted phishing attempts and scam calls and text messages. On information and belief, these suspicious phishing attempts and scam messages are a continuation of the "very targeted" actions by the "neo-Nazi" hacker to "further[] their political agenda" by targeting,

exposing, or otherwise harming individuals associated with Columbia (including Plaintiff Hall, Zohran Mamdani, and all other Class Members).[147]

271. Plaintiff has suffered from fear and anxiety because his Private Information was stolen by a politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia, as well as on account of knowing that his highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against him for the rest of his life. Furthermore, these emotional injuries forced Plaintiff Hall to make changes to his medical prescriptions.

272. Plaintiff Hall's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Hall suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

273. As a former applicant, Plaintiff Hall was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Hall suffered actual injury and lost the "benefit of the bargain." Plaintiff Hall provided his Private Information to Columbia with the reasonable and mutual expectation that Columbia would implement and maintain adequate data security practices and paid Columbia an application fee— but Columbia cut corners and declined to provide the bargained for data security. Had Columbia been transparent about its deficient data security, then Plaintiff Hall would not have entrusted Columbia with his Private Information.

---

[147] *Id.*

274.    Because of the Data Breach, Plaintiff Hall suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

275.    Because of the Data Breach, Plaintiff Hall suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

276.    Columbia deprived Plaintiff Hall of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

277.    Plaintiff Hall has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

278.    As a direct and traceable result of the Data Breach, Plaintiff Hall suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from

Plaintiff Hall; (h) actual fraud involving his financial account; and (g) other economic and non-economic harm (as detailed herein).

### Plaintiff Shakeem Holmes

279.    Plaintiff Holmes is a former student of Columbia—having last attended Columbia in or around 2020. Thus, Plaintiff Holmes last provided his Private Information to Columbia on or around 2020.

280.    During the time he was a student at Columbia, Plaintiff Holmes paid money to Columbia for tuition, fees, and data security (which, upon information and belief, is funded from a portion of the tuition and fees that Columbia charges its students).

281.    Pursuant to this student relationship, Columbia required that Plaintiff Holmes disclose, on information and belief, at least the following types of Private Information name, contact details, Social Security number, demographic information, academic history, financial-aid related information, insurance-related information, and health-related information.

282.    In doing so, Plaintiff Holmes trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Holmes would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Holmes's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

283.    Plaintiff Holmes reasonably understood that a portion of the funds paid to Columbia would be used to pay for adequate cybersecurity and protection of his Private Information.

284.     On information and belief, Plaintiff Holmes is a Class Member, and his Private Information was exposed and stolen in the Data Breach. After all, Plaintiff provided his Private Information to Columbia before the Data Breach occurred. Moreover, Bloomberg confirmed that the stolen data included "at least 1.8 million Social Security numbers" and "2.5 million applications[.]"[148] Thus, the size of the Class appears to be far larger than the 868,969 number that Columbia reported to the Maine Attorney General in August 2025.[149]

285.     On information and belief, the Data Breach exposed a broader range of Plaintiff Holmes's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff Holmes, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[150]

286.     Plaintiff Holmes is very careful about the privacy and security of his Private Information—and Plaintiff Holmes protects his Private Information by, *inter alia*, shredding sensitive financial documents; using strong passwords, or random password generators for online accounts; and using unique passwords for each account.

287.     Additionally, Plaintiff Holmes checks his credit report every month or two through his bank account.

---

[148] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

[149] *Data Breach Notifications*, MAINE ATTY GEN (Aug. 7, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5cd48662-983a-4c9d-8b5b-e5e097cbbcd5.html.

[150] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

288. Plaintiff Holmes suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[151]

289. On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Holmes and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Holmes, Zohran Mamdani, and all other Class Members).[152]

290. Plaintiff Holmes has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms.

291. As a result of the Data Breach, Plaintiff Holmes has lost at least two (2) hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach and carefully monitoring his financial account transactions. This is valuable time that Plaintiff Holmes would have spent on other activities, including but not limited to work and/or recreation.

292. Plaintiff Holmes' Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Holmes suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

293. As a former student, Plaintiff Holmes was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Holmes suffered actual injury and lost the "benefit of the bargain." He entrusted Columbia with

---

[151] *Id.*
[152] *Id.*

his Private Information with the reasonable and mutual expectation that Columbia would implement and maintain reasonable data security practices and paid Columbia for educational services and reasonable data security—but Columbia cut corners and declined to provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Holmes (1) would not have entrusted Columbia with his Private Information, (2) would have declined to matriculate at Columbia and attended a different educational institution instead, or (3) would have matriculated at Columbia only if Columbia reduced its prices to account for the deficient data security.

294.    Because of the Data Breach, Plaintiff Holmes suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

295.    Because of the Data Breach, Plaintiff Holmes suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

296.    Columbia deprived Plaintiff Holmes of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

297.    Plaintiff Holmes has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

298.    As a direct and traceable result of the Data Breach, Plaintiff Holmes suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss

of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Holmes; and (h) other economic and non-economic harm (as detailed herein).

### *Plaintiff Rema Khacho*

299. Plaintiff Khacho is a former student of Columbia—having graduated from Columbia in or around 2025. Thus, Plaintiff Khacho last provided her Private Information to Columbia on or around 2025

300. During the time she was a student at Columbia, Plaintiff Khacho paid money to Columbia for tuition, fees, and data security (which, upon information and belief, is funded from a portion of the tuition and fees that Columbia charges its students).

301. Pursuant to this student relationship, Columbia required that Plaintiff Khacho disclose at least the following types of Private Information: name, contact details, Social Security number, demographic information, academic history, financial aid information, financial account information including credit and debit card information. health information, and financial account information.

302. In doing so, Plaintiff Khacho trusted that Columbia would use reasonable measures to protect her Private Information according to Columbia's internal policies, as well as state and

federal law. Plaintiff Khacho would not have allowed Columbia, or anyone in Columbia's position, to maintain her Private Information if she believed Columbia would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Khacho's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

303. Plaintiff Khacho reasonably understood that a portion of the funds paid to Columbia would be used to pay for adequate cybersecurity and protection of her Private Information.

304. Plaintiff Khacho does not recall ever learning that her information was compromised in a data breach incident—other than the Data Breach at issue here.

305. Plaintiff Khacho received a Data Breach Notice from Columbia on or around August 7, 2025, advising Plaintiff Khacho that her Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

306. In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Khacho's Private Information including at least the following: name; contact details; date of birth; Social Security number; demographic information; academic history; financial-aid related information; insurance-related information; and health-related information.

307. On information and belief, the Data Breach exposed a broader range of Plaintiff Khacho's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff Khacho, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[153]

---

[153] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

308.    Plaintiff Khacho is very careful about the privacy and security of her Private Information—and Plaintiff Khacho protects her Private Information by, *inter alia*, shredding sensitive financial documents; using strong passwords, or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

309.    Additionally, Plaintiff Khacho checks her credit report every two months through her credit monitoring service.

310.    Plaintiff Khacho suffered an invasion of privacy when her Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[154]

311.    On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Khacho and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Khacho, Zohran Mamdani, and all other Class Members).[155]

312.    Plaintiff Khacho has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft and other harms. Plaintiff Khacho's remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Khacho to take those steps in its Data Breach Notice.

313.    As a result of the Data Breach, Plaintiff Khacho has lost approximately three (3) hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach, monitoring her accounts for suspicious activity, changing account access credentials, log ins, and

---

[154] *Id.*
[155] *Id.*

passwords for at-risk, sensitive, and financial accounts. This is valuable time that Plaintiff Khacho would have spent on other activities, including but not limited to work and/or recreation.

314.    In the aftermath of the Data Breach, Plaintiff Khacho suffered from a sharp increase in suspicious and targeted phishing attempts and scam calls, emails, and text messages—wherein nefarious actors purport to be from Coinbase and financial institutions that she does not recognize. Additionally, she receives targeted phishing attempts wherein nefarious actors claim that her personal accounts were logged out and then provide links to purportedly resolve the issue. On information and belief, these suspicious phishing attempts and scam messages are a continuation of the "very targeted" actions by the "neo-Nazi" hacker to "further[] their political agenda" by targeting, exposing, or otherwise harming individuals associated with Columbia (including Plaintiff Khacho, Zohran Mamdani, and all other Class Members).[156]

315.    Plaintiff has suffered from fear and anxiety because her Private Information was stolen by politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia as well as on account of knowing that her highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against her for the rest of her life.

316.    Plaintiff Khacho's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Khacho suffered actual injury in the form of damages to and diminution in the value of her Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

---

[156] *Id.*

317.    As a former student, Plaintiff Khacho was required to and did entrust Columbia with her Private Information with the reasonable and mutual expectation that Columbia would adequately secure her Private Information and protect it from unauthorized access. Plaintiff Khacho suffered actual injury and lost the "benefit of the bargain." She entrusted Columbia with her Private Information with the reasonable and mutual expectation that Columbia would implement and maintain reasonable data security practices and paid Columbia for educational services and reasonable data security—but Columbia cut corners and declined to provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Khacho (1) would not have entrusted Columbia with her Private Information, (2) would have declined to matriculate at Columbia and attended a different educational institution instead, or (3) would have matriculated at Columbia only if Columbia reduced its prices to account for the deficient data security.

318.    Because of the Data Breach, Plaintiff Khacho suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

319.    Because of the Data Breach, Plaintiff Khacho suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

320.    Columbia deprived Plaintiff Khacho of the earliest opportunity to guard herself against the Data Breach's harmful effects by failing to promptly notify her about it.

321.    Plaintiff Khacho has a continuing interest in ensuring that her Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

322.    As a direct and traceable result of the Data Breach, Plaintiff Khacho suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect her Private Information; (e) emotional distress because identity thieves now possess her Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of her Private Information, a form of intangible property that Columbia obtained from Plaintiff Khacho; and (h) other economic and non-economic harm (as detailed herein).

### *Plaintiff Lauren Kramer*

323.    Plaintiff Kramer is a former applicant of Columbia (i.e., she applied to attend Columbia as a student but did not matriculate). Thus, Plaintiff Kramer last provided her Private Information to Columbia on or around fall or winter of 2023.

324.    Pursuant to this relationship, Columbia required that Plaintiff Kramer disclose at least the following types of Private Information: name, contact details, Social Security number, demographic information, academic history, and financial-aid related information.

325.    In doing so, Plaintiff Kramer trusted that Columbia would use reasonable measures to protect her Private Information according to Columbia's internal policies, as well as state and

federal law. Plaintiff Kramer would not have allowed Columbia, or anyone in Columbia's position, to maintain her Private Information if she believed Columbia would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Kramer's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

326.    On information and belief, Plaintiff Kramer is a Class Member, and her Private Information was exposed and stolen in the Data Breach. After all, Plaintiff provided her Private Information to Columbia before the Data Breach occurred. Moreover, Bloomberg confirmed that the stolen data included "at least 1.8 million Social Security numbers" and "2.5 million applicants[.]"[157] Thus, the size of the Class appears to be far larger than the 868,969 number that Columbia reported to the Maine Attorney General in August 2025.[158]

327.    On information and belief, the Data Breach exposed a broader range of Plaintiff Kramer's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia obtained a wide array of Private Information from Plaintiff Kramer, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[159]

328.    Plaintiff Kramer is very careful about the privacy and security of her Private Information—and Plaintiff Kramer protects her Private Information by, *inter alia*, keeping

---

[157] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.
[158] *Data Breach Notifications*, MAINE ATTY GEN (Aug. 7, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5cd48662-983a-4c9d-8b5b-e5e097cbbcd5.html.
[159] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

sensitive documents in a safe deposit box or locked safe; shredding sensitive financial documents; using strong passwords, or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

329. Additionally, Plaintiff Kramer checks her credit report quarterly through Equifax.

330. Plaintiff Kramer suffered an invasion of privacy when her Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[160]

331. On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Kramer and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Kramer, Zohran Mamdani, and all other Class Members).[161]

332. Plaintiff Kramer has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft and other harms.

333. As a result of the Data Breach, Plaintiff Kramer has lost approximately five to six hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach, inquiring about the Data Breach, monitoring accounts for fraudulent activity, contacting card issuers and/or banks, changing access credentials to at-risk, sensitive financial accounts, and other necessary mitigation efforts. This is valuable time that Plaintiff Kramer would have spent on other activities, including but not limited to work and/or recreation.

334. In the aftermath of the Data Breach, Plaintiff Kramer suffered from a sharp increase in suspicious and targeted phishing attempts and scam calls, emails, and text messages. On

---

[160] *Id.*
[161] *Id.*

information and belief, these suspicious phishing attempts and scam messages are a continuation of the "very targeted" actions by the "neo-Nazi" hacker to "further[] their political agenda" by targeting, exposing, or otherwise harming individuals associated with Columbia (including Plaintiff Kramer, Zohran Mamdani, and all other Class Members).[162] Plaintiff Kramer has lost a significant amount of time to the increased amount of targeted phishing and spam she has received following the Data Breach.

335.    Plaintiff Kramer has suffered from fear and anxiety because her Private Information was stolen by politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia, as well as on account of knowing that her highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against her for the rest of her life. Indeed, Plaintiff Kramer has been forced to dedicate hours in therapy to addressing the fear and anxiety caused by the exposure of her Private Information to the politically motivated "neo-Nazi" hacker.

336.    Plaintiff Kramer's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Kramer suffered actual injury in the form of damages to and diminution in the value of her Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

337.    As a former applicant, Plaintiff Kramer was required to and did entrust Columbia with her Private Information with the reasonable and mutual expectation that Columbia would adequately secure her Private Information and protect it from unauthorized access. Plaintiff Kramer suffered actual injury and lost the "benefit of the bargain." She entrusted Columbia with

---

[162] *Id.*

her Private Information and paid Columbia an application fee with the reasonable and mutual expectation that Columbia would implement and maintain reasonable data security practices—but Columbia cut corners and did not provide the bargained for data security. If Columbia had been transparent about its deficient data security, then Plaintiff Kramer would not have entrusted Columbia with her Private Information.

338.    Because of the Data Breach, Plaintiff Kramer suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

339.    Because of the Data Breach, Plaintiff Kramer suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

340.    Columbia deprived Plaintiff Kramer of the earliest opportunity to guard herself against the Data Breach's harmful effects by failing to promptly notify her about it.

341.    Plaintiff Kramer has a continuing interest in ensuring that her Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

342.    As a direct and traceable result of the Data Breach, Plaintiff Kramer suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect her Private Information; (e) emotional distress because identity thieves now possess her Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private

85

Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of her Private Information, a form of intangible property that Columbia obtained from Plaintiff Kramer; and (h) other economic and non-economic harm (as detailed herein).

### *Plaintiff Luke Linich*

343.    Plaintiff Linich is a former student of Columbia—having obtained a Master's Degree from Columbia in 2025. Thus, Plaintiff Linich last provided his Private Information to Columbia on or around 2025.

344.    During the time he was a student at Columbia, Plaintiff Linich paid money to Columbia for tuition, fees, and data security (which, upon information and belief, is funded from a portion of the tuition and fees that Columbia charges its students).

345.    Pursuant to this student relationship, Columbia required that Plaintiff Linich disclose at least the following types of Private Information: name, date of birth, contact details, Social Security number, demographic information, academic history, financial aid-related information, insurance-related information, health-related information.

346.    In doing so, Plaintiff Linich trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Linich would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Linich's Private Information

and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

347.    Plaintiff Linich reasonably understood that a portion of the funds paid to Columbia would be used to pay for adequate cybersecurity and protection of his Private Information.

348.    Plaintiff Linich received a Data Breach Notice from Columbia dated August 7, 2025, advising Plaintiff Linich that his Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

349.    In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Linich's Private Information including at least the following: name; contact details; date of birth; Social Security number; demographic information; academic history; financial-aid related information; insurance-related information; and health-related information.

350.    On information and belief, the Data Breach exposed a broader range of Plaintiff Linich's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff Linich, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[163]

351.    Plaintiff Linich is very careful about the privacy and security of his Private Information—and Plaintiff Linich protects his Private Information by, *inter alia*, keeping sensitive documents in a safe deposit box or locked safe; using strong passwords, or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

---

[163] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

352.    Additionally, Plaintiff Linich checks his credit report every week through his Chase bank account.

353.    Plaintiff Linich suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[164]

354.    On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Linich and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Linich, Zohran Mamdani, and all other Class Members).[165]

355.    Plaintiff Linich has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms. Plaintiff Linich's remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Linich to take those steps in its Data Breach Notice.

356.    As a result of the Data Breach, Plaintiff Linich has lost approximately 12 hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach, inquiring about the Data Breach, monitoring accounts for fraudulent activity, contacting card issuers and/or banks about fraudulent activity, changing access credentials to at-risk, sensitive financial accounts, and other necessary mitigation efforts. This is valuable time that Plaintiff Linich would have spent on other activities, including but not limited to work and/or recreation.

357.    In the fallout of the Data Breach, Plaintiff Linich suffered from the misuse of his Private Information when cybercriminals used his Private Information to commit identity theft and

---

[164] *Id.*
[165] *Id.*

place fraudulent charges of approximately $25 on his Chase bank account in May 2025 and again in October 2025.

358.    Plaintiff Linich's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Linich suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

359.    As a former student, Plaintiff Linich was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Linich suffered actual injury and lost the "benefit of the bargain." He entrusted Columbia with his Private Information with the reasonable and mutual expectation that Columbia would implement and maintain adequate data security and paid Columbia for educational services and reasonable data security—but Columbia cut corners and declined to provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Linich (1) would not have entrusted Columbia with his Private Information, (2) would have declined to matriculate at Columbia and attended a different educational institution instead, or (3) would have matriculated at Columbia only if Columbia reduced its prices to account for the deficient data security.

360.    Because of the Data Breach, Plaintiff Linich suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

361.    Because of the Data Breach, Plaintiff Linich suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

362.    Columbia deprived Plaintiff Linich of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

363.    Plaintiff Linich has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

364.    As a direct and traceable result of the Data Breach, Plaintiff Linich suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Linich; and (h) other economic and non-economic harm (as detailed herein).

### *Plaintiff Nadav Margalit*

365.    Plaintiff Margalit is a current student at Columbia.

366.    As a student at Columbia, Plaintiff Margalit pays and paid money to Columbia for tuition, fees, and data security (which, upon information and belief, is funded from a portion of the tuition and fees that Columbia charges its students).

367.    Pursuant to this relationship, Columbia required that Plaintiff Margalit disclose at least the following types of Private Information: name, contact details, date of birth, Social Security number, demographic information, academic history, financial account information including credit and debit card information, and financial-aid related information.

368.    In doing so, Plaintiff Margalit trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Margalit would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Margalit's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

369.    Plaintiff Margalit reasonably understood that a portion of the funds paid to Columbia would be used to pay for adequate cybersecurity and protection of his Private Information.

370.    Plaintiff Margalit does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

371.    Plaintiff Margalit received a Data Breach Notice from Columbia dated August 7, 2025, advising Plaintiff Margalit that his Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

372. In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Margalit's Private Information including at least the following: name; contact details; date of birth; Social Security number; demographic information; academic history; financial-aid related information; insurance-related information; and health-related information.

373. On information and belief, the Data Breach exposed a broader range of Plaintiff Margalit's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff Margalit, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[166]

374. Plaintiff Margalit is very careful about the privacy and security of his Private Information—and Plaintiff Margalit protects his Private Information by, *inter alia*, keeping sensitive documents in a safe deposit box or locked safe; shredding sensitive financial documents; using strong passwords, or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

375. Additionally, Plaintiff Margalit checks his credit report every two months through his Discover/Capital One bank account.

376. Plaintiff Margalit suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[167]

377. On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Margalit and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals

---

[166] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.
[167] *Id*.

associated with Columbia (including Plaintiff Margalit, Zohran Mamdani, and all other Class Members).[168]

378.    Plaintiff Margalit has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms. Plaintiff Margalit's remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Margalit to take those steps in its Data Breach Notice.

379.    As a result of the Data Breach, Plaintiff Margalit has lost approximately 15 to 20 hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach, inquiring about the Data Breach, monitoring accounts for fraudulent activity, contacting card issuers and/or banks, and other necessary mitigation efforts. This is valuable time that Plaintiff Margalit would have spent on other activities, including but not limited to work and/or recreation.

380.    As a result of the Data Breach, Plaintiff Margalit suffered identity theft and misuse of his Private Information. In particular, Plaintiff Margalit's checking account incurred a fraudulent charge of approximately $500 as a purported electronic payment to Self Lender, Inc. on or around July 29, 2025. His parents separately incurred a fraudulent charge of approximately $498 on or around August 22, 2025, for "CAPITAL ONE MOBILE PMT." Critically, the fraud occurred to the bank accounts that Plaintiff provided to Columbia for the purposes of paying tuition and receiving financial aid. In addition, in October 2025, Plaintiff Margalit received a notification that his Private Information had been located on the Dark Web. Plaintiff Margalit attributes the fraud and Dark Web posting to the Data Breach given the proximity in time, the unusual nature of the fraud and data misuse, the fact that he is very careful with his Private Information, and the fact that

---

[168] *Id.*

he provided this financial account information to Columbia and financial information was exposed in the Data Breach.

381.    Plaintiff Margalit has suffered from fear and anxiety because his Private Information was stolen by a politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia, as well as on account of knowing that his highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against him for the rest of his life. Furthermore, these emotional injuries have resulted in physical manifestations including sleep disruption and anxiety about his sensitive data being misused in the future.

382.    Plaintiff Margalit's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Margalit suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

383.    As a current student, Plaintiff Margalit was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Margalit suffered actual injury and lost the "benefit of the bargain." He provided his Private Information to Columbia with the reasonable and mutual expectation that Columbia would implement and maintain adequate data security practices and paid Columbia for educational services and reasonable data security—but Columbia cut corners and declined to provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Margalit (1) would not have entrusted Columbia with his Private Information, (2) would

94

have declined to matriculate at Columbia and attended a different educational institution instead, or (3) would have matriculated at Columbia only if Columbia reduced its prices to account for the deficient data security.

384. Because of the Data Breach, Plaintiff Margalit suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

385. Because of the Data Breach, Plaintiff Margalit suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

386. Columbia deprived Plaintiff Margalit of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

387. Plaintiff Margalit has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

388. As a direct and traceable result of the Data Breach, Plaintiff Margalit suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession,

and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Margalit; (h) actual fraud and data misuse; and (i) other economic and non-economic harm (as detailed herein).

### Plaintiff John McQueen

389.   Plaintiff McQueen is a former applicant of Columbia (i.e., he applied to attend Columbia as a student but did not matriculate). Thus, Plaintiff McQueen last provided his Private Information to Columbia on or around 2024.

390.   Pursuant to this relationship, Columbia required that Plaintiff McQueen disclose at least the following types of Private Information: name, contact details, Social Security number, demographic information, academic history, and financial-aid related information.

391.   In doing so, Plaintiff McQueen trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff McQueen would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff McQueen's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

392.   Plaintiff McQueen received a Data Breach Notice from Columbia dated August 7, 2025, advising Plaintiff McQueen that his Private Information was compromised. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

393. In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff McQueen's Private Information including at least the following: name; contact details; date of birth; Social Security number; demographic information; academic history; financial-aid related information; insurance-related information; and health-related information.

394. On information and belief, the Data Breach exposed a broader range of Plaintiff McQueen's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff McQueen, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[169]

395. Plaintiff McQueen is very careful about the privacy and security of his Private Information—and Plaintiff McQueen protects his Private Information by, *inter alia*, keeping sensitive documents in a safe deposit box or locked safe; using strong passwords, or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

396. Additionally, Plaintiff McQueen checks his credit report regularly through his credit card company.

397. Plaintiff McQueen suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[170]

398. On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff McQueen and Class Members on the internet and/or the

---

[169] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.
[170] *Id*.

Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff McQueen, Zohran Mamdani, and all other Class Members).[171]

399.    Plaintiff McQueen has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms. Plaintiff McQueen's remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff McQueen to take those steps in its Data Breach Notice.

400.    As a result of the Data Breach, Plaintiff McQueen has lost approximately three to five hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach, monitoring his accounts for fraudulent activity, and other necessary mitigation efforts. This is valuable time that Plaintiff McQueen would have spent on other activities, including but not limited to work and/or recreation.

401.    Plaintiff McQueen has suffered from fear and anxiety because his Private Information was stolen by a politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia, as well as on account of knowing that his highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against him for the rest of his life. He is worried about future identity theft.

402.    Plaintiff McQueen's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff McQueen suffered actual injury in the form

---

[171] *Id.*

of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

403.    As a former applicant, Plaintiff McQueen was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff McQueen suffered actual injury and lost the "benefit of the bargain." He entrusted Columbia with his Private Information and paid Columbia an application fee with the reasonable and mutual expectation that Columbia would implement and maintain reasonable data security practices—but Columbia cut corners and did not provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff McQueen would not have entrusted Columbia with his Private Information.

404.    Because of the Data Breach, Plaintiff McQueen suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

405.    Because of the Data Breach, Plaintiff McQueen suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

406.    Columbia deprived Plaintiff McQueen of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

407.    Plaintiff McQueen has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

408.    As a direct and traceable result of the Data Breach, Plaintiff McQueen suffered actual injury and damages after his Private Information was compromised in the Data Breach,

99

including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff McQueen; and (h) other economic and non-economic harm (as detailed herein).

### Plaintiff Liam Murray

409.    Plaintiff Murray is a current student at Columbia.

410.    As a student at Columbia, Plaintiff Murray pays and paid money to Columbia for tuition, fees, and data security (which, upon information and belief, is funded from a portion of the tuition and fees that Columbia charges its students).

411.    Pursuant to this student relationship, Columbia required that Plaintiff Murray disclose a wide variety of Private Information, including at least the following: name, contact details, date of birth, Social Security number, demographic information, academic history, financial account information including credit and debit card information, and financial-aid related information.

412.    In doing so, Plaintiff Murray trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Murray would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Murray's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

413.    Plaintiff Murray reasonably understood that a portion of the funds paid to Columbia would be used to pay for adequate cybersecurity and protection of his Private Information.

414.    Plaintiff Murray received a Data Breach Notice from Columbia dated August 7, 2025, advising Plaintiff Murray that his Private Information was compromised in the Data Breach.

415.    In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Murray's Private Information.

416.    On information and belief, the Data Breach exposed a broader range of Plaintiff Murray's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff Murray, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[172]

417.    Plaintiff Murray suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[173]

---

[172] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.
[173] *Id*.

418.     On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Murray and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Murray, Zohran Mamdani, and all other Class Members).[174]

419.     After the Data Breach, Plaintiff Murray suffered actual misuse of his Private Information in the form of a targeted social engineering attempt in which an unknown individual called him and prompted him to provide access to his email account by providing Plaintiff Murray's date of birth and Social Security number as verification of the caller's legitimacy. Plaintiff Murray attributes this activity to the Data Breach given the proximity in time, the unusual nature of the activity, the fact that he is very careful with his Private Information, and the fact he has never experienced anything like this before.

420.     As a result of the Data Breach, Plaintiff Murray has lost valuable time that he would have spent on other activities, including but not limited to work and/or recreation. This lost time includes time spent securing his email account and removing individuals who had gained unauthorized access. Plaintiff Murray has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms. Plaintiff Murray's remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Murray to take those steps in its Data Breach Notice.

421.     As a result of the Data Breach, Plaintiff Murray has lost valuable time that he would have spent on other activities, including but not limited to work and/or recreation.

---

[174] *Id.*

422. Plaintiff Murray's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Murray suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

423. As a current student, Plaintiff Murray was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Murray suffered actual injury and lost the "benefit of the bargain." He entrusted Columbia with his Private Information with the reasonable and mutual expectation that Columbia would implement and maintain reasonable data security practices and paid Columbia for educational services and reasonable data security—but Columbia cut corners and declined to provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Murray (1) would not have entrusted Columbia with his Private Information, (2) would have declined to matriculate at Columbia and attended a different educational institution instead, or (3) would have matriculated at Columbia only if Columbia reduced its prices to account for the deficient data security.

424. Because of the Data Breach, Plaintiff Murray suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

425. Because of the Data Breach, Plaintiff Murray suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

426. Columbia deprived Plaintiff Murray of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

427.    Plaintiff Murray has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

428.    As a direct and traceable result of the Data Breach, Plaintiff Murray suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Murray; (h) actual data misuse; and (i) other economic and non-economic harm (as detailed herein).

### *Plaintiff Gabriela Nadeau*

429.    Plaintiff Nadeau is a former applicant of Columbia (i.e., she applied to attend Columbia as a student but did not matriculate). Thus, Plaintiff Nadeau last provided her Private Information to Columbia on or around 2019.

430.    Plaintiff Nadeau also completed coursework at Barnard College during the 2018 to 2019 academic year.

431.    Pursuant to this relationship, Columbia required that Plaintiff Nadeau disclose at least the following types of Private Information: name, billing address, date of birth, and Social Security number.

432.    In doing so, Plaintiff Nadeau trusted that Columbia would use reasonable measures to protect her Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Nadeau would not have allowed Columbia, or anyone in Columbia's position, to maintain her Private Information if she believed Columbia would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Nadeau's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

433.    Plaintiff Nadeau received a Data Breach Notice from Columbia dated August 7, 2025, advising Plaintiff Nadeau that her Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

434.    In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Nadeau's Private Information including at least the following: name; contact details; date of birth; Social Security number; demographic information; academic history; financial-aid related information; insurance-related information; and health-related information.

435.    On information and belief, the Data Breach exposed a broader range of Plaintiff Nadeau's Private Information than Columbia has publicly acknowledged thus far, based on the

fact that Columbia collected a wide array of Private Information from Plaintiff Nadeau, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[175]

436.    Plaintiff Nadeau is very careful about the privacy and security of her Private Information—and Plaintiff Nadeau protects her Private Information by, *inter alia*, keeping sensitive documents in a safe deposit box or locked safe; using strong passwords, or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

437.    Additionally, Plaintiff Nadeau checks her credit report every month through a credit monitoring service called Aura. In addition, she regularly reviews the weekly emails she receives from Aura. She enrolled in this credit monitoring service in August of 2025 in order mitigate the risks she suffers from due to the Data Breach. This service costs Plaintiff Nadeau $12.99 a month on an ongoing basis.

438.    Plaintiff Nadeau suffered an invasion of privacy when her Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[176]

439.    On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Nadeau and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Nadeau, Zohran Mamdani, and all other Class Members).[177]

---

[175] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.
[176] *Id*.
[177] *Id*.

440.    Plaintiff Nadeau has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft and other harms. Plaintiff Nadeau's remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Nadeau to take those steps in its Data Breach Notice.

441.    Since the Data Breach, Plaintiff Nadeau has suffered actual misuse of her Private Information in the form of a significant increase in the number of spam phone calls she receives. These phone calls occur in such a large volume that Plaintiff Nadeau is required to use a call filter, which has caused her to miss important phone calls from her employer. Plaintiff Nadeau attributes this activity to the Data Breach given the proximity in time, the fact that Plaintiff Nadeau is very careful with her Private Information, and the fact that the notable increase in spam calls is highly unusual.

442.    As a result of the Data Breach, Plaintiff Nadeau has lost approximately ten hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach, contacting credit bureaus, monitoring and investigating her accounts for fraudulent and suspicious activity, and other necessary mitigation efforts. This is valuable time that Plaintiff Nadeau would have spent on other activities, including but not limited to work and/or recreation.

443.    Plaintiff Nadeau has incurred significant out of pocket costs as a result of the Data Breach. She paid $156 for an annual subscription to the Aura credit monitoring service to review her credit report and monitor for any signs of identity theft or fraud caused by the Data Breach. She has specifically maintained this subscription because of the Data Breach and to mitigate her damages caused by the Data Breach.

444.    In the aftermath of the Data Breach, Plaintiff Nadeau suffered from a sharp increase in suspicious and targeted phishing attempts and scam calls, emails, and text messages. On

107

information and belief, these suspicious phishing attempts and scam messages are a continuation of the "very targeted" actions by the "neo-Nazi" hacker to "further[] their political agenda" by targeting, exposing, or otherwise harming individuals associated with Columbia (including Plaintiff Nadeau, Zohran Mamdani, and all other Class Members).[178]

445.    Plaintiff Nadeau has suffered from fear, depression, and anxiety because her Private Information was stolen by a politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia, as well as on account of knowing that her highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against her for the rest of her life. In short, Plaintiff Nadeau is suffering from significant stress due to the Data Breach and the knowledge that her highly protected, confidential Private Information is now in the hands of malfeasants.

446.    Plaintiff Nadeau's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Nadeau suffered actual injury in the form of damages to and diminution in the value of her Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

447.    As a former Columbia applicant and someone who took courses at Barnard College, Plaintiff Nadeau was required to and did entrust Columbia with her Private Information with the reasonable and mutual expectation that Columbia would adequately secure her Private Information and protect it from unauthorized access. Plaintiff Nadeau suffered actual injury and lost the "benefit of the bargain." She entrusted Columbia with her Private Information and paid Columbia an application fee with the reasonable and mutual expectation that Columbia would implement

---

[178] *Id.*

and maintain reasonable data security practices and also paid Barnard, who in turn paid Columbia, for educational services and reasonable data security—but Columbia cut corners and declined to provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Nadeau (1) would not have entrusted Columbia with her Private Information, or (2) would have declined to matriculate at Barnard and/or enroll in courses at Columbia and attended a different educational institution instead.

448.    Because of the Data Breach, Plaintiff Nadeau suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

449.    Because of the Data Breach, Plaintiff Nadeau suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

450.    Columbia deprived Plaintiff Nadeau of the earliest opportunity to guard herself against the Data Breach's harmful effects by failing to promptly notify her about it.

451.    Plaintiff Nadeau has a continuing interest in ensuring that her Private Information— which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

452.    As a direct and traceable result of the Data Breach, Plaintiff Nadeau suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect her Private Information; (e) emotional distress because identity thieves now possess her Private Information; (f) imminent

and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of her Private Information, a form of intangible property that Columbia obtained from Plaintiff Nadeau; and (h) other economic and non-economic harm (as detailed herein).

### *Plaintiff Joseph Quintero*

453. Plaintiff Quintero is a former student of Columbia—having last attended Columbia in or around 2025. Thus, Plaintiff Quintero last provided his Private Information to Columbia on or around 2025.

454. During the time he was a student at Columbia, Plaintiff Quintero paid money to Columbia for tuition, fees, and data security (which, upon information and belief, is funded from a portion of the tuition and fees that Columbia charges its students).

455. Pursuant to this relationship, Columbia required that Plaintiff Quintero disclose, on information and belief, at least the following types of Private Information: name; contact details; Social Security number; demographic information; academic history; financial-aid related information; financial account information; insurance-related information; and health-related information.

456. In doing so, Plaintiff Quintero trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Quintero would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to

implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Quintero's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

457. Plaintiff Quintero reasonably understood that a portion of the funds paid to Columbia would be used to pay for adequate cybersecurity and protection of his Private Information.

458. Plaintiff Quintero received a Data Breach Notice from Columbia in or around July 2, 2025, advising Plaintiff Quintero that his Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

459. The Data Breach Notice did not specify what Private Information was exposed. On information and belief, the Data Breach exposed his name; contact details; date of birth; Social Security number; demographic information; academic history; financial-aid related information; financial account information; insurance-related information; and health-related information.

460. On information and belief, the Data Breach exposed a broader range of Plaintiff Quintero's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff Quintero, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[179]

461. Plaintiff Quintero is very careful about the privacy and security of his Private Information—and Plaintiff Quintero protects his Private Information by, *inter alia*, keeping sensitive documents in a safe deposit box or locked safe; shredding sensitive financial documents;

---

[179] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

using strong passwords, or random password generators for online accounts; and using unique passwords for each account.

462.    Additionally, Plaintiff Quintero checks his credit report every week through his credit monitoring service.

463.    Plaintiff Quintero suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[180]

464.    On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Quintero and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Quintero, Zohran Mamdani, and all other Class Members).[181]

465.    Plaintiff Quintero has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms. Plaintiff Quintero's remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Quintero to take those steps in its Data Breach Notice.

466.    As a result of the Data Breach, Plaintiff Quintero has lost at least one (1) hour attempting to mitigate the fallout of the Data Breach by researching the Data Breach and reviewing his accounts for suspicious activity. Thereafter, Plaintiff now spends time on an ongoing basis reviewing his credit report and financial accounts each week. This is valuable time that Plaintiff Quintero would have spent on other activities, including but not limited to work and/or recreation.

---

[180] *Id.*
[181] *Id.*

467.    In the aftermath of the Data Breach, Plaintiff Quintero suffered from a sharp increase in suspicious and targeted phishing attempts and scam calls and text messages—including messages that claim to deal with his Social Security number. On information and belief, these suspicious phishing attempts and scam messages are a continuation of the "very targeted" actions by the "neo-Nazi" hacker to "further[] their political agenda" by targeting, exposing, or otherwise harming individuals associated with Columbia (including Plaintiff Quintero, Zohran Mamdani, and all other Class Members).[182]

468.    Plaintiff Quintero has suffered from fear and anxiety because his Private Information was stolen by a politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia as well as on account of knowing that his highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against him for the rest of his life.

469.    Plaintiff Quintero's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Quintero suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

470.    As a former student, Plaintiff Quintero was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Quintero suffered actual injury and lost the "benefit of the bargain." He entrusted Columbia with his Private Information and paid Columbia an application fee with the reasonable and mutual

---

[182] *Id.*

113

expectation that Columbia would implement and maintain reasonable data security practices and paid Columbia for educational services and reasonable data security—but Columbia cut corners and declined to provide the bargained for data security. If Columbia had been transparent about its deficient data security, then Plaintiff Quintero (1) would not have entrusted Columbia with his Private Information, (2) would have declined to matriculate at Columbia and attended a different educational institution instead, or (3) would have matriculated at Columbia only if Columbia reduced its prices to account for the deficient data security.

471. Because of the Data Breach, Plaintiff Quintero suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

472. Because of the Data Breach, Plaintiff Quintero suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

473. Columbia deprived Plaintiff Quintero of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

474. Plaintiff Quintero has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

475. As a direct and traceable result of the Data Breach, Plaintiff Quintero suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private

114

Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Quintero; and (h) other economic and non-economic harm (as detailed herein).

### *Plaintiff Carrick Reider*

476.     Plaintiff Reider is a former applicant of Columbia (i.e., he applied to attend Columbia as a student but did not matriculate). Thus, Plaintiff Reider last provided his Private Information to Columbia on or around December 2019.

477.     Pursuant to this relationship, Columbia required that Plaintiff Reider disclose at least the following types of Private Information: full name, date of birth, phone number, email address, Social Security number, financial and payment information (including debit and/or credit card information), and financial-aid related information.

478.     In doing so, Plaintiff Reider trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Reider would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Reider's Private Information

115

and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

479.    Plaintiff Reider does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

480.    Plaintiff Reider received a Data Breach Notice from Columbia dated August 7, 2025, advising Plaintiff Reider that his Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

481.    In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Reider's Private Information including at least the following: name; contact details; date of birth; Social Security number; demographic information; academic history; financial-aid related information; insurance-related information; and health-related information.

482.    On information and belief, the Data Breach exposed a broader range of Plaintiff Reider's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia collected a wide array of Private Information from Plaintiff Reider, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[183]

483.    Plaintiff Reider is very careful about the privacy and security of his Private Information—and Plaintiff Reider protects his Private Information by, *inter alia*, keeping sensitive documents in a safe deposit box or locked safe; using strong passwords for online accounts; and changing online passwords frequently.

484.    Additionally, Plaintiff Reider checks his credit report every few months through his credit card account.

---

[183] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.

485.    Plaintiff Reider suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[184]

486.    On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Reider and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Reider, Zohran Mamdani, and all other Class Members).[185]

487.    Plaintiff Reider has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms. Plaintiff Reider's remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Reider to take those steps in its Data Breach Notice.

488.    As a result of the Data Breach, Plaintiff Reider has lost approximately 24 to 30 hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach, contacting banks, credit card companies, or other vendors about fraudulent/s activity, monitoring and investigating fraudulent activity, changing access credentials to at-risk, sensitive financial accounts, and other necessary mitigation efforts. This is valuable time that Plaintiff Reider would have spent on other activities, including but not limited to work and/or recreation.

489.    As a result of the Data Breach, Plaintiff Reider has suffered from fraud and misuse of his Private Information when cybercriminals used his Private Information to commit identity theft and published his Private Information on the Dark Web. Specifically, in October 2025, Plaintiff Reider incurred an attempted fraudulent charge of $700 for electronics, and charges at

---

[184] *Id.*
[185] *Id.*

Waffle House and other locations in Atlanta when he was not physically present in Atlanta. This was the same card Plaintiff Reider used to pay for his Columbia application. That same month, he received a notification from McAfee that his information was located on the Dark Web. Later, in February 2026, Plaintiff Reider noticed suspicious credit inquiries on his credit report, including loan inquiries that he did not recognize or authorize. Plaintiff Reider attributes the foregoing fraudulent and suspicious activity to the Data Breach based on the proximity in time, the unusual nature of the activity, the fact that he is very careful with his Private Information, the fact that he provided the same payment card to Columbia, and the fact that financial information was stolen in the Data Breach.

490.    In the aftermath of the Data Breach, Plaintiff Reider suffered from a sharp increase in suspicious and targeted phishing attempts and scam calls, emails, and text messages relating to loan offers and debt relief scams. On information and belief, these suspicious phishing attempts and scam messages are a continuation of the "very targeted" actions by the "neo-Nazi" hacker to "further[] their political agenda" by targeting, exposing, or otherwise harming individuals associated with Columbia (including Plaintiff Reider, Zohran Mamdani, and all other Class Members).[186]

491.    Plaintiff Reider has suffered from fear and anxiety because his Private Information was stolen by a politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia, as well as on account of knowing that his highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against him for the rest of his life. He had anxiety about

---

[186] *Id.*

asking his parents to borrow money after he incurred the fraudulent charges. Furthermore, these emotional injuries have resulted in physical manifestations including sleep disruption.

492. Plaintiff Reider's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Reider suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

493. As a former applicant, Plaintiff Reider was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would adequately secure his Private Information and protect it from unauthorized access. Plaintiff Reider suffered actual injury and lost the "benefit of the bargain." He entrusted Columbia with his Private Information and paid Columbia an application fee with the reasonable and mutual expectation that Columbia would implement and maintain reasonable data security practices—but Columbia cut corners and did not provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Reider would not have entrusted Columbia with his Private Information.

494. Because of the Data Breach, Plaintiff Reider suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

495. Because of the Data Breach, Plaintiff Reider suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

496. Columbia deprived Plaintiff Reider of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

119

497.    Plaintiff Reider has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

498.    As a direct and traceable result of the Data Breach, Plaintiff Reider suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information; (e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Reider; (h) actual fraud and data misuse; and (i) other economic and non-economic harm (as detailed herein).

### *Plaintiff Andrew Rudick*

499.    Plaintiff Andrew Rudick is a former applicant of Columbia (i.e., he applied to attend Columbia as a student but did not matriculate). Thus, Plaintiff Rudick last provided his Private Information to Columbia in or around 2005 or 2006.

500.    Pursuant to this relationship, Columbia required that Plaintiff Rudick disclose a wide variety of Private Information.

501.    In doing so, Plaintiff Rudick trusted that Columbia would use reasonable measures to protect his Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Rudick would not have allowed Columbia, or anyone in Columbia's position, to maintain his Private Information if he believed Columbia would fail to implement reasonable and industry standard practices to safeguard his Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Rudick's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

502.    Upon information and belief, Plaintiff Rudick does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

503.    Plaintiff Rudick received a Data Breach Notice from Columbia dated December 30, 2025, advising Plaintiff Rudick that his Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

504.    In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Rudick's Private Information including at least the following: name; contact details; date of birth; Social Security number; demographic information; academic history; financial-aid related information; insurance-related information; and health-related information.

505.    On information and belief, the Data Breach exposed a broader range of Plaintiff Rudick's Private Information than Columbia has publicly acknowledged thus far, based on the fact

that Columbia collected a wide array of Private Information from Plaintiff Rudick, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[187]

506.    Plaintiff Rudick is very careful about the privacy and security of his Private Information—and Plaintiff Rudick protects his Private Information by, inter alia, using strong passwords and changing online passwords frequently.

507.    Plaintiff Rudick suffered an invasion of privacy when his Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[188]

508.    On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Rudick and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Rudick, Zohran Mamdani, and all other Class Members).[189]

509.    Plaintiff Rudick has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft and other harms. Plaintiff Rudick's remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Rudick to take those steps in its Data Breach Notice.

510.    As a result of the Data Breach, Plaintiff Rudick has lost approximately seven (7) to eight (8) hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach, contacting the New York Police Department, Federal Bureau of Investigation, Columbia,

---

[187] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.
[188] *Id*.
[189] *Id*.

Kroll, and monitoring accounts for suspicious activity. This is valuable time that Plaintiff Rudick would have spent on other activities, including but not limited to work and/or recreation.

511.    In the aftermath of the Data Breach, Plaintiff Rudick suffered from a sharp increase in suspicious and targeted phishing attempts and scam calls, emails, and text messages. On information and belief, these suspicious phishing attempts and scam messages are a continuation of the "very targeted" actions by the "neo-Nazi" hacker to "further[] their political agenda" by targeting, exposing, or otherwise harming individuals associated with Columbia (including Plaintiff Daley, Zohran Mamdani, and all other Class Members).[190]

512.    Plaintiff Rudick has suffered from fear and anxiety because his Private Information was stolen by a politically motivated "neo-Nazi" hacker who has already weaponized and leaked the stolen data to target individuals associated with Columbia, Columbia has not provided him sufficient information about the Data Breach, as well as on account of knowing that his highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against him for the rest of his life. The anxiety resulting from the Data Breach affected his ability to spend quality time with his family.

513.    Plaintiff Rudick's Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Rudick suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

514.    As a former applicant, Plaintiff Rudick was required to and did entrust Columbia with his Private Information with the reasonable and mutual expectation that Columbia would

---

[190] *Id.*

adequately secure his Private Information and protect it from unauthorized access. Plaintiff Rudick suffered actual injury and lost the "benefit of the bargain." He entrusted Columbia with his Private Information and paid Columbia an application fee with the reasonable and mutual expectation that Columbia would implement and maintain reasonable data security practices—but Columbia cut corners and did not provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Rudick would not have entrusted Columbia with his Private Information.

515.    Because of the Data Breach, Plaintiff Rudick suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

516.    Because of the Data Breach, Plaintiff Rudick suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

517.    Columbia deprived Plaintiff Rudick of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.

518.    Plaintiff Rudick has a continuing interest in ensuring that his Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

519.    As a direct and traceable result of the Data Breach, Plaintiff Rudick suffered actual injury and damages after his Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect his Private Information;

124

(e) emotional distress because identity thieves now possess his Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of his Private Information, a form of intangible property that Columbia obtained from Plaintiff Rudick; and (h) other economic and non-economic harm (as detailed herein).

### *Plaintiff Mary Thomas*

520. Plaintiff Thomas is a former applicant of Columbia (i.e., she applied to attend Columbia as a student but did not matriculate). Thus, Plaintiff Thomas last provided her Private Information to Columbia on or around 2021.

521. Pursuant to this relationship, Columbia required that Plaintiff Thomas disclose at least the following types of Private Information: name, contact details, Social Security number, demographic information, academic history, and financial-aid related information.

522. In doing so, Plaintiff Thomas trusted that Columbia would use reasonable measures to protect her Private Information according to Columbia's internal policies, as well as state and federal law. Plaintiff Thomas would not have allowed Columbia, or anyone in Columbia's position, to maintain her Private Information if she believed Columbia would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration. Columbia obtained and continues to maintain Plaintiff Thomas's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

523.    Plaintiff Thomas received a Data Breach Notice from Columbia dated August 7, 2025, advising Plaintiff Thomas that her Private Information was compromised in the Data Breach. In other words, Columbia confirmed that Plaintiff was injured by the Data Breach.

524.    In the Data Breach Notice, Columbia confirmed that the Data Breach exposed Plaintiff Thomas's Private Information including at least the following: name; contact details; date of birth; Social Security number; demographic information; academic history; financial-aid related information; insurance-related information; and health-related information.

525.    On information and belief, the Data Breach exposed a broader range of Plaintiff Thomas's Private Information than Columbia has publicly acknowledged thus far, based on the fact that Columbia obtained a wide array of Private Information from Plaintiff Thomas, and based on the fact that the hacker exfiltrated at least 460 gigabytes of data from Columbia's servers.[191]

526.    Plaintiff Thomas is very careful about the privacy and security of her Private Information—and Plaintiff Thomas protects her Private Information by, *inter alia*, keeping sensitive documents in a safe deposit box or locked safe; shredding sensitive financial documents; using strong passwords, or random password generators for online accounts; changing online passwords frequently; and using unique passwords for each account.

527.    Additionally, Plaintiff Thomas checks her credit report regularly through her Discover credit card account.

528.    Plaintiff Thomas suffered an invasion of privacy when her Private Information was exposed to—and then stolen by—the politically motivated hacker during the "very targeted" Data Breach."[192]

---

[191] Cameron Fozi, *Columbia University Applicants' Personal Data Stolen by Hacker*, BLOOMBERG (July 1, 2025), https://www.bloomberg.com/news/articles/2025-07-01/columbia-university-applicants-personal-data-stolen-by-hacker.
[192] *Id*.

529.   On information and belief, the hacker has already leaked—or will imminently leak—the Private Information of Plaintiff Thomas and Class Members on the internet and/or the Dark Web to "further[] their political agenda" by exposing information about individuals associated with Columbia (including Plaintiff Thomas, Zohran Mamdani, and all other Class Members).[193]

530.   Plaintiff Thomas has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft and other harms. Plaintiff Thomas' remediation efforts are both reasonable and foreseeable considering that Columbia itself directed Plaintiff Thomas to take those steps in its Data Breach Notice.

531.   As a result of the Data Breach, Plaintiff Thomas has lost approximately two hours attempting to mitigate the fallout of the Data Breach by researching the Data Breach, contacting the major credit bureaus, reviewing her bank accounts, monitoring her credit reports, monitoring fraudulent activity, and changing access credentials to at-risk, sensitive financial accounts, and other necessary mitigation efforts. This is valuable time that Plaintiff Thomas would have spent on other activities, including but not limited to work and/or recreation.

532.   Plaintiff has suffered from fear and anxiety because her Private Information was stolen by a politically motivated "neo-Nazi" hacker who have already weaponized and leaked the stolen data to target individuals associated with Columbia, as well as on account of knowing that her highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against her for the rest of her life.

---

[193] *Id.*

533. Plaintiff Thomas' Private Information is a form of intangible property that Columbia was required to adequately protect. Plaintiff Thomas suffered actual injury in the form of damages to and diminution in the value of her Private Information when it was stolen by a politically motivated "neo-Nazi" hacker.

534. As a former applicant, Plaintiff Thomas was required to and did entrust Columbia with her Private Information with the reasonable and mutual expectation that Columbia would adequately secure her Private Information and protect it from unauthorized access. Plaintiff Thomas suffered actual injury and lost the "benefit of the bargain." She entrusted Columbia with her Private Information with the reasonable and mutual expectation that Columbia would implement and maintain reasonable data security practices—but Columbia cut corners and did not provide the bargained for data security. If Columbia had been transparent about its deficient data security, Plaintiff Thomas would not have entrusted Columbia with her Private Information.

535. Because of the Data Breach, Plaintiff Thomas suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft.

536. Because of the Data Breach, Plaintiff Thomas suffers from the imminent and impending injury whereby the "neo-Nazi" hacker will weaponize the stolen Private Information to target, expose, or otherwise harm individuals associated with Columbia.

537. Columbia deprived Plaintiff Thomas of the earliest opportunity to guard herself against the Data Breach's harmful effects by failing to promptly notify her about it.

538. Plaintiff Thomas has a continuing interest in ensuring that her Private Information—which, on information and belief, is still within the custody or control of Columbia—is protected and safeguarded from additional breaches or cybersecurity risks.

539.    As a direct and traceable result of the Data Breach, Plaintiff Thomas suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) theft of Private Information; (d) loss of the benefit of the bargain because Columbia did not adequately protect her Private Information; (e) emotional distress because identity thieves now possess her Private Information; (f) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the Dark Web, remains unencrypted and available for unauthorized third parties to access and abuse, remains backed up in Columbia's possession, and is subject to further unauthorized disclosures so long as Columbia failed to undertake appropriate and adequate measures to protect the Private Information; (g) diminution in the value of her Private Information, a form of intangible property that Columbia obtained from Plaintiff Thomas; and (h) other economic and non-economic harm (as detailed herein).

F.    *Columbia Acquired, Collected, and Stored Plaintiffs' and Class Members' Private Information*

540.    As a condition of applying for admission or employment and/or attending Columbia, Plaintiffs and Class Members were required to entrust Columbia with their sensitive and confidential Private Information.

541.    Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiffs' and Class Members' Private Information, Defendant would be unable to perform its services.

542.    By collecting and storing the Private Information of Plaintiffs and Class Members, Defendant knowingly and voluntarily assumed legal and equitable duties and knew or should have

129

known that it was responsible for protecting the Private Information it collected and stored from unauthorized disclosure.

543.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and maintained securely, to use their information for business purposes only, and to make only authorized disclosures of their information.

544.    Defendant could have prevented the Data Breach by properly securing and encrypting the files and servers containing the Private Information of Plaintiffs and Class Members.

545.    As discussed *infra*, Defendant made promises and representations to its current and former employees, applicants, and students that it would securely maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information. Plaintiffs and Class Members would not have provided their Private Information to Columbia absent these representations.

546.    Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

### G. *Columbia Knew or Should Have Known of the Risk of a Data Breach Because Entities in Possession of Private Information are Particularly Suspectable to Cyber Attacks*

547.    Because Defendant had a duty to protect Plaintiffs' and Class Members' Private Information, Defendant knew or should have known, through readily available and accessible information, about potential threats for the unauthorized exfiltration and misuse of such information. Data security breaches have dominated the headlines for the last two decades. And it

130

doesn't take an IT industry expert to know it. The general public is aware of the names of some of the biggest cybersecurity breaches: Target,[194] Yahoo,[195] Marriott International,[196] Chipotle, Chili's, Arby's,[197] and others.[198]

548.    In the years immediately preceding the Data Breach, Columbia knew or should have known that its computer systems were a target for cybersecurity attacks because warnings were readily available and accessible via the internet.

549.    In 2023, an all-time high for the number of data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[199] The estimated number of organizations impacted by data compromises has increased by 2,600 percentage points since 2018, and the estimated number of victims has increased by 1,400 percentage points.[200] The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.[201]

---

[194] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[195] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[196] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[197] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[198] *See, e.g.*, John Leyden et al., *The 20 Biggest Data Breaches of the 21st Century*, CSO ONLINE (June 12, 2025), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

[199] *Identity Theft Resource Center 2023 Annual Data Breach Report Reveals Record Number of Compromises*, IDENTITY THEFT RES. CTR. (Jan. 25, 2024), https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/.

[200] *Id.*

[201] *Id.*

550.    2024 was even worse for data breaches. While the total number of compromises fell 44 events short of the 2023 all-time high, the number of total victims increased to a staggering 1,350,835,988 victims, a 211% increase year over year.[202] Notably, 162 compromises in 2024 occurred in the Education sector, making educational institutions like Columbia the 5th most common industry for data compromises.[203]

551.    The theft of Plaintiffs' and Class Members' Private Information, particularly those who are racial, ethnic, or religious minorities, is especially rife for financial, emotional, reputational, and other harms, and compromises the security of these individuals.

552.    The term hacktivism "was first coined in 1996 by a member of the hacker collective 'Cult of the Dead Cow' known as 'Omega.'"[204]

553.    As evidenced *supra*, hacktivists claim to engage in "cyber attacks or DoS [denial of service] attacks to make political statements, expose what they consider wrongdoing, or to pressure entities such as governments and corporations to change policies."[205]

554.    Common attack methods employed by hacktivists include distributed denial of service (DDoS), website defacement, data theft and information leaks, all of which are detailed *supra*.

555.    Hacktivists may also leak personal data or engage in "doxxing" to further their causes. According to a blog post by Lizzie Clark at *Searchlight Cyber*:

> Hacktivists may use doxxing or data leak attacks to expose sensitive information, such as internal communications, customer data, or classified documents. These attack methods are based on the fact that hacktivists can hack into organizations' systems and weaponize

---

[202] *ITRC 2024 Annual Data Breach Report*, IDENTITY THEFT RES. CTR. (Jan. 28, 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report/.
[203] *Id.*
[204] *What Is Hacktivism: Its Purposes and Methods*, GROUP I-B, https://www.group-ib.com/resources/knowledge-hub/hacktivism/ (last visited April 10, 2026).
[205] *Id.*

the information against them. The outcome of these attacks can lead to embarrassment and reputational harm. Even if the technical impact of an attack is minimal, leaking internal practices or policies can cause long-term and lasting damage.[206]

556.    Though the full extent of the data impacted in the Data Breach is not yet known, "data compromised in attacks against educational institutions includes identifying information and deeply sensitive student records, such as incidents of sexual abuse, mental health records, and reports of abusive parents."[207]

557.    The exfiltration of such sensitive information "can affect future opportunities, college admissions, employment, and the mental health of students. The impacts are especially magnified for students from marginalized backgrounds, who already face discrimination in academic and employment opportunities."[208]

558.    In 2024, 9.1 percent of hacktivist attacks targeted the education sector.[209]

559.    Recent years have seen increasingly pervasive cyberattacks on universities, particularly those targeting admissions related data.[210] High profile examples include Grinnell

---

[206] Lizzie Clark, *The Growing Threat Posed by Hacktivist Groups*, SEARCHLIGHT CYBER (Mar. 5, 2025), https://slcyber.io/blog/the-growing-threat-posed-by-hacktivist-groups/.

[207] Nicole Tisdale, *The Hidden Injustice of Cyberattacks*, WIRED (Feb. 12, 2024), https://archive.is/20240214174524/https://www.wired.com/story/cybersecurity-marginalized-communities-problem/#selection-1993.0-1997.365.

[208] *Id.*

[209] *High-Tech Crime Trends Report 2025*, GROUP I-B (2025), https://hs-25755956.f.hubspotemail-eu1.net/hubfs/25755956/report/protected/group-ib-high-tech-crime-trends-2025-en.pdf?utm_campaign=59106520-COM-Report-2025-HTCT&utm_medium=email&_hsenc=p2ANqtz-9afAOpzzHt5mJoHdqdDUuoKS488tMQUTr58A2WIicXfBiEG5Q4c4gHjSRMHap-JLv9zVpXPWn7Xj6ih7sAf_-qlrEfRA&_hsmi=104938457&utm_content=104938457&utm_source=hs_automation.

[210] *See* JP Castellanos, *Hacktivism is a Growing Threat to Higher Education*, Campus Technology (Aug. 27, 2025), https://campustechnology.com/articles/2025/08/27/hacktivism-is-a-growing-threat-to-higher-education.aspx? (describing the risks faced by victims of politically motivated attacks on institutions of higher education and noting that "[h]acktivism, or cyberattacks driven by political, ideological, or social motivations, is not new to higher education.").

College,[211] Oberlin College,[212] Hamilton College,[213] The University of Michigan,[214] Stanford University,[215] Princeton University,[216] and the University of Pennsylvania,[217] each having suffered targeted data breaches in recent years.

560.    Wealthy, high-profile universities such as Columbia are particularly ripe targets, with one industry expert opining: "In the current political climate, academic institutions and their employees are drawing ire from all kinds of fringe groups, protesters and entities that might get incensed by something they say or do and launch those types of attacks."[218] Hackers are also attracted to these types of universities due to their large endowments and to obtain lists of wealthy donors to extort.[219]

561.    The hacktivists involved in this Data Breach as well as the New York University data breach earlier in 2025 "have attributed their motivations to getting enrollment data to show

---

[211] Aimee Picchi, *Grinnell, Oberlin and Hamilton applicants ransomed over hacked application info*, CBS NEWS (Mar. 8, 2019), https://www.cbsnews.com/news/grinnell-oberlin-hamilton-colleges-hacked-applicants-ransomed-over-hacked-application-info/.
[212] *Id.*
[213] *Id.*
[214] Scarlett Evans, *Cyberattack Hits University of Michigan, Compromises Data From 230,000*, IOT WORLD TODAY (Oct. 25, 2023), https://www.iotworldtoday.com/security/cyberattack-hits-university-of-michigan-compromises-data-from-230-000-.
[215] Jonathan Greig, *Stanford University investigating cyberattack after ransomware claims*, THE RECORD (Oct. 27, 2023), https://therecord.media/stanford-investigating-cyberattack-after-ransomware.
[216] Tom Giles & Andrew Martin, *Princeton Hacked in Latest Attack on an Ivy League School*, BLOOMBERG (Nov. 16, 2025), https://www.bloomberg.com/news/articles/2025-11-16/princeton-university-says-database-with-donor-info-compromised.
[217] Stephanie Saul, *Penn Data Breach Involves Decades of Student and Alumni Information*, N.Y. TIMES (Nov. 4, 2025), https://www.nytimes.com/2025/11/04/us/penn-data-breach-donors-students.html.
[218] Kathryn Palmer, *Why Hackers Are Targeting the Ivy League*, INSIDE HIGHER ED. (Nov. 20, 2025), https://www.insidehighered.com/news/tech-innovation/administrative-tech/2025/11/20/why-hackers-are-targeting-ivy-league.
[219] *Id.*

their alleged defiance of the Supreme Court's 2023 ruling . . . that race-conscious admissions are unconstitutional."[220]

562.    This readily available and accessible information confirms that, prior to the Data Breach, Columbia knew or should have known that: (i) cybercriminals were targeting entities such as Columbia that stored large volumes of Private Information; (ii) cybercriminals were ferociously aggressive in their pursuit of companies and universities in possession of significant sensitive information such as Columbia; (iii) cybercriminals were leaking stolen Private Information on Dark Web portals; and (iv) cybercriminals' tactics include threatening to release stolen data.

563.    Even absent an awareness of publicly available information regarding the general threat of data breaches, Columbia has had recent prior experiences with being hacked. Columbia should have used this experience to harden its infrastructure and implement better data practices.

564.    Prior to the Data Breach, Columbia knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' Private Information could be accessed, exfiltrated, and published as the result of a cyberattack.

565.    Columbia should certainly have been aware, and indeed was aware, that it was at risk of a data breach that could expose the Private Information that it collected and maintained.

566.    Columbia was also on notice of the importance of data encryption of Private Information. Columbia knew it kept Private Information in its systems and yet it appears Columbia did not encrypt these systems or the information contained within them.

---

[220] *Id.*

**H.** *Cyber Criminals Have Misused and Will Continue to Misuse Plaintiffs' Private Information*

567.    Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach can and will be used in various ways for criminals to exploit Plaintiffs and Class Members and profit off their misfortune.

568.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[221] For example, with the Private Information stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[222] These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and the Class Members.

569.    Social Security numbers, which were compromised in the Data Breach, are particularly sensitive personal information. As the Consumer Federation of America explains:

> **Social Security number.** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social

---

[221] *Facts & Statistics: Identity Theft and Cybercrime*, INS. INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity") (last visited April 10, 2026).
[222] *See* Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, STATESMAN JOURNAL (Nov. 15, 2017), https://www.statesmanjournal.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/860643001/.

Security number and it's not a good idea because it is connected to your life in so many ways.[223]

570.    The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use It to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[224]

571.    Moreover, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

572.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[225]

---

[223] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (emphasis added).
[224] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION (Oct. 2024), www.ssa.gov/pubs/EN-05-10064.pdf.
[225] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

573.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number, name, and date of birth.

574.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[226]

575.    Private Information is such a valuable commodity to identity thieves that criminals will use it for years once it has been compromised.[227]

576.    While the original motive for the Breach may not have been financial, this does not mean that opportunists will not capitalize on the opportunity to financially prey on Plaintiffs and the Class. A Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[228] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[229]

577.    Further, armed with the Private Information accessed in the Data Breach, data thieves can use that data to commit a variety of crimes, including using Class Members'

---

[226] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[227] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (July 5, 2007), https://www.gao.gov/assets/gao-07-737.pdf.

[228] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, SECURITY WATCH (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[229] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

information to commit identity theft and fraud using their compromised Private Information. Moreover, data thieves or malicious actors who may have purchased or otherwise illegally obtained Private Information may use that data to target Plaintiffs and Class Members with violence or threats of harm based on animus toward members of particular political, ethnic, or religious groups.

578.    These risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, when information is posted on websites that hackers and others use to make stolen credentials public, "[i]dentity thieves are actively looking for any consumer credentials they can find: if your account data becomes public, they will use it."[230] Indeed, here, we know that the hacker has already disseminated the stolen Private Information to numerous news outlets and nefarious actors, and upon information and belief, posted the Private Information on the Dark Web.

579.    Hackers may not use the information immediately, but this does not mean it will not be used at all. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information *may continue for years*. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[231]

---

[230] Ari Lazarus, *How fast will identity thieves use stolen info?*, MILITARY CONSUMER (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.

[231] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (July 5, 2007), https://www.gao.gov/assets/gao-07-737.pdf (emphasis added).

580.    For instance, with a stolen Social Security number, information that was confirmed comprised in the instant Data Breach, someone can fraudulently open financial accounts, get medical care, file tax returns, commit crimes, and steal benefits.[232]

581.    The ramifications of Defendant's failure to keep its Class Members' Private Information secure are long-lasting and severe. Once that information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not appear for six to 12 months or even longer.

582.    Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

583.    Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened. [233] This gives thieves ample time to seek multiple medical treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[234]

584.    Identity theft victims must spend countless hours and large amounts of money repairing the impact on their credit and protecting themselves in the future.[235]

---

[232] *See* Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, STATESMAN JOURNAL (Nov. 15, 2017), https://www.statesmanjournal.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/860643001/.

[233] *See Medical ID Theft Checklist*, IDENTITYFORCE (Jan. 11, 2023), https://www.identityforce.com/blog/medical-id-theft-checklist-2.

[234] *2025-2026 Data Breach Response Guide*, EXPERIAN (July 31, 2025), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

[235] *Guide for Assisting Identity Theft Victims*, FEDERAL TRADE COMMISSION, 4 (Sept. 2013), https://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

585.    Defendant's offer of limited identity monitoring to Plaintiffs and the Class is woefully inadequate and will not fully protect Plaintiffs from the damages and harm caused by its failures. There may be a time lag between when harm occurs versus when it is discovered and when Private Information is stolen and when it is used. Once the offered coverage has expired, Plaintiffs and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to Columbia's gross negligence. Furthermore, identity monitoring only alerts someone to the fact that they have *already been the victim of identity theft* (*i.e.*, fraudulent acquisition and use of another person's Private Information)—it does not prevent identity theft.[236] Nor can an identity monitoring service remove personal information from the dark web.[237] "The people who trade in stolen personal information [on the Dark Web] won't cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[238]

586.    As a direct and proximate result of the Data Breach, Plaintiffs and the Class have had their Private Information exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of further harm from fraud and identity theft. Plaintiffs and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come. Even more serious is the identity restoration that Plaintiffs and other

---

[236] *See* Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, CNBC (Nov. 30, 2017), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

[237] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[238] *Id.*

Class Members must go through, which can include spending countless hours filing police reports, following Federal Trade Commission checklists, and calling financial institutions to cancel fraudulent credit applications, to name just a few of the steps.

587.    Plaintiffs and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

i.    Actual identity theft, including fraudulent credit inquiries and cards being opened in their names;

ii.    Trespass, damage to, and theft of their personal property including Private Information;

iii.    Improper disclosure of their Private Information;

iv.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals and having been already misused;

v.    Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cybercriminals have their Private Information and that identity thieves have already used that information to defraud other victims of the Data Breach;

vi.    Ascertainable losses in the form of time taken to respond to identity theft and attempt to restore identity, including lost opportunities and lost wages from uncompensated time off from work;

vii.    Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

viii.    Ascertainable losses in the form of deprivation of the value of Plaintiffs' and Class Members' Private Information for which there is a well-established and quantifiable national and international market;

ix.    The loss of use of and access to their credit, accounts, and/or funds;

x.    Damage to their credit due to fraudulent use of their Private Information; and

xi.    Increased cost of borrowing, insurance, deposits, and the inability to secure more favorable interest rates because of a reduced credit score.

588.    One measure of harm to Plaintiffs and Class Members whose Private Information was accessed without authorization is the market value the hackers ascribed to Class Members' Private Information when it was, upon information and belief, posted for sale on the Dark Web. This market value for access to Private Information can be determined by reference to both legitimate and illegitimate markets for such information.

589.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the Dark Web. Numerous sources cite Dark Web pricing for stolen identity credentials.[239] For example, Private Information can be sold at a price ranging from $40 to $200.[240] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[241]

---

[239] *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[240] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[241] *In the Dark*, VPN OVERVIEW (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

590.    Moreover, Plaintiffs and Class Members are interested in ensuring that their information, which remains in the possession of Defendant, is protected from further breaches by implementing industry-standard security measures and safeguards. Defendant has shown itself wholly incapable of protecting Plaintiffs' Private Information.

591.    Plaintiffs and Class Members also have an interest in ensuring that the Private Information they provided to Columbia is removed from Columbia's unencrypted files.

592.    Defendant acknowledged, in its letter to Plaintiffs and Class Members, that the Data Breach would cause inconvenience to affected individuals by providing numerous steps for Class Members to take to mitigate the harm caused by the Data Breach.[242]

593.    At Columbia's suggestion, Plaintiffs have taken reasonable steps to mitigate the harms flowing from the Data Breach. Given the kind of Private Information Columbia made accessible to hackers, however, Plaintiffs are very likely to incur additional damages.

594.    Because identity thieves have their Private Information, Plaintiffs and all Class Members will need to have identity theft monitoring protection for several years and possibly for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[243]

595.    Plaintiffs and Class Members are now at heightened risk of being targets for violence or other harm based on their racial, religious, ethnic, or other demographic characteristics that were compromised as a result of the Data Breach.

596.    None of this should have happened.

---

[242] *See* Data Breach Notice.
[243] *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

## I.  *Columbia University Could Have Prevented the Data Breach*

597.    Data breaches are preventable.[244] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK: "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[245] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[246]

598.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[247]

599.    In a Data Breach like this, many failures laid the groundwork for the Breach. The FTC has published guidelines that establish reasonable data security practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[248] The guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses

---

[244] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).
[245] *Id.* at 17.
[246] *Id.* at 28.
[247] *Id.*
[248] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 3, 2023), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

600.    Upon information and belief, Columbia failed to comply with industry standards and FTC guidelines. Upon information and belief, Columbia also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well-respected authorities in reasonable cybersecurity readiness.

601.    As the Federal Bureau of Investigation explains, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[249]

602.    To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

---

[249] *See How to Protect Your Networks from RANSOMWARE*, 3, FBI (Oct. 3, 2023), https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[250]

---

[250] *Id.* at 3–4.

603. Further, to prevent and detect cyberattacks, including the attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

148

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[251]

604.    In addition, to prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
    - Apply latest security updates
    - Use threat and vulnerability management
    - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**
    - Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**
    - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**
    - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**
    - Monitor for adversarial activities
    - Hunt for brute force attempts
    - Monitor for cleanup of Event Logs
    - Analyze logon events

- **Harden infrastructure**
    - Use Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection

---

[251] *See Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware.

> ▪ Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[252]

605. Since Defendant was storing the Private Information of millions of individuals, Defendant could and should have implemented all of the above measures to prevent and detect malicious cyberattacks.

606. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the Private Information of Plaintiffs and Class Members.

607. Defendant could have prevented this Data Breach by properly securing and encrypting the folders, files, and or data fields containing the Private Information of Plaintiffs and Class Members. Alternatively, Defendant could have destroyed the data it no longer had a reasonable need to maintain or only stored data in an internet-accessible environment when there was a reasonable need to do so.

608. Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data. Moreover, as alleged above, this was not Columbia's first—or even second—data breach. It should have taken stronger and better steps to protect the Private Information at issue to prevent yet another breach.

609. Specifically, among other failures, Columbia had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[253] Indeed, the United States Department of Health and

---

[252] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT THREAT INTELLIGENCE (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[253] *See* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, FORTRA (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

Human Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal information, stating, "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[254]

610.    In sum, this Data Breach could have been prevented through industry standard network segmentation and encryption of confidential information. Further, the Data Breach could have likely been prevented had Defendant utilized appropriate malware prevention and detection technologies.

611.    Defendant disregarded the rights of Plaintiffs and Class Members by recklessly and/or negligently failing to take and implement adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a direct and proximate result of Defendant's negligence, Plaintiffs' and Class Members' Private Information was compromised through disclosure to an unknown and unauthorized criminal third party.

612.    Upon information and belief, Defendant breached its duties and obligations in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately

---

[254] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. DEP'T OF HEALTH AND HUMAN SERVICES    (Apr.    22,    2014),    https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack; and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

### J.  *Consumers Prioritize Data Security*

613.   In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[255] Therein, Cisco reported the following:

i.   "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[256]

ii.   "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[257]

iii.   89% of consumers stated that "I care about data privacy."[258]

iv.   83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[259]

---

[255] *Privacy Awareness: Consumers Taking Charge to Protect Personal Information*, CISCO (2024), https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf.
[256] *Id*. at 3.
[257] *Id*.
[258] *Id*. at 9.
[259] *Id*.

v.     51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[260]

vi.    75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[261]

### K.  *Columbia Fails to Comply with FTC Guidelines*

614.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

615.    In 2016, the FTC updated its publication, *Protecting Private Information: A Guide for Business*, establishing cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer and employee information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

616.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[260] *Id.*
[261] *Id.* at 11.

153

617.    The FTC has brought enforcement actions against employers for failing to protect employee data adequately and reasonably and for failing to protect private consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

618.    These FTC enforcement actions include actions against employers over the compromised Private Information of their employees and against business over the compromised information of their customers, like Defendant here.

619.    Defendant failed to ensure that Plaintiffs' and Class Members' sensitive Private Information was stored in a network with basic data security practices.

620.    Defendant's failure to ensure that reasonable and appropriate measures were in place to protect against unauthorized access to customers' and employees' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

621.    Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of its employees and of consumers who entrusted their data to Defendant. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**L. *Columbia's Response to the Data Breach is Inadequate to Protect Plaintiffs and the Class***

622.    Defendant failed to inform Plaintiffs and Class Members of the Data Breach in time for them to protect themselves from identity theft.

623.    The initial Data Breach took place in May of 2025. Defendant stated that it discovered the Data Breach by at least June 24, 2025. And yet, Columbia did not begin notifying

affected individuals until August 2025. Even then, Columbia failed to inform Plaintiffs and Class Members exactly what information was exposed in the Data Breach, leaving Plaintiffs and Class Members unsure as to the scope of information that was compromised.

624.    During these intervals, the cybercriminals exploited the information while Columbia was investigating the Data Breach.

625.    If Columbia had investigated the Data Breach more diligently and reported it sooner, Plaintiffs and the Class could have taken steps to protect themselves sooner and to mitigate the damages caused by the Breach.

**M.** *Common Injuries and Damages*

626.    As a result of Defendant's negligence and the inadequate data security practices that existed on the breached IT network, the Data Breach, and the foreseeable consequences of Private Information ending up in possession of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; (e) emotional distress on account of knowing that their highly sensitive Private Information is no longer confidential and can be used for blackmail, harassment, intimidation, vandalism, assault, extortion, hate crimes, identity theft or fraud, and any number of additional harms against them for the rest of their lives; and (f) the continued risk to their Private Information, which remains in the possession and/or control of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

**N.** *Columbia Had an Obligation to Protect Private Information Under the Law and the Applicable Standard of Care*

627. Defendant was prohibited by the FTCA (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

628. Defendant is further required by various states' laws and regulations to protect Plaintiffs' and Class Members' Private Information.

629. Defendant owed a duty to Plaintiffs and Class Members to design, maintain, and test its computer and application systems to ensure the Private Information in its possession was adequately secured and protected.

630. Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees (and others who accessed Private Information within its computer systems) on how to adequately protect Private Information.

631. Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a breach on its systems in a timely manner.

632. Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

633. Defendant owed a duty to Plaintiffs and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material fact in the decision to entrust Private Information to Defendant.

156

634.    Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when data breaches occurred.

635.    Defendant owed a duty of care to Plaintiffs and Class Members because it was a foreseeable victim of a data breach.

### O.  *The Breach Increases Plaintiffs' and Class Members' Risk of Identity Theft*

636.    The Private Information stolen in the Data Breach has already been disseminated by the hacker who perpetrated the Breach to numerous media outlets and nefarious actors. Upon information and belief, the unencrypted Private Information of Plaintiffs and Class Members is already for sale on the Dark Web. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

637.    The link between a data breach and identity theft risk is simple and well-established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by, *inter alia*, posting and selling the stolen information on the black market to other criminals, who then utilize the information to commit a variety of identity theft related crimes discussed below.

638.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[262] For example, with the Private Information stolen in the Data Breach, identity thieves can open financial accounts, apply for credit, collect government benefits, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or

---

[262] *Facts & Statistics: Identity Theft and Cybercrime*, INSURANCE INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity") (last visited April 10, 2026).

undocumented immigrants, steal benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[263] These criminal activities have resulted and will result in devastating financial and personal losses to Plaintiffs and Class Members.

639.    Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.[264]

640.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

641.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches can be the starting point for these additional targeted attacks on the victims.

642.    These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, they will use it.[265]

---

[263] John Egan, *What Should I Do if My Driver's License Number Is Stolen?*, EXPERIAN (June 13, 2024), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.

[264] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (July 5, 2007), https://www.gao.gov/products/gao-07-737.

[265] Ari Lazarus, *How fast will identity thieves use stolen info?*, MILITARY CONSUMER (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.

643.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[266]

644.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

645.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

646.    The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiffs and the other Class Members.

---

[266] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See* Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

647.    Thus, even if certain information (such as emails or telephone numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

648.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**P.  *Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

649.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

650.    Thus, due to the actual, imminent, and substantial risk of identity theft, Plaintiffs and Class Members must, as Columbia's Data Breach Notice encourages them to do, "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft and fraud.

651.     Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as signing up for credit monitoring and identity theft insurance, closing and opening new credit cards, and securing their financial accounts.

652.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in

which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[267]

653.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[268]

### Q.  *Diminution and Deprivation of Value of Private Information*

654.    Private Information is a valuable property right.[269] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts including heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

655.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[270]

656.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[271] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker

---

[267] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (July 5, 2007), https://www.gao.gov/products/gao-07-737.
[268] *Id.*
[269] *See* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[270] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.
[271] David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak*, LOS ANGELES TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

who in turn aggregates the information and provides it to marketers or app developers.[272] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[273]

657.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the Dark Web. Numerous sources cite Dark Web pricing for stolen identity credentials. For example, Private Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[274] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the Dark Web.[275] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[276]

658.    Based on the foregoing, the Private Information compromised in the Data Breach, which includes Social Security numbers, is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

659.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred

---

[272] *The personal data revolution*, DATACOUP, https://datacoup.com/ (last visited April 10, 2026).

[273]    *Frequently Asked Questions*, NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited April 10, 2026).

[274] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[275] Ben Luthi, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[276]    *In the Dark*, VPNOVERVIEW (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

660. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., Social Security numbers and names.

661. The fraudulent activity resulting from the Data Breach may not come to light for years.

662. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if the relevant data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

663. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

664. Defendant was, or should have been, fully aware of the unique type and the significant volume of data it allowed to be stored on a vulnerable network, amounting to potentially millions of individuals' detailed personal information and, thus, the significant number of individuals who the exposure of the unencrypted data would harm.

665.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to protect the Private Information of Plaintiffs and Class Members.

### R. *Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

666.    Credit and identity theft monitoring is reasonable and necessary given the targeted attack in this case, sophisticated criminal activity, the type of Private Information involved in this Data Breach, the fact that the hacker has already disseminated the stolen Private Information to media outlets and nefarious third parties, and upon information and belief, placed the stolen Private Information on the black market/Dark Web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

667.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

668.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[277] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

---

[277] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

164

669.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

670.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### S. *Loss of Benefit of the Bargain*

671.    Columbia's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

672.    Plaintiffs and Class Members provided their Private Information to Columbia with the reasonable and mutual expectation that Columbia would implement and maintain adequate data security practices to secure and protect the Private Information it collected and stored.

673.    Furthermore, when accepting educational services or employment opportunities from Defendant under certain terms, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying, or being paid less, for services and data security to protect the Private Information, when in fact, Columbia did not provide the expected data security. Accordingly, Plaintiffs and Class Members received educational services and employment positions that were of less value than they reasonably expected to receive under the bargains they struck with Defendant.

### CLASS ACTION ALLEGATIONS

674.    Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a Nationwide Class, and/or State Subclasses defined as follows:

**Nationwide Class**: All United States residents whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach (the "Class").

**California Subclass:** All individuals domiciled in California whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

**Connecticut Subclass:** All individuals domiciled in Connecticut whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

**Florida Subclass:** All individuals domiciled in Florida whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

**Georgia Subclass:** All individuals domiciled in Georgia whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

**Maine Subclass:** All individuals domiciled in Maine whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

**Maryland Subclass:** All individuals domiciled in Maryland whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

**Massachusetts Subclass:** All individuals domiciled in Massachusetts whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

**New Jersey Subclass:** All individuals domiciled in New Jersey whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

**New York Subclass:** All individuals domiciled in New York whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

**Pennsylvania Subclass:** All individuals domiciled in Pennsylvania whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

**Tennessee Subclass:** All individuals domiciled in Tennessee whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

**Texas Subclass:** All individuals domiciled in Texas whose Private Information was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

675. Excluded from the Class and Subclasses are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

676. Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

677. Class certification of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis utilizing the same evidence as would be used to prove those elements in separate actions alleging the same claims.

678. **Numerosity:** The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiffs and exclusively in the possession of Defendant, upon information and belief, millions of individuals were impacted. The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

679.   **Commonality:** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a.   Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b.   Whether Defendant had respective duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c.   Whether Defendant had respective duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d.   Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e.   Whether Defendant was negligent in collecting and storing Plaintiffs' and Class members' Private Information, and breached its duties thereby;

f.   Whether and when Defendant actually learned of the Data Breach;

g.   Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

h.   Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

i.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

j.   Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

k.   Whether Defendant was unjustly enriched;

l.   Whether Defendant's conduct violated the statutes as set forth herein;

m.   Whether Plaintiffs and Class Members are entitled to actual damages. statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct; and

n.   Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief or restitution to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

680.   **Typicality:** Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffer from the same violations of the law as each other member of the Class.

681.   **Predominance and Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

682.   **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or

adverse to the Class Members and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

683. **Superiority and Manageability:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

684. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs are exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause

of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

685.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

686.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Plaintiffs and Class Members, Defendant may continue to refuse to provide proper notification to Plaintiffs and Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

687.    **<u>Injunctive Relief:</u>** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Federal Rule of Civil Procedure 23(b)(2).

688.    Class certification under Federal Rule of Civil Procedure 23(c)(4) is also appropriate because this Court can designate specific claims or issues or class-wise treatment and may designate multiple subclasses. Particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendant failed to timely notify the Plaintiffs and the Class of the Data Breach;

    b.  Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

689. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

**(On Behalf of Plaintiffs and the Class, or, alternatively, the State Subclasses)**

690. Plaintiffs re-allege and incorporate by reference all preceding factual allegations, as if fully set forth herein.

691. Defendant owes a duty under common law to Plaintiffs and the Class to exercise reasonable care in safeguarding, securing, and protecting the highly sensitive and confidential data it solicits, collects, stores, and maintains. This includes a duty owed by Defendant to exercise reasonable care in safeguarding, securing, and protecting Plaintiffs' and Class Members' Private Information.

692.    Defendant owes a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards, and other requirements discussed herein, to ensure that its systems and networks, and the personnel responsible for them, adequately secure and protect the Private Information that Defendant solicits, collects, stores, and maintains.

693.    Defendant's duty to use reasonable data security measures includes, among other things: (a) designing, maintaining, and testing its security protocols to ensure that the Private Information of Plaintiffs and Class Members is adequately secured and protected; (b) removing or deleting sensitive data when no longer needed for authorized purposes; and (c) implementing and maintaining procedures to detect and prevent improper access to and misuse of Plaintiffs' and Class Members' Private Information.

694.    Defendant owes a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, HIPAA, and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protect individuals' Private Information.

695.    By soliciting, accepting, storing, and maintaining Plaintiffs' and Class Members' Private Information, Defendant undertook a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

696.    Defendant solicits, collects, stores, and maintains the Private Information of Plaintiffs and Class Members as part of its regular business practices as a university.

697.    Defendant required Plaintiffs and Class Members to entrust it with their Private Information in order to apply for admission to or employment at its university. Defendant requires

173

its students and student-applicants, including Plaintiffs and Class Members, as well as its employees, to submit non-public Private Information in the ordinary course of providing its services.

698.    Defendant gathered and stored the Private Information of Plaintiffs and Class Members as part of its business of soliciting its services to its students and student-applicants, which solicitations and services affect commerce.

699.    Plaintiffs and Class Members entrusted Defendant with their Private Information with the reasonable and mutual understanding that Defendant would safeguard their information.

700.    Defendant had full knowledge of the sensitivity of the Private Information it collected and stored and the types of harm that Plaintiffs and Class Members could and would suffer if their Private Information were wrongfully disclosed.

701.    By voluntarily undertaking and assuming the responsibility to collect and store Plaintiffs' and Class Members' Private Information, and in fact doing so, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Plaintiffs' and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft.

702.    Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

703.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

174

704.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the Private Information it collected and stored.

705.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of being students and/or student-applicants at Columbia, and/or employees of Columbia.

706.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described herein, but also because Defendant is bound by industry standards to protect confidential Private Information.

707.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

708.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former students' and student-applicants' and employees' Private Information that it was no longer required to retain pursuant to regulations.

709.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

710.    Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent,

175

mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

711.    Defendant waited months to provide Plaintiffs and the Class such notice.

712.    Defendant breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.  Failing to adopt, implement, and maintain adequate security measures to reduce the risk of data breaches and to safeguard Plaintiffs' and Class Members' Private Information;

b.  Failing to adequately protect the Private Information of Plaintiffs and the Class Members;

c.  Failing to adequately monitor the security of its networks and systems;

d.  Failing to adequately train employees on how to avoid and/or prevent cyberattacks;

e.  Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against cyberattacks;

f.  Failing to ensure the confidentiality and integrity of electronic Private Information it created, received, maintained, and/or transmitted, including through the encryption of Private Information;

g.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations;

h.  Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports;

176

  i. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic Private Information;

  j. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

  k. Failing to adhere to industry standards for cybersecurity;

  l. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information;

  m. Failing to detect in a timely manner that Plaintiffs' and Class Members' Private Information had been compromised;

  n. Failing to remove former students' and student-applicants' Private Information after it was no longer required to retain it pursuant to regulations; and

  o. Failing to timely and adequately notify Plaintiffs and Class Members about the Data Breach's occurrence and scope, so they could take appropriate steps to mitigate the potential for identity theft and other damages.

713. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it collected and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

714. Plaintiffs and Class Members were within the class of persons the FTC Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statute was intended to guard against.

715. Defendant's violation of Section 5 of the FTC Act constitutes negligence.

716.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

717.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

718.    It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury. Further, the Data Breach was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting educational institutions.

719.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if their Private Information were wrongfully disclosed.

720.    Plaintiffs and the Class were the foreseeable and probable victims of any inadequate data security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the critical importance of providing adequate security for that Private Information, and the necessity of encrypting Private Information stored on its systems or transmitted through third party systems.

721.    It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in one or more types of injuries to Plaintiffs and Class Members.

722.    Plaintiffs and the Class had no ability to protect their Private Information that was in, and upon information and belief, remains in, Defendant's possession.

178

723.    Defendant was in the best position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

724.    Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard Private Information.

725.    Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

726.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the Private Information of Plaintiffs and the Class would not have been compromised and stolen in the Data Breach.

727.    There is a close causal connection between Defendant's failure to implement adequate data security measures to protect the Private Information of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The Private Information of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate data security measures.

728.    As described herein, there is a large legal and illegal market for the type of Private Information exposed in the Data Breach. Unauthorized disclosure of Private Information decreases its value in the legal market for Private Information to the extent that it may no longer be considered reliable or to the extent that it may become part of the public record.

179

729.    Due to Defendant's negligence, Plaintiffs' and Class Members' Private Information was exposed to an unauthorized malevolent actor resulting in the lost or diminished value of their Private Information.

730.    In addition to lost value of their Private Information, as a result of the Data Breach, Plaintiffs and Class Members have also already expended (and will continue to expend) time and money on the prevention, detection, and recovery from identity theft and fraud resulting from the risk of future harm stemming from the exposure of their Private Information due to Defendant's negligent failure to employ adequate data security.

731.    Exposure of Plaintiffs' and Class Members' Private Information to an unknown and unauthorized third-party malevolent actor – i.e., a hacker – has resulted in concrete harm to Plaintiffs and Class Members.

732.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) nominal damages; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

733.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

734.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
## BREACH OF IMPLIED CONTRACT

**(On Behalf of Plaintiffs and the Class, or, alternatively, the State Subclasses)**

735.    Plaintiffs re-allege and incorporate by reference all preceding factual allegations, as if fully set forth herein.

736.    Defendant required applicants, students, and employees to provide their Private Information as a condition of, and in order to be considered for, receiving services from Columbia (consideration for admission and/or enrollment, and/or employment from Columbia). When Plaintiffs and Class Members provided consideration and Private Information to Defendant during Columbia's admissions and enrollment process, they entered into implied contracts with Defendant, pursuant to which Defendant agreed to implement and maintain reasonable data security practices to adequately secure and protect the Private Information it collected and stored.

737.    Columbia solicited and invited Plaintiffs and Class Members to entrust it with their Private Information, which they were required to provide in order to apply for admission and/or to enroll at Columbia.

738.    Plaintiffs and Class Members were required to entrust their Private Information to Defendant during Columbia's application and enrollment process.

739.    All Plaintiffs and Class Members paid application fees to Defendant, or application fees were paid on their behalf.

740.     Plaintiffs and Class Members, whose applications were accepted and who subsequently enrolled at Columbia, also paid tuition and fees to Columbia, or tuition and fees were paid on their behalf, upon enrollment.

741.     Plaintiffs and Class Members provided their Private Information to Columbia with the reasonable and mutual expectation that Columbia would implement and maintain reasonable and adequate data security practices to protect their Private Information from unauthorized access. Columbia knew or reasonably should have known that Plaintiffs and Class Members held this belief and expectation.

742.     In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

743.     Columbia impliedly promised to implement and maintain reasonable and adequate data security practices to protect Plaintiffs' and Class Members' Private Information from unauthorized access. This is reinforced by Columbia's representations in its publicly posted privacy policies and other disclosures (discussed herein).[278]

744.     Columbia required Plaintiffs and Class Members to provide their Private Information during the application and/or enrollment process. In doing so, Columbia made implied or implicit promises that its data security practices were reasonably sufficient to protect Plaintiffs' and Class Members' Private Information.

---

[278] *See, e.g.*, *Privacy Policy*, COLUMBIA, https://www.college.columbia.edu/privacy/ (last visited April 10, 2026); *University Policies*, COLUMBIA, https://undergrad.admissions.columbia.edu/policies (last visited April 10, 2026).

745. By accepting Plaintiffs' and Class Members' Private Information during the application and/or enrollment process, Columbia implicitly represented that its data security practices were sufficient to protect and secure the Private Information it collected and stored.

746. Columbia's conduct in requiring prospective students, including Plaintiffs and Class Members, to provide their Private Information during the application process illustrates Columbia's intent to be bound by an implied promise to implement and maintain reasonable data security practices sufficient to protect and secure the Private Information it collected and stored.

747. Implicit in the agreement between Defendant and Plaintiffs and Class Members, was Columbia's obligation to: (a) use the Private Information it collected and stored for business purposes only; (b) take reasonable steps to safeguard that Private Information; (c) prevent unauthorized disclosures of the Private Information; (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information; (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure; and (f) retain the Private Information it collected and stored only under conditions that kept such information secure and confidential.

748. The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

749. Plaintiffs and Class Members would not have provided their Private Information to Columbia, or paid application fees and/or tuition to Columbia, in the absence of Columbia's explicit and implied promises to implement and maintain reasonable data security practices.

750. Plaintiffs and Class Members who enrolled at Columbia paid money to Defendant, in the form of tuition and fees, with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security.

751.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant or paid money to Defendant—in the form of application fees or tuition—in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

752.    Plaintiffs and Class Members fully performed their obligations under their implied contracts with Columbia. They provided their Private Information, and paid consideration in the form of application fees and/or tuition, to Columbia in exchange for Columbia's consideration of their applications and its implied promise to adopt reasonable data security safeguards.

753.    The conduct of the parties evidenced their mutual assent to be bound by contract: Plaintiffs and Class Members provided their Private Information based on Defendant's promises to protect the information from unauthorized access and disclosure in order to obtain services from Defendant. Conversely, Defendant promised to protect the Private Information it collected from Plaintiffs and Class Members in return for the payments and services it received from them.

754.    Columbia breached its implied contracts with Plaintiffs and Class Members by failing to implement and maintain reasonable data security practices.

755.    Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their Private Information, by failing to delete the Private Information of Plaintiffs and the Class from its network once the relationship ended, and by failing to provide accurate and timely notice to Plaintiffs and Class Members that their Private Information was compromised and stolen as a result of the Data Breach.

756.    As a result of Columbia's conduct, Plaintiffs and Class Members have suffered, and continue to suffer, legally cognizable damages arising from the Data Breach.

757.    As a direct and proximate result of Defendant's breach of its implied contracts, Plaintiffs and Class members sustained damages, including, but not limited to: (i) invasion of

privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of their bargain; (vi) nominal damages; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

758.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

759.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**

**(On Behalf of Plaintiffs and the Class, or, alternatively, the State Subclasses)**

760.    Plaintiffs re-allege and incorporate by reference all preceding factual allegations, as if fully set forth herein.

761.    Plaintiffs bring this Count in the alternative to the breach of implied contract count above.

762.    Plaintiffs and Class Members conferred a benefit on Defendant by providing their Private Information to Columbia and further conferred a monetary benefit on Defendant in the form of payment of application fees and/or tuition-related fees. In exchange, Plaintiffs and Class Members should have received from Defendant the application and enrollment services that were

the subject of their transactions and should have had their Private Information protected with adequate data security.

763.    Columbia applicants, including Plaintiffs and Class Members, are required to pay "[a]n $85 nonrefundable application fee."[279] Plaintiffs and Class Members had a reasonable expectation and understanding that the nonrefundable fees they paid to Columbia would be used to cover the administrative costs of processing their applications for admission, including the cost of adequate data security to protect and secure the highly sensitive and confidential Private Information contained in their applications.

764.    For matriculated students, the cost of attendance at Columbia includes tuition and fees, including a "Student Life Fee, which is used to cover many of the services offered to students[.]"[280] The Student Life Fee "combines the Student Activity Fee, Career Education Fee, Printing Fee, Recreational Facilities Fee, *Information Technology Fee*, Lerner Fee, and Cross-Cutting Multi-School Activities Fee."[281] According to Columbia's website, which provides "a breakdown of how [the Student Life Fee] is distributed across the various services provided to . . . student[s]," the Information Technology Fee "helps fund the student support services offered by Columbia University Information Technology (CUIT) including email and network support, Student Services Online (SSOL), student computer labs, CourseWorks, classroom technology, and the Service Desk."[282] Columbia students, including Plaintiffs and Class Members, therefore had a

---

[279] *How to Apply*, COLUMBIA, https://undergrad.admissions.columbia.edu/apply/firstyear (last visited April 10, 2026) ("Payment (or fee waiver) is due at the time that you submit your application.").

[280] *See Cost of Attendance*, COLUMBIA, https://www.gs.columbia.edu/content/cost-attendance#!/%23cu_accordion_item-1364 (last visited April 9, 2026).

[281] *Id.* (emphasis added).

[282] *Id.* (for the 2025–2026 school year, the Student Life Fee for full time undergraduate fees was $854, per semester, of which $299 is allocated to the "Information Technology Fee"); *see also Columbia University Information Technology – Our Mission*, COLUMBIA, https://www.cuit.columbia.edu/ (last visited April 9, 2026) ("CUIT is committed to delivering

reasonable expectation and understanding that the Information Technology Fee they paid to Columbia each semester as a condition of enrollment would be used, in part, to cover the cost of adequate data security to protect their highly sensitive and confidential Private Information.

765. Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from its collection of Plaintiffs' and Class Members' data and used Plaintiffs' and Class Members' Private Information for business purposes.

766. Defendant failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs and Class Members for the value that their Private Information provided.

767. Defendant acquired Plaintiffs' and Class Members' Private Information through inequitable means because it failed to investigate and/or disclose the inadequate data security practices previously alleged.

768. Defendant was enriched at the expense of Plaintiffs and Class Members to the extent that it obtained payments and services from them based on its promise that it would protect their Private Information from unauthorized disclosure even though it failed to expend the time, money and effort necessary to provide adequate data security.

769. If Plaintiff and Class Members had known that Defendant would not implement and maintain adequate data security practices to monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information to Defendant, applied or enrolled, or paid application fees and/or tuition to Defendant.

770. Plaintiffs and Class Members have no adequate remedy at law.

---

high-quality, stable, and secure technology solutions and services to the Columbia community while providing the IT Leadership required to guide the University on its path toward the future.").

771.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of data security that would have prevented the Data Breach or mitigated its effects, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

772.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

773.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of their bargain; (vi) nominal damages; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

774.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by

establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

775.     While predicated on the same misconduct by Columbia supporting their negligence and breach of contract claims, Plaintiffs' and Class Members' unjust enrichment claim seeks damages in addition to, and distinct from, compensatory damages and restitution damages. Plaintiffs' and Class Members' unjust enrichment claim also seeks disgorgement of monies that it would be inequitable and unconscionable to allow Columbia to retain that it saved by shirking data-security, while leaving Plaintiffs and Class Members to suffer the consequences.

## COUNT IV
## BREACH OF BAILMENT

**(On Behalf of Plaintiffs and the Class, or, alternatively, the State Subclasses)**

776.     Plaintiffs re-allege and incorporate by reference all preceding factual allegations, as if fully set forth herein.

777.     Plaintiffs' and Class Members' Private Information is personal property and was conveyed to Defendant for the certain purpose of applying for admission to Columbia with the understanding Columbia would keep that information private and confidential.

778.     Plaintiffs' and Class Members' Private Information has value and is highly prized by hackers and criminals. Defendant was aware of the risks it took when soliciting, collecting, and storing Plaintiffs' and Class Members' Private Information, and Defendant assumed the risk voluntarily.

779.     Once Defendant accepted Plaintiffs' and Class Members' Private Information, it was in the exclusive possession of that information in the unique format in which it solicited that information, and neither Plaintiffs nor Class Members could control that information once it was within the possession, custody, and control of Defendant.

189

780.    Due to the Data Breach, the value of Plaintiffs' and the Class's Private Information has been diminished in that public disclosure of this information has reduced its value in both the legitimate and illegitimate data marketplace.

781.    Plaintiffs and Class Members have also been forced to spend time and money securing their information from further illicit access and misuse. Much of the information disclosed—such as Social Security Numbers—is difficult (if not impossible) to change and Plaintiffs and Class Members will suffer the consequences of this Breach for decades.

782.    Plaintiffs and Class Members provided their Private Information to Defendant with the mutual understanding and reasonable expectation that Defendant would implement and maintain adequate data security practices to protect Plaintiffs' and Class Members' confidential data from unauthorized access and disclosure.

783.    Defendant accepted possession of Plaintiffs' and Class Members' Private Information. By accepting possession, Defendant understood that Plaintiffs and Class Members expected Defendant to safeguard their personal and financial information adequately. Accordingly, a bailment was established for the mutual benefit of the parties.

784.    During the bailment, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care, diligence, and prudence in protecting their Personal Information.

785.    Defendant failed to safeguard Plaintiffs' and Class Members' Private Information when it failed to implement and maintain adequate data security safeguards to protect against the known risk of a cyberattack. Defendant breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiffs' and Class Members' Private Information, resulting in the unlawful and unauthorized access to and misuse of such information.

786.    Defendant's failure to secure and safeguard Plaintiffs' and Class Members' Private Information resulted in that information being accessed and obtained by unauthorized third parties.

787.    Defendant further breached its duty to safeguard Plaintiffs' and Class Members' Private Information by failing to notify them individually in a timely and accurate manner that their information had been breached and compromised.

788.    As a direct and proximate result of Defendant's failure to keep Plaintiffs' and Class Members' Private Information secure, Plaintiffs and Class Members suffered injuries, as alleged herein, for which compensation—including actual, consequential, and nominal damages—is appropriate.

789.    As alleged *supra*, the damages suffered by Plaintiffs and the Class as a result of the Data Breach include (among other things) diminution in the value of their Private Information— meaning that the information provided to Columbia by Plaintiffs and the Class is worth less now than it was prior to being subject to the bailment.

## COUNT V
## VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT
## Conn. Gen. Stat. Ann. §42-110a, *et seq.*

**(On Behalf of Plaintiff Liam Murray and the Connecticut Subclass)**

790.    Plaintiff Murray ("Plaintiff" for purposes of this Count) re-alleges and incorporates by reference all preceding factual allegations, as if fully set forth herein.

791.    Plaintiff brings this claim against Defendant on behalf of himself and the Connecticut Subclass.

792.    The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. §42-110b(a). CUTPA expressly

191

provides that consideration be given to interpretations by the FTC and the federal courts relating to Section 5 of the FTC Act. *See* Conn. Gen. Stat. Ann. §42-110b(b).

793.    Columbia is a "person" as defined by Conn. Gen. Stat. Ann. §42-110a(3).

794.    Plaintiff and Connecticut Subclass Members are actual consumers of Columbia's goods or services and each qualifies as a "person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b" under Conn. Gen. Stat. Ann. § 42-110g.

795.    Columbia advertised, offered, or sold goods or services in Connecticut and therefore engaged in trade or commerce directly or indirectly affecting the people of Connecticut when it solicited and accepted applications for prospective or actual enrollment in its institution from the people of Connecticut. Conn. Gen. Stat. §42-110a(4).

796.    Columbia engaged in deceptive, unfair, and unlawful acts and practices in the conduct of trade or commerce, in violation of CUTPA.

797.    Columbia's deceptive acts and practices include:

   a.    misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Connecticut Subclass members' Private Information;

   b.    misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Connecticut Subclass Members' Private Information, including duties imposed by the FTC Act and the Connecticut data breach notification statute (Conn. Gen. Stat. Ann. §42-471);

   c.    omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Connecticut Subclass Members' Private Information; and

d. omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Connecticut Subclass Members' Private Information, including duties imposed by the FTC Act.

798. Columbia's unfair acts and practices include:

a. failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Connecticut Subclass Members' Private Information;

b. failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Connecticut Subclass Members' Private Information, including duties imposed by the FTC Act; and

c. failing to comply with the duties imposed by Conn. Gen. Stat. Ann. §36a-701b to disclose the Data Breach to Plaintiff and Connecticut Subclass Members in a timely and accurate manner.

799. Columbia's conduct constitutes unfair methods of competition and unfair practices within the meaning of CUTPA because its immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers, and provided no benefit to consumers or competition.

800. Columbia cut corners and minimized costs by failing to reasonably or adequately secure Plaintiff's and Connecticut Subclass Members' Private Information.

801. The injuries suffered by Plaintiff and Connecticut Subclass Members are not outweighed by any countervailing benefits to consumers or competition. And, because Columbia is solely responsible for reasonably ensuring it reasonably or adequately secured Plaintiff's and Connecticut Subclass Members' Private Information, there is no way Plaintiff and Connecticut

193

Subclass Members could have known about Columbia's inadequate data security practices. By withholding important information from consumers about the adequacy of its data security measures, Columbia created an asymmetry of information between it and Plaintiff and Connecticut Subclass Members that precluded them from taking action to avoid or mitigate injury. There were reasonably available alternatives to further Columbia's legitimate business interests.

802.    Columbia's conduct constitutes unfair practices within the meaning of CUTPA because it undermines public policy that businesses protect Private Information, as reflected in the FTC Act.

803.    Columbia's acts and practices are unfair because Columbia's failure to disclose the inadequacies in its data security practices materially interfered with consumers' decision-making in their transactions with Columbia (including in their application processes and attendance at the university). Further, Columbia took unreasonable advantage of consumers' lack of understanding about the material risks and costs in their transactions with Columbia and consumers' inability to protect themselves due to the asymmetry of information concerning Columbia's data security practices.

804.    Columbia's misrepresentations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Columbia's data security measures and ability to protect the confidentiality of consumers' Private Information.

805.    Columbia's acts and practices, including its material omissions, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

806.    Columbia intended to mislead Plaintiff and Connecticut Subclass Members and induce them to rely on its misrepresentations and omissions.

807.    Columbia had a duty to disclose the above-described facts due to the circumstances of this case and the sensitivity and extent of the Private Information in its possession. This duty arose because members of the public, including Plaintiff and Connecticut Subclass Members, bestowed trust and confidence in Columbia to keep their Private Information secure. Columbia's duty to disclose also arose from its possession of exclusive knowledge regarding the security of its vendors' and business associates' systems.

808.    Had Columbia disclosed to Plaintiff and Connecticut Subclass Members that it did not adequately verify, monitor, and audit its data security practices, Columbia would have been unable to continue in business, and it would have been forced to adopt reasonable data security measures and comply with the law.

809.    Columbia was trusted with sensitive and valuable Private Information regarding at least hundreds of thousands, if not millions, of consumers, including Plaintiff and Connecticut Subclass Members. Columbia accepted the responsibility of protecting the data it collected and stored while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Connecticut Subclass Members acted reasonably in relying on Columbia's misrepresentations and omissions, the truth of which they could not have discovered.

810.    Columbia acted intentionally, knowingly, and maliciously to violate CUTPA and recklessly disregarded Plaintiff's and Connecticut Subclass Members' rights.

811.    Columbia's deceptive and unfair trade practices significantly impact the public, because many members of the public are actual or potential consumers of Columbia's services and the Data Breach affected hundreds of thousands or millions of Americans, which include Plaintiff and Connecticut Subclass Members.

812. Columbia's violations present a continuing risk to Plaintiff and Connecticut Subclass Members as well as to the general public.

813. As a direct and proximate result of Columbia's unconscionable and deceptive acts or practices, Plaintiff and Connecticut Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including: (a) loss of the benefit of their bargain with Columbia, as they would not have provided their Private Information to Columbia or paid Columbia for its services or would have paid less for such services but for the violations alleged herein; (b) loss from actual or attempted fraud and identity theft; (c) costs for credit monitoring and identity protection services; (d) time and expenses related to monitoring their financial accounts for fraudulent activity; (e) loss of value of their Private Information; and (f) an increased, imminent risk of fraud, identity theft, and other targeted misuse of their information (including racially, religiously, or politically motivated misuse).

814. Plaintiff and Connecticut Subclass Members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, equitable relief, and attorneys' fees and costs.

## COUNT VI
## VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES
## – CONSUMER PROTECTION ACT
## Texas Bus. & Com. Code § 17.41, *et seq.*

**(On Behalf of Plaintiff Steven Daley and the Texas Subclass)**

815. Plaintiff Steven Daley ("Plaintiff" for purposes of this Count) repeats and realleges the preceding factual allegations, as if fully set forth herein.

816. Plaintiff brings this claim against Columbia on behalf of himself and the Texas Subclass.

196

817. Columbia is a "person" as defined by Tex. Bus. & Com. Code § 17.45(3). 794. Plaintiff and Texas Subclass Members are "consumers" as defined by Tex. Bus. & Com. Code §17.45(4).

818. Columbia advertised, offered, or sold services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

819. Columbia engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including:

   a. representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have (Tex. Bus. & Com. Code § 17.46(b)(5);

   b. representing that goods or services are of a particular standard, quality, or grade, if they are of another (Tex. Bus. & Com. Code § 17.46(b)(7)); and

   c. advertising goods or services with intent not to sell them as advertised (Tex. Bus. & Com. Code § 17.46(9)).

820. Columbia's false, misleading, and deceptive acts and practices include:

   a. failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Texas Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

   b. failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

197

c.   failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Texas Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, which was a direct and proximate cause of the Data Breach;

d.   misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Texas Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.   misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Texas Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45;

f.   omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Texas Subclass Members' Private Information; and

g.   omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Texas Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45.

821.   Columbia intended to mislead Plaintiff and Texas Subclass Members and induce them to rely on its misrepresentations and omissions. Columbia's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Columbia's data security and ability to protect the confidentiality of consumers' Private Information.

822.    Had Columbia disclosed to Plaintiff and Texas Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Columbia would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law. Instead, Columbia collected, stored, and maintained Plaintiff's and Texas Subclass Members' Private Information as part of the services Columbia provided and for which Plaintiff and Texas Subclass members paid (directly or indirectly) without advising Plaintiff and Texas Subclass Members that Columbia's data security practices were insufficient to maintain the safety and confidentiality of Plaintiff's and Texas Subclass Members' Private Information. Accordingly, Plaintiff and Texas Subclass Members acted reasonably in relying on Columbia's misrepresentations and omissions, the truth of which they could not have discovered.

823.    Columbia had a duty to disclose the above facts due to the circumstances of this case and the sensitivity of the Private Information in its possession. This duty arose because Plaintiff and Texas Subclass Members reposed a trust and confidence in Columbia when they provided their Private Information to Columbia in exchange for Columbia's services. In addition, such a duty is implied by law due to the nature of the relationship between consumers, including Plaintiff and Texas Subclass Members, and Columbia because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Columbia.

824.    Columbia's duty to disclose also arose from its:

    a.    possession of exclusive knowledge regarding its data security practices and the security of the Private Information it collected and stored;

    b.    active concealment of the state of its data security; and/or

c. incomplete representations about the security and integrity of its computer and data storage systems, while purposefully withholding material facts from Plaintiff and Texas Subclass Members that contradicted its representations and omissions.

825. Columbia engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Columbia engaged in acts or practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

826. Consumers, including Plaintiff and Texas Subclass Members, lacked knowledge about deficiencies in Columbia's data security practices because that information was known exclusively by Columbia.

827. Consumers also lacked the ability, experience, or capacity to secure the Private Information in Columbia's possession or to fully protect their interests with regard to their data. Plaintiff and Texas Subclass Members lack expertise in information security matters and do not have access to Columbia's systems in order to evaluate its security controls. Columbia took advantage of its special skill and access to the Private Information to hide its inability to protect the security and confidentiality of Plaintiff's and Texas Subclass Members' Private Information.

828. Columbia intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result. The unfairness resulting from Columbia's conduct is glaringly noticeable, flagrant, complete, and unmitigated. The Data Breach, which resulted from Columbia's unconscionable business acts and practices, exposed Plaintiff and Texas Subclass Members to a wholly unwarranted risk to the safety of their Private Information and the security of their identity or credit and worked a substantial hardship on a significant and unprecedented number of consumers.

200

Plaintiff and Texas Subclass Members cannot mitigate this unfairness because they cannot undo the Data Breach.

829.    Columbia acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Plaintiff's and Texas Subclass Members' rights. Columbia is of such a sophisticated and large nature that other data breaches and public information regarding security vulnerabilities put it on notice that their security and privacy protections were inadequate.

830.    As a direct and proximate result of Columbia's unconscionable and deceptive acts or practices, Plaintiff and Texas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including: (a) loss of the benefit of their bargain with Columbia, as they would not have provided their Private Information to Columbia or paid Columbia for its services or would have paid less for such services but for the violations alleged herein; (b) loss from fraud and identity theft; (c) costs for credit monitoring and identity protection services; (d) time and expenses related to monitoring their financial accounts for fraudulent activity; (e) loss of value of their Private Information; and (f) an increased, imminent risk of fraud, identity theft and other targeted misuse of their information (including racially, religiously, or politically motivated misuse).

831.    Columbia's unconscionable and deceptive acts or practices were a producing cause of Plaintiff's and Texas Subclass Members' injuries, ascertainable losses, and economic and non-economic damages.

832.    Columbia's violations present a continuing risk to Plaintiff and Texas Subclass Members as well as to the general public.

833.    Plaintiff and Texas Subclass Members seek all monetary and non-monetary relief allowed by law, including: (a) economic damages; (b) treble damages for each act committed intentionally or knowingly; (c) restitution; (d) court costs; (e) reasonably and necessary attorneys' fees; (f) injunctive relief; and (g) any other relief which the Court deems proper.

## COUNT VII
## VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
### (Md. Code Ann., Com. Law, §§ 13-301, *et seq.*)

### (On Behalf of Plaintiff Khamari Babb and the Maryland Subclass)

834.    Plaintiff Khamari Babb ("Plaintiff" for purposes of this Count) repeats and realleges the preceding factual allegations, as if fully set forth herein.

835.    Plaintiff brings this Count on behalf of himself and the Maryland Subclass.

836.    Columbia is a "person" as defined by Md. Code, Com Law § 13-101(h).

837.    Columbia's conduct as alleged herein related to "sales," "offers for sale," or "bailment" as defined by Md. Code, Com. Law § 13-101(i) and § 13-303.

838.    Plaintiff and Maryland Subclass Members are "consumers" as defined by Md. Code, Com. Law § 13-101(c).

839.    Columbia advertises, offers, or sells "consumer goods" or "consumer services" as defined by Md. Code, Com. Law § 13-101(d) by nature of the education services it offers.

840.    Columbia advertised, offered, or sold goods or services in Maryland and engaged in trade or commerce directly or indirectly affecting the people of Maryland when such people of Maryland applied to or sought enrollment at Columbia.

841.    Columbia engaged in unfair and deceptive trade practices in violation of Md. Code, Com. Law § 13-301, including:

a.  Making false or misleading oral or written representations that have the capacity, tendency, or effect of deceiving or misleading consumers (Md. Code, Com. Law § 13-301(1));

b.  Representing that consumer goods or services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity that they do not have (Md. Code, Com. Law § 13-301(2)(i));

c.  Representing that consumer goods or services are of a particular standard, quality, grade, style, or model that they are not (Md. Code, Com. Law § 13-301(2)(iv));

d.  Failing to state a material fact where the failure deceives or tends to deceive (Md. Code, Com. Law § 13-301(3));

e.  Advertising or offering consumer goods or services without intent to sell, lease, or rent them as advertised or offered (Md. Code, Com. Law § 13-301(5)(i));

f.  Deception, fraud, false pretense, false premise, misrepresentation or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services or the subsequent performance with respect to an agreement, sale lease or rental (Md. Code, Com. Law § 13-301(9)).

842.   Defendant engaged in these unfair and deceptive trade practices in connection with offering for sale or selling consumer goods or services in violation of Md. Code, Com. Law § 13-303, including:

a.  Failing to implement and maintain reasonable data security measures to protect Plaintiff's and Maryland Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

203

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve data security measures after previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to maintain reasonable data security procedures and practices appropriate to the sensitivity of the Private Information it collected and stored, the size of its business and operations, and available technology in violation of the Maryland Personal Information Protection Act, Md. Code, Com. Law § 14-3503, which was a direct and proximate cause of the Data Breach;[283]

d. Failing to disclose the Data Breach in a timely and accurate manner, in violation of Md. Code, Com. Law § 14-3504(b);

e. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Maryland Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Maryland Personal Information Protection Act, Md. Code, Com. Law § 14-3503, which was a direct and proximate cause of the Data Breach;

f. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Maryland Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

---

[283] Under Md. Comm. Code § 14-3503(a), "[t]o protect [P]ersonal [I]nformation from unauthorized access, use, modification, or disclosure, a business that owns, maintains, or licenses [P]ersonal [I]nformation of an individual residing in the State shall implement and maintain reasonable security procedures and practices that are appropriate to the nature of [P]ersonal [I]nformation owned, maintained, or licensed and the nature and size of the business and its operations."

204

g. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Maryland Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Maryland Personal Information Protection Act, Md. Code, Com. Law § 14-3503;

h. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Maryland Subclass Members' Private Information; and

i. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Maryland Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Maryland Personal Information Protection Act, Md. Code, Com. Law § 14-3503.

843. Columbia's representations and omissions were material because they were likely to deceive Plaintiff and Maryland Subclass Members about the adequacy of Columbia's data security and ability to protect the confidentiality of consumers' Private Information. Columbia's misrepresentations and omissions would have been important to a significant number of consumers in making financial decisions.

844. Columbia intended to mislead Plaintiff and Maryland Subclass Members and induce them to rely on its misrepresentations and omissions.

845. Had Columbia disclosed to Plaintiff and Maryland Subclass Members that its data systems were not secure and were thus vulnerable to attack, it could not have continued in business and would have been forced to adopt reasonable data security measures and comply with the law.

Instead, Columbia collected, stored, and maintained Plaintiff's and Maryland Subclass Members' Private Information as part of the services Columbia provided and for which Plaintiff and Maryland Subclass Members paid without advising Plaintiff and Maryland Subclass Members that Columbia's data security practices were insufficient to maintain the safety and confidentiality of Plaintiff's and Maryland Subclass Members' Private Information. Accordingly, Plaintiff and Maryland Subclass Members acted reasonably in relying on Columbia's misrepresentations and omissions, the truth of which they could not have discovered.

846.     Columbia acted intentionally, knowingly, and maliciously to violate Maryland's Consumer Protection Act and recklessly disregarded Plaintiff's and Maryland Subclass Members' rights. Defendant (1) represented in its information privacy and confidentiality policies that it was implementing reasonable security measures to protect Plaintiff's and Maryland Subclass Members' sensitive Private Information, and (2) failed to implement reasonable data security measures despite being on notice that its data security and privacy protections were inadequate.

847.     As a direct and proximate result of Columbia's unfair and deceptive acts and practices, Plaintiff and Maryland Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Columbia as they would not have provided their Private Information to Columbia or paid Columbia application fees and/or tuition or would have paid less but for Columbia's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Private Information; and an increased, imminent risk of fraud, identity theft, and other targeted misuse of their information (including racially, religiously, or politically motivated misuse).

206

848.    Plaintiff and Maryland Subclass Members seek all monetary and non-monetary relief allowed by law, including damages, restitution, disgorgement, injunctive relief, and attorneys' fees and costs.

**COUNT VIII**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW**
**(N.Y. Gen. Bus. Law § 349, *et seq.*)**

**(On Behalf of Plaintiffs Raymond Chao, Randall Erwin, Shakeem Holmes, Rema Khacho, Luke Linich, Joseph Quintero and the New York Subclass)**

849.    Plaintiffs Raymond Chao, Randall Erwin, Shakeem Holmes, Rema Khacho, Luke Linich, and Joseph Quintero ("New York Plaintiffs") repeat and re-allege the preceding factual allegations, as if fully set forth herein.

850.    New York Plaintiffs bring the following claim against Columbia on behalf of themselves and the New York Subclass.

851.    New York General Business Law § 349(a) states, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

852.    Columbia is a "person, firm, corporation or association or agent or employee thereof" within the meaning of N.Y. Gen. Bus. Law § 349(b).

853.    At all relevant times, Columbia was engaged in "business," "trade," or "commerce" within the meaning of N.Y. Gen. Bus. Law § 349(a).

854.    New York Plaintiffs and New York Subclass Members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

855.    At all relevant times, Columbia, with its headquarters and offices in New York, engaged in transactions affecting trade or commerce and furnishing services in New York

including, but not limited to, the responsibility for overseeing or contributing to the protocols for properly safeguarding New York Plaintiffs' and New York Subclass Members' Private Information.

856.    More specifically, Columbia engaged in deceptive acts and practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in New York, in violation of N.Y. Gen. Bus. Law § 349, including by:

a.  failing to implement and maintain reasonable security and privacy measures to protect New York Plaintiffs' Private Information, which was a direct and proximate cause of the Data Breach;

b.  failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures, which was a direct and proximate cause of the Data Breach;

c.  failing to comply with common law and statutory duties pertaining to the security and privacy of New York Plaintiffs' Private Information, including, but not limited to, duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.  failing to timely and adequately notify New York Plaintiffs of the Data Breach;

e.  omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure New York Plaintiffs' Private Information; and

f.  omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of New York Plaintiffs' Private Information, including, but not limited to, duties imposed by the FTC Act, 15 U.S.C. § 45.

857.    Had New York Plaintiffs and New York Subclass Members been aware that Columbia did not maintain adequate data security safeguards, New York Plaintiffs and New York Subclass Members would not have provided their Private Information to Columbia or paid Columbia application fees and/or tuition at a monetary cost to themselves.

858.    As a direct and proximate cause of Columbia's unfair and deceptive trade practices, New York Plaintiffs and New York Subclass Members were damaged because: (a) they paid for data security protection they did not receive; (b) they face a substantially increased risk of identity theft and other targeted misuse of their information (including racially, religiously, or politically motivated misuse)—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (c) their Private Information was improperly disclosed to unauthorized individuals; (d) the confidentiality of their Private Information has been breached; (e) they were deprived of the value of their Private Information, for which there is a well-established national and international market; (f) of lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; (g) of loss of potential value of their Private Information; (h) of overpayment for the services that were received without adequate data security and loss of the benefit of their bargains; (i) of actual identity theft; (j) the continued risk to their Private Information, which remains in Columbia's possession and is subject to further unauthorized disclosures so long as Columbia fails to undertake appropriate and adequate measures to protect the Private Information in its possession; and (k) nominal damages.

859.    Columbia's deceptive and unlawful acts and practices complained of herein affected consumers and the public interest and consumers at large, including at least hundreds of thousands, if not millions, of New Yorkers affected by the Data Breach. Columbia's deceptive acts

and practices were likely to and did in fact deceive the public at large and reasonable consumers, including the New York Plaintiffs, regarding Columbia's data security measures and supervision of sensitive data entrusted to it.

860.    Columbia's violations present a continuing risk to New York Plaintiffs and New York Subclass Members.

861.    Pursuant to N.Y. Gen. Bus. Law § 349(h), New York Plaintiffs seek all monetary and non-monetary relief allowed by law, including damages on behalf of themselves and the other New York Subclass Members in the amount of the greater of actual damages or $50 for each violation of N.Y. Gen. Bus. Law § 349. Because Columbia's conduct was committed willfully and knowingly, New York Plaintiffs and New York Subclass Members are entitled to recover up to three times their actual damages, up to $1,000, plus an award of reasonable attorney's fees.

**COUNT IX**
**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. Ann. §§ 56:8-1, *et seq.***

**(On Behalf of Plaintiff David Guirgis and the New Jersey Subclass)**

862.    Plaintiff David Guirgis ("Plaintiff" for purposes of this Count) repeats and realleges the preceding factual allegations, as if fully set forth herein.

863.    Plaintiff brings this Count on behalf of himself and the New Jersey Subclass.

864.    Columbia is a "person" as defined by N.J. Stat. Ann. § 56:8-1(d).

865.    Columbia sells "merchandise" as defined by N.J. Stat. Ann. §§ 56:8-1(c) & (e).

866.    The New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1, *et seq*., prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, and misrepresentation as well as the knowing concealment, suppression, or omission of any material

fact with the intent that others rely on that concealment, omission, or fact in connection with the sale or advertisement of any merchandise.

867. Columbia's unconscionable and deceptive practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and New Jersey Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures after previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and New Jersey Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and New Jersey Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and New Jersey Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and New Jersey Subclass Members' Private Information; and

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and New Jersey Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

868.  Columbia's representations and omissions were material because they were likely to deceive Plaintiff and New Jersey Subclass Members about the adequacy of Columbia's data security and ability to protect the confidentiality of consumers' Private Information.

869.  Columbia intended to mislead Plaintiff and New Jersey Subclass Members and induce them to rely on its misrepresentations and omissions.

870.  Columbia acted intentionally, knowingly, and maliciously to violate New Jersey's Consumer Fraud Act, and recklessly disregarded Plaintiff's and New Jersey Subclass members' rights. Defendant (1) represented in its information privacy and confidentiality policies that it was implementing reasonable security measures to protect Plaintiff's and New Jersey Subclass Members' Private Information and (2) failed to implement reasonable data security measures despite being on notice that its data security and privacy protections were inadequate.

871.  As a direct and proximate result of Columbia's unconscionable and deceptive practices, Plaintiff and New Jersey Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Columbia as they would not have paid Columbia for goods and services or would have paid less for such goods and services but for Columbia's

212

violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Private Information; and an increased, imminent risk of fraud, identity theft, and other targeted misuse of their information (including racially, religiously, or politically motivated misuse).

872.    Plaintiff and New Jersey Subclass Members seek all monetary and nonmonetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

<b><u>COUNT X</u></b><br>
<b><u>VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES<br>
AND CONSUMER PROTECTION LAW<br>
73 Pa. Cons. Stat. §§ 201-2 & 201-3, <i>et seq.</i></u></b>

**(On Behalf of Plaintiff Carrick Reider and the Pennsylvania Subclass)**

873.    Plaintiff Carrick Reider ("Plaintiff" for purposes of this Count) repeats and realleges the preceding factual allegations, as if fully set forth herein.

874.    Plaintiff brings this Count on behalf of himself and the Pennsylvania Subclass.

875.    Columbia is a "person" as defined by 73 Pa. Cons. Stat. § 201-2(2).

876.    Plaintiff and Pennsylvania Subclass Members purchased goods and services in "trade" and "commerce" as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes, directly or indirectly.

877.    Columbia engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of their trade and commerce in violation of 73 Pa. Cons. Stat. Ann. § 201-3, including the following:

a. Representing that its goods and services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have (73 Pa. Stat. Ann. § 201-2(4)(v));

b. Representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Stat. Ann. § 201-2(4)(vii)); and

c. Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)).

878.    Columbia's unfair or deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Pennsylvania Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures after previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Pennsylvania Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Pennsylvania Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Pennsylvania Subclass

Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Pennsylvania Subclass Members' Private Information; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Pennsylvania Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

879. Columbia's representations and omissions were material because they were likely to deceive Plaintiff and Pennsylvania Subclass Members about the adequacy of Columbia's data security and ability to protect the confidentiality of consumers' Private Information.

880. Columbia intended to mislead Plaintiff and Pennsylvania Subclass Members and induce them to rely on its misrepresentations and omissions.

881. Had Columbia disclosed to Plaintiff and Pennsylvania Subclass Members that its data systems were not secure and thus were vulnerable to attack, Columbia could not have continued in business and would have been forced to adopt reasonable data security measures and comply with the law. Instead, Columbia received, maintained, and compiled Plaintiff's and Pennsylvania Subclass Members' Private Information as part of the services Columbia provided and for which Plaintiff and Pennsylvania Subclass members paid without advising Plaintiff and Pennsylvania Subclass Members that Columbia's data security practices were insufficient to maintain the safety and confidentiality of Plaintiff's and Pennsylvania Subclass Members' Private Information. Accordingly, Plaintiff and the Pennsylvania Subclass Members acted reasonably in

215

relying on Columbia's misrepresentations and omissions, the truth of which they could not have discovered.

882.    Columbia acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law and recklessly disregarded Plaintiff's and Pennsylvania Subclass Members' rights. Columbia (1) represented in its information privacy and confidentiality policies that it implemented reasonable security measures to protect Plaintiff's and Pennsylvania Subclass Members' sensitive personal information and (2) failed to implement reasonable data security measures despite being on notice that its data security and privacy protections were inadequate.

883.    As a direct and proximate result of Columbia's unfair methods of competition and unfair or deceptive acts or practices and Plaintiff's and Pennsylvania Subclass Members' reliance on them, Plaintiff and Pennsylvania Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Columbia, since they would not have paid Columbia for goods and services or would have paid less for such goods and services but for Columbia's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Private Information; and an increased, imminent risk of fraud and identity theft, and other targeted misuse of their information (including racially, religiously, or politically motivated misuse).

884.    Plaintiff and Pennsylvania Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is

216

greater), treble damages, restitution, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

## COUNT XI
## INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION
## (Article 1, § 1)

**(On Behalf of Plaintiff Andrew Rudick and the California Subclass)**

885.    Plaintiff Andrew Rudick ("Plaintiff" for purposes of this Count) repeats and re-alleges the preceding factual allegations, as if fully set forth herein.

886.    Plaintiff and California Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their Private Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites for the purpose of applying to or studying at institutions of higher education without the risk of their data being exfiltrated.

887.    Plaintiff and California Subclass Members had a reasonable expectation that their communications, identity, and other data would remain confidential, and Columbia would keep its platform secure.

888.    By failing to secure Plaintiff's and California Subclass Members' Private Information, Columbia intentionally invaded Plaintiff's and California Subclass Members' right to privacy under the California Constitution.

889.    This invasion of privacy is serious in nature, scope, and impact because it relates to consumers' Private Information. Moreover, it constitutes an egregious breach of the societal norms underlying the right of privacy.

890.    As a result of Columbia's actions, Plaintiff and California Subclass Members have suffered harm and injury, including but not limited to invasion of their privacy rights.

217

891. Plaintiff and California Subclass Members have been damaged as a direct and proximate result of Columbia's invasion of privacy and are entitled to just compensation, including monetary damages.

892. Plaintiff and California Subclass Members seek appropriate relief for this injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests.

893. Plaintiff and California Subclass Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Columbia's actions, directed at injuring Plaintiff and California Subclass Members in conscious disregard of their rights.

894. Such damages are needed to deter Columbia from engaging in such conduct in the future.

895. Plaintiff also seeks other such relief as the Court may deem just and proper.

**COUNT XII**
**VIOLATION OF THE CALIFORNIA CUSTOMER RECORDS ACT**
**Cal. Civ. Code §§ 1798.80 *et seq.* ("CCRA")**

**(On Behalf of Plaintiff Andrew Rudick and the California Subclass)**

896. Plaintiff Andrew Rudick ("Plaintiff" for purposes of this Count) repeats and re-alleges the preceding factual allegations, as if fully set forth herein.

897. "[T]o ensure that personal information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

898.    Columbia is a business that owns, maintains, or licenses personal information, within the meaning of Cal. Civ. Code § 1798.81.5, about Plaintiff and California Subclass Members.

899.    Columbia violated Cal. Civ. Code § 1798.81.5 by failing to implement reasonable measures to protect California Subclass Members' Private Information.

900.    Businesses that own or license computerized data that includes personal information are required to notify California residents when their Private Information has been acquired (or has reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach notification must include "the types of personal information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

901.    Columbia is a business that owns or licenses computerized data that includes personal information as defined by Cal. Civ. Code § 1798.82.

902.    Plaintiff's and California Subclass Members' Private Information includes personal information identified in Cal. Civ. Code § 1798.82(h) such as their names, Social Security numbers, and health insurance information, and is thereby covered by Cal. Civ. Code § 1798.82.

903.    Plaintiff and California Subclass Members are "customers" within the meaning of Cal. Civ. Code § 1798.80(c), as their personal information was provided to Columbia in the process of paying submit an application for admission into the University.

904.    The Data Breach constituted a breach of Columbia's security systems, networks, and servers.

219

905. Because Columbia reasonably believed that Plaintiff and California Subclass Members' Private Information was acquired by unauthorized persons during the Data Breach, Columbia had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

906. Columbia unreasonably delayed informing Plaintiff and California Subclass Members about the breach of security of their Private Information after it knew the Breach had occurred.

907. Upon information and belief, no law enforcement agency instructed Columbia that notification to California Subclass Members would impede an investigation.

908. Thus, by failing to disclose the Data Breach in a timely and accurate manner, Columbia also violated Cal. Civ. Code § 1798.82. Pursuant to Cal. Civ. Code § 1798.84, "[a]ny waiver of a provision of this title is contrary to public policy and is void and unenforceable," "[a]ny customer injured by a violation of this title may institute a civil action to recover damages," and "[a]ny business that violates, proposed to violate, or has violated this title may be enjoined."

909. As a direct and proximate result of Columbia's violations of Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiff and California Subclass Members were (and continue to be) injured and suffered (and will continue to suffer) damages, as described above.

910. As a result of Columbia's violations of Cal. Civ. Code § 1798.82, Plaintiff and California Subclass Members were deprived of prompt notice of the Data Breach and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiff and California Subclass Members because their stolen information would have had less value to identity thieves.

911.    As a result of Columbia's violations of Cal. Civ. Code § 1798.82, Plaintiff and California Subclass Members suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

912.    As a direct consequence of the actions as identified above, Plaintiff and California Subclass Members incurred additional losses and suffered further harm to their privacy, including, but not limited to, economic loss, the loss of control over the use of their identity, increased stress, fear, and anxiety, harm to their constitutional right to privacy, lost time dedicated to the investigation of the Data Breach and effort to cure any resulting harm, the need for future expenses and time dedicated to the recovery and protection of further loss, and privacy injuries associated with having their sensitive Private Information disclosed, that they would not have otherwise incurred, and are entitled to recover compensatory damages according to proof pursuant to § 1798.84(b).

913.    Plaintiff and California Subclass Members seek relief under Cal. Civ. Code § 1798.84, including, but not limited to, actual damages, any applicable statutory damages, and equitable and injunctive relief.

### COUNT XIII
### VIOLATION OF THE UNFAIR COMPETITION LAW
### Bus. & Prof. Code § 17200 *et seq.* ("UCL")

**(On Behalf of Plaintiff Rudick and the California Subclass)**

914.    Plaintiff Rudick ("Plaintiff" for purposes of this Count) repeats and re-alleges the preceding factual allegations, as if fully set forth herein.

915.    Plaintiff pleads this claim for equitable relief, including restitution and injunctive relief, in the alternative to his claims for damages.

916.    The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

917.    Columbia's actions as alleged herein in this Class Action Complaint constitute an "unlawful" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.* because Columbia's actions: (a) violated the California Consumer Records Act, Cal. Civ. Code §§ 1798.80 *et seq.*, (b) violated the CCPA, Cal. Civ. Code §§ 1798.100 *et seq.*, (c) constituted negligence; and (d) violated federal law and regulations, including the FTC Act.

918.    Columbia's actions as alleged in this Class Action Complaint also constitute an "unfair" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.*, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious.

919.    The harm caused by Columbia's wrongful conduct outweighs any utility of such conduct and has caused—and will continue to cause—substantial injury to the California Subclass, including Plaintiff. There were ample reasonably available alternatives that would have furthered Columbia legitimate business practices, including using industry-standard technologies to protect data (e.g., two-factor authorization, effective encryption and anonymization, compartmentalization of sensitive data, software patches, limiting how much data any user may access, and the purging of data no longer necessary for Columbia's services).

920.    Columbia also unreasonably delayed in notifying Plaintiff and California Subclass Members regarding the unauthorized release and disclosure of their Private Information.

921.    Additionally, Columbia's conduct was "unfair" because it violated the legislatively declared policies reflected by California's strong data-breach and online-privacy laws, including the California Consumer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*, the CCPA, Cal. Civ.

Code §§ 1798.100, *et seq.*, and the California constitutional right to privacy, Cal. Const. Art. 1, § 1.

922.    Columbia's conduct also is deceptive in violation of the UCL. Columbia's fraudulent business acts and practices include:

    a.  Failing to adequately secure the personal information of Plaintiff and California Subclass Members from disclosure to unauthorized third parties or for improper purposes;

    b.  Enabling the disclosure of personal and sensitive facts about Plaintiff and California Subclass Members in a manner that is highly offensive to a reasonable person;

    c.  Enabling the disclosure of personal and sensitive facts about Plaintiff and California Subclass Members without their informed, voluntary, affirmative, and clear consent;

    d.  Omitting, suppressing, and concealing the material fact that Columbia did not reasonably or adequately secure Plaintiff's and California Subclass Members' personal information.

923.    Columbia's omissions were material because they were likely to deceive reasonable consumers about the adequacy of its data security and ability to protect the confidentiality of Plaintiff's and California Subclass Members' personal information.

924.    The harm from Columbia's conduct was not reasonably avoidable by consumers. Plaintiff and California Subclass Members were required to provide their Private Information to Columbia to apply for admission and/or take courses at the university, which without their consent or knowledge, was in turn provided to Columbia. Plaintiff and California Subclass Members did not know of, and had no reasonable means of discovering, that their information would be exposed to hackers through inadequate data security measures.

925.    There were reasonably available alternatives that would have furthered Columbia's business interests of electronically transferring its customers' information while protecting Private Information.

926.    A reasonable person would regard Columbia's derelict data security and the Data Breach as important, material facts that could and should have been disclosed.

927.    As a direct and proximate result of Columbia's unlawful, unfair, and fraudulent conduct, Plaintiff lost money or property because his sensitive personal information experienced a diminution of value and because he devoted additional time to monitoring his financial accounts for fraudulent activity. Plaintiff faces ongoing and impending damages related to theft of his Private Information.

928.    Columbia's wrongful practices constitute a continuing course of unfair competition because, on information and belief, Columbia has failed to remedy the lax security practices or even fully notify all affected California persons. Plaintiff and the California Subclass seek equitable relief pursuant to Cal. Bus. & Prof. Code § 17203 to end Columbia's wrongful practices and require Columbia to maintain adequate and reasonable security measures to protect the Private Information of Plaintiff and the California Subclass.

929.    Plaintiff and California Subclass Members lack an adequate remedy at law because the injuries here include an imminent risk of identity theft and fraud that can never be fully remedied through damages, ongoing identity theft and fraud, as well as long term incalculable risk associated with medical fraud.

930.    Further, if an injunction is not issued, Plaintiff and California Subclass Members will suffer irreparable injury. The risk of another such breach is real, immediate, and substantial. Columbia has still not provided adequate information on the cause and scope of the Data Breach.

224

Plaintiff and California Subclass Members lack an adequate remedy at law that will reasonably protect against the risk of a further breach.

931. Plaintiff and the California Subclass also seek an order requiring Columbia to make full restitution of all monies it received through its wrongful conduct, along with all other relief permitted under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

**COUNT XIV**
**VIOLATION OF TENNESSEE PERSONAL CONSUMER**
**INFORMATION RELEASE ACT**
**(Tenn. Code Ann. §§ 47-18-2107, *et seq.*)**

**(On Behalf of Plaintiff Mary Thomas and the Tennessee Subclass)**

932. Plaintiff Mary Thomas ("Plaintiff" for purposes of this Count) repeats and realleges the preceding factual allegations as if fully set forth herein.

933. Plaintiff brings this Count on behalf of herself and the Tennessee Subclass.

934. Columbia is a "person" as defined by Tenn. Code § 47-18-103(18).

935. Plaintiff and Tennessee Subclass Members are "consumers" as meant by Tenn. Code § 47-18-103(6).

936. Columbia advertised and sold "goods" or "services" in "consumer transaction[s]" as defined by Tenn. Code §§ 47-18-103(12), (23) & (24).

937. Columbia advertised, offered, or sold goods or services in Tennessee and engaged in trade or commerce directly or indirectly affecting the people of Tennessee as defined by Tenn. Code §§ 47-18-103(7), (18) & (19). And, Columbia's acts or practices affected the conduct of trade or commerce, under Tenn. Code § 47-18-104.

938. Columbia's unfair and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Tennessee Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures after previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Tennessee Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Tennessee Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Tennessee Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Tennessee Subclass Members' Private Information; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of

226

Plaintiff's and Tennessee Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

939.    Columbia intended to mislead Plaintiff and Tennessee Subclass Members and induce them to rely on its misrepresentations and omissions.

940.    Columbia's representations and omissions were material because they were likely to deceive Plaintiff and Tennessee Subclass Members about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

941.    Had Columbia disclosed to Plaintiff and Tennessee Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Columbia could not have continued in business and would have been forced to adopt reasonable data security measures and comply with the law. Instead, Columbia received, maintained, and compiled Plaintiff's and Tennessee Subclass Members' Private Information as part of the services Defendant provided and for which Plaintiff and Tennessee Subclass members paid without advising Plaintiff and Tennessee Subclass Members that Columbia data security practices were insufficient to maintain the safety and confidentiality of could not have continued. Accordingly, Plaintiff and the Tennessee Subclass Members acted reasonably in relying on Columbia's misrepresentations and omissions, the truth of which they could not have discovered.

942.    Columbia had a duty to disclose the above facts due to the circumstances of this case and the sensitivity and extensivity of the Private Information in its possession. This duty arose because Plaintiff and the Tennessee Subclass Members reposed trust and confidence in Columbia when they provided their Private Information to Columbia in exchange for Defendant's services. In addition, such a duty is implied by law due to the nature of the relationship between consumers, including Plaintiff and the Tennessee Subclass, and Columbia because consumers are unable to

227

fully protect their interests with regard to their data and place trust and confidence in Columbia. Columbia's duty to disclose also arose from its:

    a.   Possession of exclusive knowledge regarding the security of the data in its systems;

    b.   Active concealment of the state of its security; and/or

    c.   Incomplete representations about the security and integrity of its computer and data systems, and its prior data breaches, while purposefully withholding material facts from Plaintiff and the Tennessee Subclass that contradicted these representations.

943.    Columbia's "unfair" acts and practices caused or were likely to cause substantial injury to consumers that was not reasonably avoidable by consumers themselves or outweighed by countervailing benefits to consumers or to competition.

944.    The injury to consumers was and is substantial because it was non-trivial, non-speculative, and involved a monetary injury and/or an unwarranted risk to the safety of consumers' Private Information or the security of their identity or credit. The injury to consumers was substantial not only because it inflicted harm on a significant number of consumers but also because it inflicted a significant amount of harm on each consumer.

945.    Consumers could not have reasonably avoided injury because Columbia's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the inadequacy of their data security, Columbia created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

946.    Columbia's inadequate data security had no countervailing benefit to consumers or to competition.

947.    By misrepresenting and omitting material facts about its data security and failing to comply with its common law and statutory duties pertaining to data security (including its duties under the FTC Act), Columbia violated the following provisions of Tenn. Code § 47-18-104(b):

    a.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have (Tenn. Code § 47-18-104(b)(5));

    b.  Representing that goods or services are of a particular standard, quality, or grade, if they are of another (Tenn. Code § 47-18-104(b)(7));

    c.  Advertising goods or services with intent not to sell them as advertised (Tenn. Code § 47-18-104(b)(9)); and

    d.  Representing that a consumer transaction confers or involves rights, remedies, or obligations that it does not have or involve. (Tenn. Code § 47-18-104(b)(12))

948.    Columbia acted intentionally, knowingly, and maliciously to violate Tennessee's Consumer Protection Act and recklessly disregarded Plaintiff's and Tennessee Subclass Members' rights. Columbia (1) represented in its information privacy and confidentiality policies that it was implementing reasonable security measures to protect Plaintiff's and Tennessee Subclass Members' sensitive personal information and (2) failed to implement reasonable data security measures despite being on notice that its data security and privacy protections were inadequate.

949.    As a direct and proximate result of Columbia's unfair and deceptive acts or practices, Plaintiff and Tennessee Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Columbia, since they would not have paid Columbia for goods and services or would have paid less for such goods and services but for

229

Columbia's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Private Information; and an increased, imminent risk of fraud, identity theft, and other targeted misuse of their information (including racially, religiously, or politically motivated misuse).

950.    Columbia's violations present a continuing risk to Plaintiff and Tennessee Subclass Members as well as to the general public.

951.    Plaintiff and Tennessee Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, actual damages, treble damages for each willful or knowing violation, attorneys' fees and costs, and any other relief that is necessary and proper.

## COUNT XV
## DECLARATORY JUDGEMENT

**(On Behalf of Plaintiffs and the Class, or, alternatively, the State Subclasses)**

952.    Plaintiffs re-allege and incorporate by reference all preceding factual allegations, as if fully set forth herein.

953.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

954.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' Private Information and whether Columbia is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their Private Information.

955.    Plaintiffs allege that Columbia's data security measures remain inadequate.

956. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

957. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. Columbia owes a legal duty to secure the Private Information of its current and/or former students, applicants, and employees and to timely notify impacted individuals of a data breach under common law and various state and federal statutes; and

    b. Columbia continues to breach this legal duty by failing to employ reasonable measures to secure the Private Information in its possession.

958. This Court should also issue corresponding prospective injunctive relief requiring Columbia to employ adequate data security protocols consistent with law and industry standards to protect Private Information in Columbia's data network.

959. If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Columbia. The risk of another such breach is real, immediate, and substantial. If another breach at Columbia occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and she will be forced to bring multiple lawsuits to rectify the same conduct.

960. The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Columbia if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Columbia of complying with an injunction by

employing reasonable prospective data security measures is relatively minimal, and Columbia has a pre-existing legal obligation to employ such measures.

961. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Columbia, thus eliminating the additional injuries that would result to Plaintiffs and current and/or former students and applicants and employees whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that this Court:

A. Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23;

B. Order appropriate compensatory, statutory, punitive, and nominal damages to Plaintiffs and Class Members under applicable law;

C. Order appropriate injunctive, equitable, and declaratory relief under applicable law;

D. Award Plaintiffs appropriate Class Representative Service Awards for their prosecution of this matter on behalf of all Class Members;

E. Award Plaintiffs and the Class pre-judgement and/or post-judgment interest as prescribed by law;

F. Award reasonable attorneys' fees and costs as permitted by law; and

G. Enter other and further relief as the Court deems to be both just and fair.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury for any and all issues in this action so triable as of right.

Dated: April 10, 2026

Respectfully submitted,

*/s/ William B. Federman*
William B. Federman
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania
Oklahoma City, OK 73102
T: (405) 235-1560
E: wbf@federmanlaw.com

Ashley M. Crooks (SBN 58007760)
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
T: (636) 357-1100
E: acrooks@hausfeld.com

Rachele R. Byrd*
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
T: (619) 239-4599
E: byrd@whafh.com

Charles E. Schaffer*
**LEVIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
T: (215) 592-1500
E: cschaffer@lfsblaw.com

*Admitted Pro Hac Vice*

***Interim Co-Lead Class Counsel***

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2026, the foregoing document was filed electronically with the Clerk of Court to be served by operations of the Court's electronic filing system on all parties of record.

*/s/ William B. Federman*
William B. Federman
